# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In re: CONGOLEUM CORPORATION, | Civil Action No. 09-4371 (JAP) |
| Debtors. | Bankr. Case No. 03-51524 |

## DECLARATION OF HOWARD N. FEIST, III

HOWARD N. FEIST, III, under penalty of perjury, hereby declares as follows:

1.      I am the Chief Financial Officer for Congoleum Corporation ("Congoleum" and together with Congoleum Sales, Inc., and Congoleum Fiscal, Inc., the "Debtors").  I submit this declaration in support of Congoleum's motion filed concurrently herewith (the "Motion") for the entry of an order pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and §§ 363 and 105(a) of the Bankruptcy Code authorizing and approving certain Settlement Agreements among (i) the Debtors, (ii) certain Participating Insurers, NJPLIGA and NJSLIGF, (iii) the ACC and (iv) the Claimants' Representatives.[1]  Each Settlement Agreement is also consented to by the FCR and Congoleum's parent company, ABI.  Except where otherwise indicated, I make this declaration on personal

---

[1]  Capitalized terms used but not otherwise defined herein are defined in accordance with their usage in the memorandum of law submitted with the Motion.

knowledge that I have gained during the performance of my duties on behalf of Congoleum or on a review of company business records.

## THE MULTI-INSURER SETTLEMENT

2.     The Multi-Insurer Settlement, agreed to in principle in mid-November 2009 achieves a comprehensive settlement that will fully and finally resolve all of the disputes by and between the Debtors, the ACC, the Claimants' Representatives, NJPLIGA and NJSLIGF, and over a dozen Participating Insurers.  The Claimants' Representative Joseph Rice and counsel for the ACC and FCR were integrally involved in the negotiations that resulted in the Multi-Insurer Settlement. Substantial further negotiations of the complex insurance settlement have led to final documentation of the settlement among the Parties.

3.     Pursuant to the Multi-Insurer Settlement, each Participating Insurer and NJPLIGA and NJSLIGF is responsible for paying a specified settlement amount to the Plan Trust, for a combined total of $100 million.  The Debtors believe that the Multi-Insurer Settlement is fair, reasonable, and is in the best interests of these estates.

4.     The Multi-Insurer Settlement represents an important juncture in these Chapter 11 cases.  With this settlement, the Debtors have resolved their disputes with some of the most vociferous objectors to the Plan and have added a substantial funding basis for the Plan Trust.  Now that the Multi-Insurer Settlement

2

is in place, the Debtors will be able to move towards confirmation with the

approval of virtually all of the significant parties-in-interest in this case.  In

addition, the Multi-Insurer Settlement fully and finally resolves the State Court

Coverage Action, a complex and expensive litigation that has spanned over eight

(8) years.[2]

## THE INDIVIDUAL SETTLEMENT AGREEMENTS

5.     Pursuant to the Multi-Insurer Settlement, each Participating Insurer

and NJPLIGA and NJSLIGF has agreed to separate Settlement Agreements

specifying all the terms and conditions of its particular settlement.[3]  While

negotiations proceeded at length with respect to the $100 million aggregate amount

of the individual Settlement Agreements, the share payable by each Participating

Insurer and NJPLIGA and NJSLIGF, itself a contentious issue among the insurers

in the Coverage Action, was separately negotiated by the Participating Insurers and

NJPLIGA and NJSLIGF.

---

[2]  Seaton is the only other insurance company which is presently a party to the
Coverage Action.  The Debtors and Seaton are in active settlement negotiations
which should be completed shortly.  Approval of the Multi-Insurer Settlement
and a prospective Seaton settlement will result in dismissal of the Coverage
Action upon payment of the respective Settlement Amounts.  The Debtors have
also filed a motion to approve an amended settlement with St. Paul Travelers,
although the claims among and between Congoleum and St. Paul Travelers were
previously dismissed from the Coverage Action when the settlement was
originally reached in 2006.

[3]  The description of the Settlement Agreements in this Motion is a summary.  In
the event of inconsistency between that description and the actual terms of the
Settlement Agreements, the latter shall control.

3

A.   **The Hartford Settlement**

6.      On or about January 28, 2010, the Debtors, the ACC, the Claimants'

Representatives and the Hartford Parties entered into a certain Settlement

Agreement.  A true and correct copy of the Hartford Settlement Agreement is

attached hereto as Exhibit A.

7.      The Hartford Parties have nine (9) policies which are subject to the

Hartford Settlement Agreement.  Congoleum and the Hartford Parties dispute the

Hartford Parties' coverage obligations with respect to the Hartford Policies.  Of the

Hartford Policies, seven (7) are policies issued by First State beginning in 1977.

Policy 924233, with effective dates from January 1, 1977 to January 1, 1978,

policy 925946, with effective dates from January 1, 1978 to January 1, 1979, and

policy 927497, with effective dates from January 1, 1979 to January 1, 1980, each

provides $4 million in coverage as part of Congoleum's $10 million layer of

coverage in excess of $11 million in underlying limits in the respective policy

period.  Similarly, policy 929216, with effective dates from January 1, 1980 to

January 1, 1981, policy 930852, with effective dates from January 1, 1981 to

January 1, 1982, policy 933238, with effective dates from January 1, 1982 to

January 1, 1983, and policy 934313, with effective dates from January 1, 1983 to

January 1, 1984, each provides $5 million in coverage as a part of Congoleum's

$10 million layer of coverage in excess of $11 million in underlying limits in the respective policy period.

8.      The other two (2) policies are Twin City policies, each of which is a higher-level excess policy.  Policy TXS102624, with effective dates from January 1, 1983 to January 1, 1984, provides (i) $5 million in coverage as part of Congoleum's $55 million layer of coverage in excess of $26 million in underlying limits and (ii) $5 million in coverage as part of Congoleum's $20 million layer of coverage in of $81 million in underlying limits.  Policy TXS103545, with effective dates from January 1, 1984 to January 1, 1985, provides (i) $5 million in coverage as a part of Congoleum's $55 million layer of coverage in excess of $26 million in underlying limits and (ii) $4 million in coverage as part of Congoleum's $20 million layer of coverage in excess of $81 million in underlying limits.

9.      Once the applicable underlying limits of these policies are exhausted, Congoleum contends that the Hartford Policies provide up to $51 million in coverage.  The Hartford Parties, however, argue that there are numerous defenses to coverage available, including that Congoleum has materially breached the Hartford Policies, and that, as a result, the Hartford Parties are relieved of certain coverage obligations.  The Hartford Parties also dispute whether there is or would be a sufficient volume of otherwise insurable claims to reach and/or exhaust the relevant coverage limits.

500411198v8

10.     In order to completely resolve and settle all of the outstanding disputes relating to the Hartford Policies by and between the parties, the Hartford Parties have agreed to pay to the Plan Trust a total of $16,500,000 within thirty (30) days of the later of (a) the Approval Date or (b) the date the Confirmation Order becomes a Final Order.  The Debtors believe in their best business judgment that the Hartford Settlement Agreement is fair, reasonable, and is in the best interests of the creditors and the estates.

**B.     The CNA Settlement**

11.     On or about January 28, 2010, the Debtors, the ACC, the Claimants' Representatives and CNA entered into a certain Settlement Agreement.  A true and correct copy of the CNA Settlement Agreement is attached hereto as Exhibit B.

12.     CNA has six (6) actual or alleged policies which are subject to the CNA Settlement Agreement.  The CNA Policies all are or are alleged to be multi-year excess policies at varying levels.  In part because each of the CNA Policies has or allegedly has a multi-year policy period, Congoleum and CNA dispute the limits of liability available under each of these policies.

13.     Five (5) of the CNA Policies were issued or allegedly issued to Congoleum by Continental Casualty.  Congoleum and Continental Casualty dispute the existence of two (2) of these policies.  Congoleum alleges the existence of policy RDU9973958 with effective dates from January 1, 1964 to January 1,

6

1967, providing $5 million in annual coverage in excess of $500,000 in underlying primary limits.  CNA disputes the existence of this policy, which issue is contested and unresolved in the Coverage Action.  Policy RDU943328, with effective dates from January 1, 1967 to January 28, 1970, provides $5 million in annual coverage in excess of $500,000 in underlying primary limits.  Congoleum alleges the existence of policy RDX-030-809-16-04, with effective dates from January 28, 1970 to February 16, 1973, providing $5 million in annual coverage as part of Congoleum's $10 million layer of coverage in excess of its $5 million first-layer umbrella coverage.  CNA disputes the existence of this policy, which issue is contested and unresolved in the Coverage Action.  Policy RDU-8065433, with effective dates from February 16, 1973 to January 1, 1975, provides $10 million in annual first-layer umbrella coverage in excess of $1 million in underlying primary coverage.  Policy RDX8937036, with effective dates from December 17, 1973 to January 1, 1975, provides $10 million in annual coverage as part of Congoleum's $55 million layer of coverage in excess of $26 million in underlying limits.

14.    In addition to the CNA Policies issued or allegedly issued by Continental Casualty listed above, policy EXC102428, issued by Continental Insurance with effective dates from January 1, 1985 to January 1, 1986, provides $10 million in coverage as part of Congoleum's $25 million layer of coverage in excess of $76 million in underlying limits.

15.     Once the applicable underlying limits of these policies are exhausted, Congoleum contends that the CNA Policies provide approximately up to $95 million in coverage.  CNA, however, argues that there are numerous defenses to coverage available, including that Congoleum has materially breached the CNA Policies, and that, as a result, CNA is relieved of certain coverage obligations. CNA also disputes whether there is or would be a sufficient volume of otherwise insurable claims to reach and/or exhaust the relevant coverage limits.

16.     In order to completely resolve and settle all of the outstanding disputes relating to the CNA Policies by and between the parties, CNA has agreed to pay to the Plan Trust a total of $16,500,000.  CNA shall pay 50% of the Settlement Amount within thirty (30) days of the later of (a) the Approval Date or (b) the date the Confirmation Order becomes a Final Order.  The balance of the Settlement Amount shall be paid on or before January 20 of the calendar year immediately following the year in which the first payment was made.  The Debtors believe in their best business judgment that the CNA Settlement Agreement is fair, reasonable, and is in the best interests of the creditors and the estates.

## C.     __The Wausau Settlement__

17.     On or about January 28, 2010, the Debtors, the ACC, the Claimants' Representatives and Wausau entered into a certain Settlement Agreement.  A true

and correct copy of the Wausau Settlement Agreement is attached hereto as

Exhibit C.

18.    Wausau has seven (7) policies which are subject to the Wausau

Settlement Agreement.  Three (3) of these policies are primary level policies.

Policy 0524-00-084282, with effective dates from January 1, 1973 to January 1,

1974, policy 0525-00-084282, with effective dates from January 1, 1974 to

January 1, 1975, and policy 0526-00-084282, with effective dates from January 1,

1975 to January 1, 1976, each provides $1 million in primary coverage that is or

was responding on a first-dollar basis to certain of Congoleum's asbestos liabilities

for claims arising during the policy periods.  In August 2002, Wausau notified

Congoleum that its primary policies had been exhausted as a result of payments by

Wausau.

19.    Beyond these primary policies, Wausau has four (4) single-year

excess policies at issue in the coverage litigation.  Policy 5733-00-200275, with

effective dates from January 1, 1982 to January 1, 1983, and policy 5734-00-

200275, with effective dates from January 1, 1983 to January 1, 1984, each

provides $5 million in coverage in excess of Congoleum's $1 million layer of

coverage in underlying primary limits in the respective policy period.  Policy 5736-

00-102319, with effective dates from January 1, 1985 to January 1, 1986, provides

$5 million in coverage as part of Congoleum's $15 million layer of coverage in

excess of $16 million in underlying limits.  Finally, policy 5736-02-102319, with effective dates from January 1, 1985 to January 1, 1986, provides $7 million in coverage as part of Congoleum's $20 million layer of coverage in excess of $31 million in underlying limits.

20.     Once the applicable underlying limits of these policies are exhausted, if applicable, Congoleum contends that the Wausau Policies provide up to $25 million in coverage.  Wausau, however, argues that there are numerous defenses to coverage available, including that Congoleum has materially breached the Wausau Policies, and that, as a result, Wausau is relieved of certain coverage obligations. Wausau also disputes whether there is or would be a sufficient volume of otherwise insurable claims to reach and/or exhaust the relevant coverage limits.

21.     In order to completely resolve and settle all of the outstanding disputes relating to the Wausau Policies by and between the parties, Wausau has agreed to pay to the Plan Trust a total of $11,500,000 within thirty (30) days of the later of (a) the Approval Date or (b) the date the Confirmation Order becomes a Final Order.  The Debtors believe in their best business judgment that the Wausau Settlement Agreement is fair, reasonable, and is in the best interests of the creditors and the estates.

### D.    The OneBeacon Settlement

22.    On or about January 28, 2010, the Debtors, the ACC, the Claimants'
Representatives and OneBeacon entered into a certain Settlement Agreement.  A
true and correct copy of the OneBeacon Settlement Agreement is attached hereto
as Exhibit D.

23.    OneBeacon has a single policy which is subject to the OneBeacon
Settlement Agreement.  Policy EY-9399-004, issued by Employers Commercial
Union Insurance Company of America with effective dates from January 28, 1970
to February 16, 1973, provides $5 million in annual coverage in excess of
$500,000 in underlying primary limits.  Once the applicable underlying limits of
this policy are exhausted, Congoleum contends that the OneBeacon Policy
provides approximately up to $15 million in coverage.  OneBeacon, however,
argues that there are numerous defenses to coverage available, including that
Congoleum has materially breached the OneBeacon Policy, and that, as a result,
OneBeacon is relieved of certain coverage obligations.  OneBeacon also disputes
whether there is or would be a sufficient volume of otherwise insurable claims to
reach and/or exhaust the relevant coverage limits.

24.    In order to completely resolve and settle all of the outstanding
disputes relating to the OneBeacon Policy and between the parties, OneBeacon has
agreed to pay to the Plan Trust a total of $10,242,733 within thirty (30) days of the

11

later of (a) the Approval Date or (b) the date the Confirmation Order becomes a Final Order.  The Debtors believe in their best business judgment that the OneBeacon Settlement Agreement is fair, reasonable, and is in the best interests of the creditors and the estates.

### E.      The Munich Re Settlement

25.      On or about January 28, 2010, the Debtors, the ACC, the Claimants' Representatives and Munich Re entered into a certain Settlement Agreement.  A true and correct copy of the Munich Re Settlement Agreement is attached hereto as Exhibit E.

26.      Munich Re has a single policy which is subject to the Munich Re Settlement Agreement.  Policy M-0691611, issued by American Re-Insurance Company (n/k/a Munich Re) with effective dates from February 16, 1973 to January 1, 1976, provides $5 million in annual coverage as part of Congoleum's $10 million layer of coverage in excess of $11 million in underlying limits.  Once the applicable underlying limits of this policy are exhausted, Congoleum contends that the Munich Re Policy provides up to $15 million in coverage.  Munich Re, however, argues that there are numerous defenses to coverage available, including that Congoleum has materially breached the Munich Re Policy, and that, as a result, Munich Re is relieved of certain coverage obligations.  Munich Re also

disputes whether there is or would be a sufficient volume of otherwise insurable claims to reach and/or exhaust the relevant coverage limits.

27.    In order to completely resolve and settle all of the outstanding disputes relating to the Munich Re Policy by and between the parties, Munich Re has agreed to pay to the Plan Trust a total of $8,212,800.  Munich Re shall pay 50% of the Settlement Amount within thirty (30) days of the later of (a) the Approval Date or (b) the date the Confirmation Order becomes a Final Order.  The balance of the Settlement Amount shall be paid on or before January 20 of the calendar year immediately following the year in which the first payment was made. The Debtors believe in their best business judgment that the Munich Re Settlement Agreement is fair, reasonable, and is in the best interests of the creditors and the estates.

## F.    **The MMO Settlement**

28.    On or about January 28, 2010, the Debtors, the ACC, the Claimants' Representatives and MMO entered into a certain Settlement Agreement.  A true and correct copy of the MMO Settlement Agreement is attached hereto as Exhibit F.

29.    MMO has eleven (11) policies which are subject to the MMO Settlement Agreement.  Each of the MMO Policies is a single-year, excess-layer policy issued to Congoleum by Employers Mutual Casualty Company.  Policy

13

MMO70018, with effective dates from January 1, 1978 to January 1, 1979, provides $2 million in coverage as part of Congoleum's $55 million layer of coverage in excess of $26 million in underlying limits.  In each of the next four (4) policy years, from 1979 to 1982, MMO issued two (2) single-year excess policies per year—one lower-attaching and one higher-attaching—with effective dates from January 1 of the first year to January 1 of the following year.  The four lower-attaching policies are policy 70606 (1/1/1979-1/1/1980), policy 71201 (1/1/1980-1/1/1981), policy 71653 (1/1/1981-1/1/1982), and policy 73047 (1/1/1982-1/1/1983).  The four higher-attaching policies are policy 70607 (1/1/1979-1/1/1980), policy 71202 (1/1/1980-1/1/1981), policy 71654 (1/1/1981-1/1/1982), and policy 73048 (1/1/1982-1/1/1983).  During these years, each of the lower-attaching policies provides $1 million in coverage as part of Congoleum's $10 million layer of coverage in excess of $11 million in underlying limits and each of the higher-attaching policies provides $4 million in coverage as part of Congoleum's $55 million layer of coverage in excess of $26 million in underlying limits.  For two (2) more years beginning in 1983, MMO issued only one excess policy per year.  Policy 73326, with effective dates from January 1, 1983 to January 1, 1984, provides $5 million in coverage as part of Congoleum's $55 million layer of coverage in excess of $26 million in underlying limits.  Policy 73526, with effective dates from January 1, 1984 to January 1, 1985, provides $5

14

million in coverage as part of Congoleum's $20 million layer of coverage in excess of $81 million in underlying limits.  Once the applicable underlying limits of these policies are exhausted, Congoleum contends that the MMO Policies provide up to $32 million in coverage.  MMO, however, argues that there are numerous defenses to coverage available, including that Congoleum has materially breached the MMO Policies, and that, as a result, MMO is relieved of certain coverage obligations.  MMO also disputes whether there is or would be a sufficient volume of otherwise insurable claims to reach and/or exhaust the relevant coverage limits.

30.    In order to completely resolve and settle all of the outstanding disputes relating to the MMO Policies by and between the parties, MMO has agreed to pay to the Plan Trust a total of $7,330,750.  MMO shall pay 50% of the Settlement Amount within thirty (30) days of the later of (a) the Approval Date or (b) the date the Confirmation Order becomes a Final Order.  The balance of the Settlement Amount shall be paid on or before January 20 of the calendar year immediately following the year in which the first payment was made.  The Debtors believe in their best business judgment that the MMO Settlement Agreement is fair, reasonable, and is in the best interests of the creditors and the estates.

### G.    The TIG/U.S. Fire Settlement

31.    On or about January 28, 2010, the Debtors, the ACC, the Claimants' Representatives, TIG and U.S. Fire entered into a certain Settlement Agreement.

15

A true and correct copy of the TIG/U.S. Fire Settlement Agreement is attached hereto as Exhibit G.

32.     TIG has two (2) policies which are subject to the TIG/U.S. Fire Settlement Agreement.  Each of these policies was issued by International Surplus Lines Insurance Company with effective dates from January 1, 1985 to January 1, 1986.  Policy XSI10017 provides $5 million in coverage as part of Congoleum's $15 million layer of coverage in excess of $16 million in underlying limits.  Policy XSI10018 provides $10 million in coverage as part of Congoleum's $20 million layer of coverage in excess of $31 million in underlying limits.  Once the applicable underlying limits of these policies are exhausted, Congoleum contends that the TIG Policies provide up to $15 million in coverage.  TIG, however, argues that there are numerous defenses to coverage available, including that Congoleum has materially breached the TIG Policies, and that, as a result, TIG is relieved of certain coverage obligations.  TIG also disputes whether there is or would be a sufficient volume of otherwise insurable claims to reach and/or exhaust the relevant coverage limits.

33.     U.S. Fire has two (2) excess policies which are subject to the TIG/U.S. Fire Settlement Agreement.  Policy 3490018299, with effective dates from January 1, 1985 to January 1, 1986, is an excess multi-marine policy which provides $10 million in coverage as part of Congoleum's $25 million layer of

16

coverage in excess of $51 million in underlying limits.  Policy H02317, also with

effective dates from January 1, 1985 to January 1, 1986, is an excess bumbershoot

liability policy which provides $5 million in coverage as part of Congoleum's $25

million layer of coverage in excess of $76 million in underlying limits.  Once the

applicable underlying limits of these policies are exhausted, Congoleum contends

that the U.S. Fire Policies provide up to $15 million in coverage.  U.S. Fire,

however, argues that there are numerous defenses to coverage available, including

that Congoleum has materially breached the U.S. Fire Policies, and that, as a result,

U.S. Fire is relieved of certain coverage obligations.  U.S. Fire also disputes

whether there is or would be a sufficient volume of otherwise insurable claims to

reach and/or exhaust the relevant coverage limits.

34.    In order to completely resolve and settle all of the outstanding

disputes relating to the TIG Policies and the U.S. Fire Policies by and between the

parties, TIG and U.S. Fire have agreed to pay to the Plan Trust a total of

$4,849,800 and $50,000 respectively within thirty (30) days of the later of (a) the

Approval Date or (b) the date the Confirmation Order becomes a Final Order.  The

Debtors believe in their best business judgment that the TIG/U.S. Fire Settlement

Agreement is fair, reasonable, and is in the best interests of the creditors and the

estates.

17

H.      **The London Settlement**

35.     On or about January 28, 2010, the Debtors, the ACC, the Claimants'

Representatives and London entered into a certain Settlement Agreement.  A true

and correct copy of the London Settlement Agreement is attached hereto as Exhibit

H.

36.     London has fifteen (15) actual or alleged policies which are subject to

the London Settlement Agreement.  Congoleum and London dispute the existence

of one (1) of these policies.  Nine (9) of the policies comprise all of Congoleum's

excess liability insurance between November 12, 1953 and February 1, 1961.

Policies K21783, K21782 and K21784, each with effective dates from November

12, 1953 to November 12, 1954, provide $1 million in coverage in excess of

$500,000 in underlying primary limits.  Policies K28288, K28289, K28290 and

K28291, each with effective dates from November 12, 1954 to January 1, 1958,

provide $1 million in coverage in excess of $500,000 in underlying primary limits

during those policy years.  Policies CK2458 and CK2459, each with effective dates

from January 1, 1958 to February 1, 1961, provide $1 million in coverage in excess

of $500,000 in underlying primary limits.

37.     In subsequent policy years, the London Policies provide certain

higher-level excess coverage.  Policy 881/WHL551, with effective dates from

April 1, 1976 to April 1, 1977, provides $5 million in coverage in excess of up to

18

$6 million in underlying primary limits. Policy 881/UJL0389, with effective dates from April 1, 1977 to January 1, 1980, provides $5 million in coverage in excess of $1 million in underlying primary limits. Policies 881/WJU551, 881/WKT051 and 881/WLT121, also with effective dates from April 1, 1977 to January 1, 1980, provide another $5 million in coverage in excess of policy 881/UJL0389. Policy 881/UJL0057, with effective dates from January 1, 1977 to January 1, 1978, provides $5 million in coverage as part of Congoleum's $55 million layer of coverage in excess of $26 million in underlying limits. Finally, Congoleum alleges the existence of policy EL 10355, with effective dates from January 1, 1980 to January 1, 1981, providing $2 million in coverage as part of Congoleum's $55 million layer of coverage in excess of $26 million in underlying limits. London disputes the existence of this policy, which issue is contested and unresolved in the Coverage Action.

38.     Once the applicable underlying limits of these policies are exhausted, Congoleum contends that the London Policies provide up to $49 million in coverage. Because all but one of these policies were also subscribed to by entities other than the Certain London Market Insurance Companies, only approximately $12.5 million of those limits were subscribed to by the Certain London Market Insurance Companies which are parties to the London Settlement Agreement. In addition, London argues that there are numerous defenses to coverage available,

19

including that Congoleum has materially breached the London Policies, and that, as a result, London is relieved of certain coverage obligations.  London also disputes whether there is or would be a sufficient volume of otherwise insurable claims to reach and/or exhaust the relevant coverage limits.

39.     In order to completely resolve and settle all of the outstanding disputes relating to the London Policies by and between the parties, each of the Certain London Market Insurance Companies has agreed to pay to the Plan Trust its several, allocated share of $4,127,050 within thirty (30) days of the later of (a) the Approval Date or (b) the date the Confirmation Order becomes a Final Order. The Debtors believe in their best business judgment that the London Settlement Agreement is fair, reasonable, and is in the best interests of the creditors and the estates.

### I.     The Westport Settlement

40.     On or about January 28, 2010, the Debtors, the ACC, the Claimants' Representatives and Westport entered into a certain Settlement Agreement.  A true and correct copy of the Westport Settlement Agreement is attached hereto as Exhibit I.

41.     Westport has three (3) policies which are subject to the Westport Settlement Agreement, two (2) of which were issued by the Manhattan Fire and Marine Insurance Company (the insurer name on these two policies was

20

subsequently changed by endorsement to Puritan Insurance Company) and the other of which was issued by Puritan Insurance Company.  Policy ML650447, with effective dates from January 1, 1978 to January 1, 1979, policy ML651558, with effective dates from January 1, 1979 to January 1, 1980, and policy ML652264, with effective dates from January 1, 1980 to January 1, 1981, each provides $5 million in coverage as part of Congoleum's $55 million layer of coverage in excess of $26 million in underlying limits in the respective policy period.  Once the applicable underlying limits of these policies are exhausted, Congoleum contends that the Westport Policies provide up to $15 million in coverage.  Westport, however, argues that there are numerous defenses to coverage available, including that Congoleum has materially breached the Westport Policies, and that, as a result, Westport is relieved of certain coverage obligations.  Westport also disputes whether there is or would be a sufficient volume of otherwise insurable claims to reach and/or exhaust the relevant coverage limits.

42.    In order to completely resolve and settle all of the outstanding disputes relating to the Westport Policies by and between the parties, Westport has agreed to pay to the Plan Trust a total of $2,988,350 within thirty (30) days of the later of (a) the Approval Date or (b) the date the Confirmation Order becomes a Final Order.  The Debtors believe in their best business judgment that the Westport

Settlement Agreement is fair, reasonable, and is in the best interests of the creditors and the estates.

### J.    The Old Republic Settlement

43.    On or about January 28, 2010, the Debtors, the ACC, the Claimants' Representatives and Old Republic entered into a certain Settlement Agreement.  A true and correct copy of the Old Republic Settlement Agreement is attached hereto as Exhibit J.

44.    Old Republic has two (2) policies which are subject to the Old Republic Settlement Agreement.  Policy OZX11607, with effective dates from January 1, 1981 to January 1, 1982, and policy OZX11787, with effective dates from January 1, 1982 to January 1, 1983, each provides $5 million in coverage as part of Congoleum's $55 million layer of coverage in excess of $26 million in underlying limits.  Policies OZX11607 and OZX11787 also provide $5 million in coverage as part of Congoleum's $20 million layer of coverage in excess of $81 million in underlying limits.  Once the applicable underlying limits of these policies are exhausted, Congoleum contends that the Old Republic Policies provide up to $20 million in coverage.  Old Republic, however, argues that there are numerous defenses to coverage available, including that Congoleum has materially breached the Old Republic Policies, and that, as a result, Old Republic is relieved of certain coverage obligations.  Old Republic also disputes whether there is or

22

would be a sufficient volume of otherwise insurable claims to reach and/or exhaust the relevant coverage limits.

45.     In order to completely resolve and settle all of the outstanding disputes relating to the Old Republic Policies by and between the parties, Old Republic has agreed to pay to the Plan Trust a total of $1,991,250 within thirty (30) days of the later of (a) the Approval Date or (b) the date the Confirmation Order becomes a Final Order.  The Debtors believe in their best business judgment that the Old Republic Settlement Agreement is fair, reasonable, and is in the best interests of the creditors and the estates.

### K.      The Transport Settlement

46.     On or about January 28, 2010, the Debtors, the ACC, the Claimants' Representatives and Transport entered into a certain Settlement Agreement.  A true and correct copy of the Transport Settlement Agreement is attached hereto as Exhibit K.

47.     Transport has two (2) high-level excess policies which are subject to the Transport Settlement Agreement.  Policy TEL 900359, with effective dates from January 1, 1984 to January 1, 1985, provides $10 million in coverage as part of Congoleum's $55 million layer of coverage in excess of $26 million of underlying limits.  Policy TEL 01129C, with effective dates from January 1, 1985 to July 15, 1985, provides $5 million in coverage as part of Congoleum's $25

23

million layer of coverage in excess of $51 million of underlying limits.  Once the applicable underlying limits of these policies are exhausted, Congoleum contends that the Transport Policies provide up to $15 million in coverage.  Transport, however, argues that there are numerous defenses to coverage available, including that Congoleum has materially breached the Transport Policies, and that, as a result, Transport is relieved of certain coverage obligations.  Transport also disputes whether there is or would be a sufficient volume of otherwise insurable claims to reach and/or exhaust the relevant coverage limits.

48.    In order to completely resolve and settle all of the outstanding disputes relating to the Transport Policies and between the parties, Transport has agreed to pay to the Plan Trust a total of $1,373,508 within thirty (30) days of the later of (a) the Approval Date or (b) the date the Confirmation Order becomes a Final Order.  The Debtors believe in their best business judgment that the Transport Settlement Agreement is fair, reasonable, and is in the best interests of the creditors and the estates.

### L.    **The Stonewall Settlement**

49.    On or about January 28, 2010, the Debtors, the ACC, the Claimants' Representatives and Stonewall entered into a certain Settlement Agreement.  A true and correct copy of the Stonewall Settlement Agreement is attached hereto as Exhibit L.

24

50.     Stonewall has a single policy which is subject to the Stonewall Settlement Agreement.  Policy 36000045, with effective dates from January 1, 1976 to January 1, 1977, provides $5 million as part of Congoleum's $10 million layer of coverage in excess of $11 million in underlying limits.  Once the applicable underlying limits of this policy are exhausted, Congoleum contends that the Stonewall Policy provides up to $5 million in coverage.  Stonewall, however, argues that there are numerous defenses to coverage available, including that Congoleum has materially breached the Stonewall Policy, and that, as a result, Stonewall is relieved of certain coverage obligations.  Stonewall also disputes whether there is or would be a sufficient volume of otherwise insurable claims to reach and/or exhaust the relevant coverage limits.

51.     In order to completely resolve and settle all of the outstanding disputes relating to the Stonewall Policy and between the parties, Stonewall has agreed to pay to the Plan Trust a total of $883,759 within thirty (30) days of the later of (a) the Approval Date or (b) the date the Confirmation Order becomes a Final Order.  The Debtors believe in their best business judgment that the Stonewall Settlement Agreement is fair, reasonable, and is in the best interests of the creditors and the estates.

500411198v8

## M.    The Navigators Settlement

52.    On or about January 28, 2010, the Debtors, the ACC, the Claimants'
Representatives and Navigators entered into a certain Settlement Agreement.  A
true and correct copy of the Navigators Settlement Agreement is attached hereto as
Exhibit M.

53.    Navigators has a single policy which is subject to the Navigators
Settlement Agreement, policy 85-L-1116/01.  For informational purposes only:
Navigators has assigned this policy internal tracking number NY85NMC/L111601.
The Navigators Policy is a subscription policy, which Navigators contends was
issued severally, but not jointly, by Colonia Insurance Company, United
Reinsurance Company of New York and Navigators Insurance Company.  The
Navigators Policy, with effective dates from January 1, 1985 to January 1, 1986,
provides $5 million in coverage as part of Congoleum's $25 million layer of
coverage in excess of $76 million in underlying limits.  Once the applicable
underlying limits of these policies are exhausted, Congoleum contends that the
Navigators Policy provides up to $5 million in coverage.  Navigators, however,
argues that there are numerous defenses to coverage available, including that
Congoleum has materially breached the Navigators Policy, and that, as a result,
Navigators is relieved of certain coverage obligations.  Navigators also disputes

whether there is or would be a sufficient volume of otherwise insurable claims to reach and/or exhaust the relevant coverage limits.

54.     In order to completely resolve and settle all of the outstanding disputes relating to the Navigators Policies by and between the parties, Navigators has agreed to pay to the Plan Trust a total of $400,000 within thirty (30) days of the later of (a) the Approval Date or (b) the date the Confirmation Order becomes a Final Order.  The Debtors believe in their best business judgment that the Navigators Settlement Agreement is fair, reasonable, and is in the best interests of the creditors and the estates.

### N.     **The American Centennial Settlement**

55.     On or about January 28, 2010, the Debtors, the ACC, the Claimants' Representatives and American Centennial entered into a certain Settlement Agreement.  A true and correct copy of the American Centennial Settlement Agreement is attached hereto as Exhibit N.

56.     American Centennial has a single policy which is subject to the American Centennial Settlement Agreement.  Policy CC-01-58-52, with effective dates from January 1, 1984 to January 1, 1985, provides $1 million in coverage as part of Congoleum's $20 million layer of coverage in excess of $81 million in underlying limits.  Once the applicable underlying limits of this policy are exhausted, Congoleum contends that the American Centennial Policy provides up

to $1 million in coverage. American Centennial, however, argues that there are numerous defenses to coverage available, including that Congoleum has materially breached the American Centennial Policy, and that, as a result, American Centennial is relieved of certain coverage obligations. American Centennial also disputes whether there is or would be a sufficient volume of otherwise insurable claims to reach and/or exhaust the relevant coverage limits.

57.     In order to completely resolve and settle all of the outstanding disputes relating to the American Centennial Policies by and between the parties, American Centennial has agreed to pay to the Plan Trust a total of $50,000 within thirty (30) days of the later of (a) the Approval Date or (b) the date the Confirmation Order becomes a Final Order. The Debtors believe in their best business judgment that the American Centennial Settlement Agreement is fair, reasonable, and is in the best interests of the creditors and the estates.

### O.    The NJPLIGA-NJSLIGF Settlement

58.     On or about January 28, 2010, the Debtors, the ACC, the Claimants' Representatives and NJPLIGA and NJSLIGF entered into a certain Settlement Agreement. A true and correct copy of the NJPLIGA-NJSLIGF Settlement Agreement is attached hereto as Exhibit O.

59.     Created by the New Jersey Property-Liability Insurance Guaranty Association Act, NJPLIGA manages and administers claims which are asserted

28

against certain insolvent insurance companies and their policyholders.  NJPLIGA

contends that it is obligated to pay claims to the extent such claims fall within the

definition of a "covered claim" as provided for by the statute.  NJPLIGA describes

itself as a private, non-profit, unincorporated legal entity dependent upon revenues

received through statutory assessments charged to all member insurers.  Although

NJPLIGA indicates that it will pay any claim which meets the definition of a

"covered claim," NJPLIGA limits recovery on any claim to a maximum statutory

benefit of the lesser of the policy limits or $300,000.  As described below,

Congoleum has claims against NJPLIGA involving six (6) different insolvent

insurers and a total of over thirty (30) individual policies.  Because the policy

limits on each implicated policy far exceed the statutory limits and because its

claim or claims against each is "covered" under the statute, Congoleum contends

that it is at least due the statutory maximum for each insolvent policy in each

policy year.  NJPLIGA, on the other hand, contends that Congoleum cannot

establish the statutory prerequisites for a "covered claim."  Under the NJPLIGA-

NJSLIGF Settlement Agreement, Congoleum is still entitled to pursue claims

against insolvent insurers in liquidation proceedings, although it is unlikely that

Congoleum would be able to obtain recoveries from insolvent insurers comparable

with those from solvent insurers.

500411198v8

60.     Congoleum claims that it is entitled to benefits from NJPLIGA as a result of six (6) high-level excess policies issued by the insolvent insurer Integrity Insurance Company.  Policy XL200500, with effective dates from January 1, 1979 to January 1, 1980, policy XL207014, with effective dates from January 1, 1983 to January 1, 1984, and policy XL207970, with effective dates from January 1, 1984 to January 1, 1985, each provides $5 million in coverage as part of Congoleum's $55 million layer of coverage in excess of $26 million in underlying limits in the respective policy period.  Policy XL207970 also provides $1 million in coverage as part of Congoleum's $10 million layer of coverage in excess of $11 million in underlying limits.  Policy XL201439, with effective dates from January 1, 1980 to January 1, 1981, policy XL201522, with effective dates from January 1, 1981 to January 1, 1982, and policy XL203766, with effective dates from January 1, 1982 to January 1, 1983, each provides $6 million in coverage as part of Congoleum's $55 million layer of coverage in excess of $26 million in underlying limits in the respective policy periods.  Finally, policy XL210163, with effective dates from January 1, 1985 to January 1, 1986, provides $3 million in coverage as part of Congoleum's $20 million layer of coverage in excess of $31 million in underlying limits.

61.     Congoleum claims that it is entitled to benefits from NJPLIGA as a result of eleven (11) high-level excess policies issued by the insolvent insurer

30

Midland Insurance Company.  Policy XL1110170044735, with effective dates from October 12, 1972 to January 1, 1976, provides coverage as part of Congoleum's $55 million layer of coverage in excess of $25 million in underlying limits.  Policy XL1110170044735 provides $20 million in coverage from October 12, 1972 to December 17, 1973, $25 million in coverage from December 17, 1973 to January 1, 1975, and $30 million in coverage from January 1, 1975 to January 1, 1976.  In addition, from 1976 to 1984, Midland issued the following policies as a series of one-year excess policies: XL145821 (1976; $30 million), XL152158 (1977; $23 million), XL148361 (1978; $23 million), XL160344 (1979; $8 million), XL706593 (1980; $5 million), XL723759 (1981; $5 million), XL724778 (1982; $5 million), XL748705 (1983; $10 million), and XL770108 (1984; $10 million). Each policy was effective from January 1 of that year to January 1of the following year and each provides coverage as part of a Congoleum's $55 million layer of coverage in excess of $26 million in underlying limits.  Between January 1, 1984 and January 1, 1985, Midland also issued Congoleum a second policy, XL770107, which provides $3 million in coverage as part of Congoleum's $10 million layer of coverage in excess of $11 million in underlying limits.

62.    Congoleum claims that it is entitled to benefits from NJPLIGA as a result of three (3) first-level excess policies issued by the insolvent insurer Mission Insurance Company.  Policy M81757, with effective dates from January 1, 1975 to

31

April 1, 1976, provides $10 million in coverage in excess of $1 million of underlying primary limits.  Policy M831963, with effective dates from April 1, 1976 to April 1, 1977, provides $5 million in coverage in excess of $1 million of underlying primary limits.  Policy M856066, with effective dates from January 1, 1980 to January 1, 1981, provides $5 million in limits in excess of $1 million of underlying primary limits.

63.    Congoleum claims that it is entitled to benefits from NJPLIGA as a result of a single policy, HEC-979-13-74, issued by the insolvent insurer The Home Insurance Company.  This multi-year excess policy, with effective dates from January 28, 1970 to February 16, 1973, provides Congoleum with $5 million in annual coverage as part of Congoleum's $10 million layer of cover in excess of up to $6 million in underlying limits.

64.    Congoleum claims that it is entitled to benefits from NJPLIGA as a result of eleven (11) excess policies issued by the insolvent insurer Transit Casualty Company.  Policy SCU955066, with effective dates from January 1, 1979 to January 1, 1980, and policy SCU955427, with effective dates from January 1, 1980 to January 1, 1981, each provides $10 million in coverage as part of Congoleum's $55 million layer of coverage in excess of $26 million in underlying limits in the respective policy period.  Policy SCU955786, with effective dates from January 1, 1981 to January 1, 1982, and policy SCU956122, with effective

32

dates from January 1, 1982 to January 1, 1983, each provides $5 million in coverage in excess of $6 million in underlying limits in the respective policy period.  Policy SCU55787, with effective dates from January 1, 1981 to January 1, 1982, and policy SCU956123, with effective dates from January 1, 1982 to January 1, 1983, each provides $10 million in coverage as part of Congoleum's $55 million layer of coverage in excess of $26 million in underlying limits in the respective policy period.  Policy SCU956394, with effective dates from January 1, 1983 to January 1, 1984, and policy SCU956652, with effective dates from January 1, 1984 to January 1, 1985, each provides $5 million in coverage in excess of $6 million in underlying limits in the respective policy period.  Policy SCU956395, with effective dates from January 1, 1983 to January 1, 1984, and policy SCU956653, with effective dates from January 1, 1984 to January 1, 1985, each provides $5 million in coverage in excess of $21 million in underlying limits in the respective policy period.  Policy SCU957115, with effective dates from January 1, 1985 to January 1, 1986, provides $4 million in coverage as part of Congoleum's $10 million layer of coverage in excess of $6 million in underlying limits.

65.    Congoleum claims that it is entitled to benefits from NJPLIGA as a result of a single excess policy issued by the insolvent insurer Western Employers Insurance Company.  Policy EX10-0185-20348, with effective dates from January 1, 1985 to January 1, 1986, provides $5 million in coverage as part of

33

Congoleum's $15 million layer of coverage in excess of $16 million in underlying limits.

66.    In addition to the policies set forth above, Congoleum claims that it is entitled to benefits from NLSLIGF as a result of a single policy issued to Congoleum by the insolvent surplus insurer Holland-America Insurance Company. Created by the New Jersey Surplus Lines Insurance Guaranty Fund Act, NLSLIGF manages and administers claims of insolvent surplus lines insurers that were eligible to transact insurance business in the State of New Jersey at the time the policy was issued. Policy R83678, with effective dates from January 1, 1981 to January 1, 1982, provides $5 million in coverage in excess of $1 million in underlying primary limits.

67.    Congoleum contends that it has a claim for coverage against NJPLIGA and NLSLIGF under the respective statutes, while NJPLIGA and NLSLIGF contend that Congoleum fails to satisfy the relevant statutory requirements and therefore is not entitled to coverage. In order to completely resolve and settle all of the outstanding disputes relating to NJPLIGA-NJSLIGF by and between the parties, NJPLIGA and NJSLIGF have agreed to pay to the Plan Trust a total of $13,000,000 within thirty (30) days of the later of (a) the Approval Date or (b) the date the Confirmation Order becomes a Final Order. The Debtors believe in their best business judgment that the NJPLIGA-NJSLIGF Settlement

34

Agreement is fair, reasonable, and is in the best interests of the creditors and the estates.

## THE MULTI-INSURER SETTLEMENT AND INDIVIDUAL SETTLEMENTS SHOULD BE APPROVED

68.     The Debtors have conducted extensive due diligence on the Subject Policies at issue with respect to each Participating Insurer and NJPLIGA and NJSLIGF, and believe in their best business judgment that the Settlement Agreements are a fair and reasonable compromise of the individualized disputes by and between the Parties and are in the best interest of the creditors and the estates. The asbestos claimant representatives—the ACC, the FCR and the Claimants' Representatives—were directly involved in negotiating the monetary terms of the Multi-Insurer Settlement and are either parties to or consenting signatories to each of the individual Settlement Agreements. The Multi-Insurer Settlement and the individual Settlement Agreements provide the estates' present asbestos creditors and future demands the best opportunity to receive real value in a timely fashion, especially with a confirmation schedule in place for the Plan. The Debtors believe that the Multi-Insurer Settlement and the individual Settlement Agreements are well above "the lowest point in the range of reasonableness" and therefore should be approved.

69.     Pursuant to each Settlement Agreement, each Participating Insurer and NJPLIGA and NJSLIGF shall make payment of its respective Settlement

35

Amount within thirty (30) days of the later of (i) the date the District Court order approving its Settlement Agreement becomes a Final Order or (ii) the date the order confirming a Chapter 11 plan of reorganization containing a § 524(g) injunction becomes a Final Order.  However, CNA, Munich Re and MMO will pay their respective Settlement Amounts in two parts.  They will pay 50% of their respective Settlement Amounts within thirty (30) days of the later of (a) the Approval Date or (b) the date the Confirmation Order becomes a Final Order.  The balance of those respective Settlement Amounts shall be paid on or before January 20 of the calendar year immediately following the year in which the first payment was made.

70.     A total of $100 million will be paid to the Plan Trust of which $97 million will be available for the payment of Asbestos Claims and/or to pay other amounts that would be payable by the Plan Trust pursuant to the Plan.  The Plan Proponents of the Plan have agreed that the Plan Trust shall pay to Reorganized Congoleum a total of $3 million for placement in the Reserve Fund, which funds shall be used for payment of claims that are not Asbestos Claims and which arose from the Debtors' operations prior to December 31, 2003 to the extent such claims survive the Reorganization Cases in accordance with the Plan.  Any unused balance of the Reserve Fund shall be transferred by the Reorganized Debtors to the Plan Trust and the Reserve Fund shall be terminated on the later of (i) the fifth

36

anniversary of the effective date of the Plan or (ii) the resolution of known Non-

Asbestos Reserve Claims that are unresolved as of the fifth anniversary of the

effective date of the Plan.  The pending Plan and Plan Trust Agreement will be

updated to reflect such agreement.

71.    The Settlement Agreements with the Participating Insurers are

structured as "sale and buyback" agreements whereby, upon payment of each

Settlement Amount, the Debtors will sell the relevant Subject Policies back to the

relevant insurer free and clear of all claims, liens, encumbrances or interests of any

other entity pursuant to §§ 363(b) and (f) of the Bankruptcy Code, supplemented

by a § 105 injunction.  The effect of this "policy buyback" is to fully and finally

extinguish and exhaust all rights, duties, limits and coverage under the Subject

Policies as if they were never issued.  The Settlement Agreement with NJPLIGA

and NJSLIGF is not structured as a sale and buyback agreement; rather, it is

structured as a compromise and settlement of the claims of the Debtors and

NJPLIGA and NJSLIGF against one another as discussed *supra*.

72.    The Settlement Agreements require that the Plan shall contain

injunctive relief, to the fullest extent permissible under Bankruptcy Code § 524(g)

and/or other applicable law, in favor of the Participating Insurers and NJPLIGA

and NJSLIGF enjoining the prosecution against the Participating Insurers or

NJPLIGA and NJSLIGF of any and all current and future asbestos personal injury

claims arising from or relating to the Debtors' manufacture, sale, distribution, installation, handling, operation or use of asbestos or asbestos-containing products alone or in combination with any other dust or product, including any contribution claims, direct action claims, or insurance coverage claims.  The Settlement Agreements also provide that the Plan shall include an injunction, to the fullest extent permitted by Bankruptcy Code § 105(a) and/or other applicable law, that permanently enjoins all other claims of all persons and entities against the Participating Insurers or NJPLIGA and NJSLIGF, including tort, extra-contractual claims, contribution claims and direct action claims, provided that they arise out of, are derived from, or are attributable to the Subject Policies (as such Subject Policies are defined in each Settlement Agreement), the subject matter of the Coverage Action or any of the matters within the scope of the releases under the Settlement Agreements.

73.    Subject to payment in full of the various Settlement Amounts, the Debtors, the ACC, the Claimants' Representatives and the Participating Insurers will provide mutual releases of all claims, rights, demands, and obligations arising out of, relating to, or in connection with the Subject Policies, including all claims against one another relating to or arising out of the Coverage Action or these bankruptcy proceedings, and any Asbestos-Related Claims, Direct Action Claims or Extra-Contractual Claims, including claims of bad faith, misconduct, failure to

act in good faith, violation of any duty of good faith and fair dealing or violation of any insurance fraud or unfair claims practices acts, or similar statutes, regulations or codes to the extent that such Extra-Contractual Claims arise out of or relate to the Subject Policies or asbestos-related personal injury claims against Congoleum.

74.     Upon execution of the Settlement Agreements, Congoleum, each Participating Insurer and NJPLIGA and NJSLIGF shall stand down with respect to their claims against each other in the pending Coverage Action.  Within ten (10) days of the date such Participating Insurer or NJPLIGA and NJSLIGF pays its respective Settlement Amount or pays the first installment of such Settlement Amount in accordance with its individual Settlement Agreement, Congoleum and such Participating Insurer or NJPLIGA and NJSLIGF shall dismiss the Coverage Action with prejudice.  Absent the Settlement Agreements becoming null and void, Congoleum and each Participating Insurer and NJPLIGA and NJSLIGF shall not initiate or prosecute any other coverage litigation against one another for claims that would fall within the releases described in the Settlement Agreements.

75.     In addition, the Participating Insurers and NJPLIGA and NJSLIGF agree that (provided that any applicable deadlines are extended) they (i) shall not file any additional objections in the bankruptcy case, (ii) shall not pursue any objections or appeals they have already made, (iii) shall not serve or pursue any discovery requests in the bankruptcy case and (iv) shall not take any other action,

directly or indirectly, to hinder, delay or oppose confirmation of a plan of reorganization that is consistent with the Settlement Agreements.  Although the Participating Insurers and NJPLIGA and NJSLIGF have agreed that they will not file any additional objections to the Plan (provided that any and all deadlines for any such filing are extended), they are not required to withdraw any objections that they have already made in the bankruptcy case until such time that the Approval Orders have become Final Orders.  Within three (3) business days after the orders approving the Settlement Agreements have become Final Orders, the Participating Insurers and NJPLIGA and NJSLIGF will withdraw all objections they have filed in the bankruptcy case to confirmation of the Plan, provided that the Plan is consistent with the Settlement Agreements.

76.     The Settlement Agreements also provide for ABI and the FCR to consent to each settlement.  ABI is consenting to a release of any rights in, and agreeing not to seek coverage under policies listed in Exhibit 1 to the Settlement Agreements and policies issued to Congoleum prior to February 28, 1993 that are Subject Policies.  The Settlement Agreements and Approval Orders expressly provide that, except for any ABI rights in those policies subject to ABI's consent, ABI's rights are not affected, impaired, enjoined, channeled or transferred under any policy issued to or insuring ABI, or any settlement or coverage-in-place agreement to which ABI is a signatory.

40

500411198v8

77.     In this case, the Debtors are aware of only one asserted lien on the proceeds of the Subject Policies, the lien granted in favor of the Collateral Trustee on all Asbestos Insurance Collateral.  This lien, however, was avoided by the Bankruptcy Court pursuant to § 544 of the Bankruptcy Code.  Furthermore, each of the Participating Insurers has represented in its Settlement Agreement that it is unaware of any pending Insurance Coverage Claims against the Subject Policies other than those lodged by Debtors, so it appears that there are no outstanding claims against the Subject Policies by former affiliates or any other person or entity with an interest in them.

78.     A sale of the Subject Policies back to the Participating Insurers free and clear of all Interests in exchange for the total Settlement Amount will generate the greatest value for the Plan Trust and, thus, is in the best interests of the Debtors and their estates.  Each Participating Insurer has indicated that it would not purchase its respective Subject Policies, or pay the Settlement Amount it has agreed to pay, were the sale of the Subject Policies back to it not free and clear of all Interests of all persons and entities.  Similarly, the ACC and the Claimants' Representatives have indicated that they would not have agreed to the Settlement Agreements without the injunction each party will receive pursuant to each Settlement Agreement.  In addition, the Debtors would not have agreed to the

41

Settlement Agreements without the injunctions they will receive pursuant to each Settlement Agreement.

79.     The Participating Insurers have agreed to pay their Settlement Amounts only if they can have certainty that they will be released fully from, and have injunctive protection against, all claims, including non-asbestos claims, that may be based on, or derive from, their Subject Policies. Indeed, inherent in the Settlement Agreements is the understanding that the Participating Insurers and NJPLIGA and NJSLIGF will not have to pay twice on account of the disputed coverage obligations that they are now settling.

80.     The Debtors submit that the Settlement Agreements with the Participating Insurers are the result of arms' length negotiations and are entitled to the protections of § 363(m). The Parties have not engaged in any conduct that would cause or permit the Settlement Agreements to be avoided under Bankruptcy Code § 363(n), such as entering into an agreement to control the price of the Settlement Amounts.

## A.     The Probability of Success in Litigation

81.     The Coverage Action was scheduled to be tried in three phases. The central issue in Phase 1 was whether there was coverage for settlements in the pre-petition Claimant Agreement. Phase 2 originally was supposed to address whether and to what extent the insurers were obligated to provide insurance coverage for

42

the 131 Pre-Petition Settlement Agreements, as well as other remaining coverage issues, such as trigger, allocation and other defenses.  At the insurers' request, however, the court in the Coverage Action entered a Case Management Order expanding the scope of Phase 2 to include a determination of whether Congoleum has coverage for any and all past, present and future asbestos claims.  Phase 3 of the Coverage Action was to include issues relating to bad faith, if appropriate.

82.     The trial regarding Phase 1 issues lasted approximately eleven months.  On May 18, 2007, the State Court issued a decision and judgment ruling that the Claimant Agreement was an unreasonable agreement, not made in good faith, and therefore Congoleum's insurers had no obligation to provide insurance coverage for the Claimant Agreement.

83.     In March 2009, the State Court determined that it would commence Phase 2 of the Coverage Action.  The Participating Insurers and NJPLIGA and NJSLIGF have asserted numerous defenses to liability and counterclaims for affirmative relief in the Coverage Action including:

- The Congoleum Agreements and Proposed Plans were not entered into in good faith and/or were not reasonable;
- The Congoleum Agreements and Proposed Plans breached the cooperation clause and the no voluntary payment clause of the policies;
- The Congoleum Agreements and Proposed Plans do not exhaust underlying insurance;

- The Congoleum Agreements and Proposed Plans violate the Participating Insurers' right to settle; and

- There is no coverage under the policies for asbestos claims settled by the Congoleum Agreements and Proposed Plans, including the proposed TDP.

84.    Advancing these arguments and others, on July 30, 2009, the Participating Insurers filed a motion for summary judgment in the Coverage Action seeking a declaration, among other things, that the Debtors have materially breached their insurance policies and, as a result, that the insurers are relieved of all of their coverage obligations under the Subject Policies for claims resolved pursuant to the Claimant Agreement.  The State Court denied the insurers' summary judgment motion, and a trial on the merits of their claims was scheduled to begin in February 2010.  A stand down of litigation has been in place since November 2009 pending finalization of the Multi-Insurer Settlement Agreement. Although Congoleum believes that it will prevail in the Coverage Action, the outcome of this litigation is far from certain.  If the Participating Insurers are successful on their claims, Congoleum (or the Plan Trust) risks losing _all_ of its insurance coverage for present and future asbestos claims.  There is no guarantee that Congoleum will successfully defend the causes of action brought—and to be brought—against it by the Participating Insurers in the next phases of the Coverage Action.  The Debtors submit that entering into the Settlement Agreements now for

44

a total amount of $100 million is an optimum resolution compared to the expense of continued litigation and the risks of trial.

### B. The Likely Difficulties of Collection

85.     Many of the Participating Insurers are high-level excess insurance carriers with policies that have varying high-level attachment points.  In order to collect the full combined aggregate limits of the Policies, the Participating Insurers contend that the Debtors would have to incur over $1.2 billion in total losses or claims allocated over various years of coverage before the their Subject Policies would be triggered and exhausted.  It is likely that it will take many years before the Plan Trust will allow $1.2 billion in total losses or claims required to trigger and exhaust the Subject Policies, if it is possible to reach such amount at all.

86.     In addition, any outcome of the Coverage Action at the trial level will almost certainly be appealed and further coverage disputes will also likely arise. Even if the Debtors prevailed in the Coverage Action, it likely will take many years before the Participating Insurers and NJPLIGA and NJSLIGF make payments on account of their Subject Policies.  In contrast, the Settlement Agreements provide certainty that the Plan Trust will receive $100 million within a year after entry of a Final Order confirming the Plan ($3 million of which will be dedicated to the Reserve Fund).

## C.    <u>The Complexity of the Litigation Involved</u>

87.    The Coverage Action has become more complex over time, not less. During the course of the litigation, over 100 depositions have been taken and many tens of thousands of documents have been produced.  The calculations of policy limits and the determination of which insurer is responsible for which amounts and in what layer of coverage involves extraordinarily complex legal and factual issues.  The Coverage Action has been underway for approximately eight (8) years already and only the first phase has been completed.  Phase 1 of the Coverage Action dealt only with the insurers' liability under the Claimant Agreement.  Phase 2 of the Coverage Action has yet to be tried.  As seen in the summary judgment briefing submitted by the Participating Insurers in July 2009, they are attempting in Phase 2 of the Coverage Action to obtain a ruling of material breach by Congoleum and a declaration regarding whether and to what extent Congoleum has rights to coverage for any and all asbestos-related claims.  Thus, Phase 2 of the litigation arguably is more critical to the Debtors than the litigation in Phase 1 of the Coverage Action.

88.    In addition, the Participating Insurers and NJPLIGA and NJSLIGF have opposed the Debtors' reorganization efforts at virtually every stage of these bankruptcy cases.  The Debtors, the Participating Insurers and NJPLIGA and NJSLIGF have spent many millions of dollars over the years in this bankruptcy

litigation.  The cost of trying both the bankruptcy case and the Coverage Action at the same time is enormous.  Congoleum, the Participating Insurers and NJPLIGA and NJSLIGF, therefore, desire to settle their disputes now so that they are not forced to litigate both the bankruptcy case and the Coverage Action for years to come.  Pursuant to the Settlement Agreements, if the agreements are approved by this Court and become final, non-appealable orders, the Participating Insurers and NJPLIGA and NJSLIGF have agreed to withdraw any pending objections in the reorganization proceeding and desist from further objections (provided that the Plan is not inconsistent with the Settlement Agreements).  Thus, the approval of the Settlement Agreements will streamline plan confirmation proceedings and pave the way for Congoleum's emergence from bankruptcy.

### D.   The Paramount Interest of the Creditors

89.    The Debtors believe that the Settlement Agreements provide a significant and valuable benefit to the Debtors' estates and their creditors.  The Debtors, in their business judgment, believe that the creditors of the estates would be better served by an agreement that secures payment of $100 million within a short period following confirmation of the Plan, rather than possibly receiving an undetermined amount at an unknown point in the future.  This is especially true given the scope of Phase 2.  The insurers were successful in Phase 1 of the Coverage Action.  If they are successful in Phase 2 of the Coverage Action, the

47

State Court could determine that Congoleum has no rights to coverage from the Participating Insurers for Congoleum's asbestos claims.  If the Coverage Action were not resolved before confirmation, the litigation would have to continue post-confirmation with the Plan Trust stepping into the shoes of the Debtors.  While the Debtors believe that they would be successful in their claims for asbestos coverage, they believe that it is far better to settle the disputes with the Participating Insurers and NJPLIGA and NJSLIGF for $100 million, rather than taking the risk of losing all insurance coverage under the Subject Policies in the future.

90.    Collectively, these Settlement Agreements represent the estates' surest chance of payment for asbestos personal injury claims under the Subject Policies. Accordingly, the Debtors submit that the terms and conditions of the Settlement Agreements are fair and reasonable in light of the costs, potential risks and delays associated with continued litigation in the Coverage Action.

91.    In addition to the Settlement Amounts to be paid pursuant to the Settlement Agreements, the Plan Trust also shall receive over $75 million from the proceeds of the various other insurance settlements that have been previously approved by the Bankruptcy Court.  Attached hereto as Exhibit P is a chart summarizing the existing court-approved insurance settlement agreements. Moreover, the contemporaneous motion to approve a settlement agreement with St. Paul Travelers will provide an additional approximately $25 million in

insurance proceeds to the Plan Trust. The $100 million Multi-Insurer Settlement combined with the prior and pending insurance settlements provides substantial funding for the Plan Trust.

92.    The Debtors further submit that each of the Settlement Agreements was negotiated at arms' length and is in the best interests of the Debtors' estates. The ACC, the FCR and the Claimants' Representatives were integrally involved in the negotiation of the monetary component of the Multi-Insurer Settlement. Each of the individual Settlement Agreements has been reviewed and signed (either as a party or a consentor) by the ACC, the FCR and the Claimants' Representatives. Thus, all of the official court-approved representatives of the present and future asbestos claimants as well as the Claimants' Representatives support approval of the Settlement Agreements.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on January 28, 2010.

Howard N. Feist, III

49