## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: CONGOLEUM CORPORATION,<br><br>Debtors. | Civil Action No. 09-4371 (JAP)<br><br>Bankr. Case No. 03-51524 |

## MEMORANDUM OF LAW IN SUPPORT OF THE DEBTORS' MOTION FOR AN ORDER AUTHORIZING AND APPROVING SETTLEMENT AGREEMENTS AMONG (I) THE DEBTORS, (II) CERTAIN PARTICIPATING INSURERS, THE NEW JERSEY PROPERTY-LIABILITY INSURANCE GUARANTY ASSOCIATION AND THE NEW JERSEY SURPLUS LINES INSURANCE GUARANTY FUND, (III) THE UNSECURED ASBESTOS CLAIMANTS' COMMITTEE, AND (IV) CLAIMANTS' REPRESENTATIVES

Congoleum Corporation ("Congoleum"), Congoleum Sales, Inc., and

Congoleum Fiscal, Inc. (collectively, the "Debtors") hereby submit this

memorandum of law in support of their motion (the "Motion") for the entry of an

order pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and §§

363 and 105(a) of the Bankruptcy Code authorizing and approving certain

settlement agreements (each, a "Settlement Agreement") among (1) the Debtors;

(2) certain Participating Insurers,[1] the New Jersey Property-Liability Insurance

---

[1] The Participating Insurers are:  (1) First State Insurance Company ("First State") and Twin City Fire Insurance Company ("Twin City" and together with First State, "Hartford Parties"); (2) Continental Casualty Company ("Continental Casualty") and The Continental Insurance Company ("Continental Insurance," and together with Continental Casualty, "CNA"); (3) Nationwide Indemnity

(Continued …)

Guaranty Association ("NJPLIGA"), and the New Jersey Surplus Lines Insurance Guaranty Fund ("NJSLIGF"); (3) the Unsecured Asbestos Claimants' Committee ("ACC"); and (4) Joseph Rice and Perry Weitz (the "Claimants' Representatives"). Each Settlement Agreement is also consented to by the Futures Representative ("FCR") and Congoleum's parent company, American Biltrite Inc. ("ABI").  In support of the Motion, the Debtors state as follows:

## PRELIMINARY STATEMENT

In mid-November, the Debtors, the ACC, the Claimants' Representatives, over a dozen Participating Insurers and NJPLIGA and NJSLIGF (collectively, the "Parties") agreed to the basic terms of a global settlement that will fully and finally

---

(… Continued)

Company acting on behalf of Employers Insurance Company of Wausau, f/k/a Employers Insurance of Wausau, A Mutual Company and/or f/k/a Employers Mutual Liability Insurance Company of Wisconsin ("Wausau"); (4) OneBeacon America Insurance Company f/k/a Employers Commercial Union Insurance Company ("OneBeacon"); (5) Munich Reinsurance America, Inc., f/k/a American Re-Insurance Company ("Munich Re"); (6) Mutual Marine Office, Inc., as managing general agent and attorney-in-fact for Employers Mutual Casualty Company ("MMO"); (7) TIG Insurance Company as Successor-By-Mergers to International Surplus Lines Insurance Company ("TIG"); (8) Certain London Market Insurance Companies, as set forth in the London Settlement Agreement (as defined below) ("London"); (9) Westport Insurance Corporation, as successor in interest to Puritan Insurance Company ("Westport"); (10) Old Republic Insurance Company ("Old Republic"); (11) Transport Insurance Company ("Transport"); (12) Stonewall Insurance Company ("Stonewall"); (13) Colonia Insurance Company, United Reinsurance Corporation of New York and Navigators Insurance Company (collectively, "Navigators"); (14) United States Fire Insurance Company ("U.S. Fire"); and (15) American Centennial Insurance Company ("American Centennial").

resolve all of the disputes by and between the Parties (the "Multi-Insurer Settlement").  The Claimants' Representative Joseph Rice and counsel for the ACC and FCR were integrally involved in the negotiations that resulted in the Multi-Insurer Settlement.  Substantial further negotiations of the complex insurance settlement have led to final documentation of the settlement among the Parties.  Pursuant to the Multi-Insurer Settlement, each Participating Insurer and NJPLIGA and NJSLIGF is responsible for paying a specified settlement amount to the Plan Trust, for a combined total of $100 million.

The Multi-Insurer Settlement represents an important juncture in these Chapter 11 cases.  With this settlement, the Debtors have resolved their disputes with some of the most vociferous objectors to the Plan and have added a substantial funding basis for the Plan Trust.  Now that the Multi-Insurer Settlement is in place, the Debtors will be able to move towards confirmation with the approval of virtually all of the significant parties-in-interest in this case.  In addition, the Multi-Insurer Settlement fully and finally resolves the State Court

3

Coverage Action,[2] a complex and expensive litigation that has spanned over eight years.[3]

The Debtors believe that the Multi-Insurer Settlement is fair, reasonable, and is in the best interests of these estates.  *See* Declaration of Howard N. Feist, III (the "Feist Decl.") ¶ 3.  Accordingly, the Debtors request that this Court approve each of the individual settlement agreements comprising the Multi-Insurer Settlement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and §§ 363 and 105 of the Bankruptcy Code.

## BACKGROUND

On December 31, 2003, the Debtors each filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court

---

[2] The Participating Insurers and NJPLIGA and NJSLIGF are parties to a lawsuit styled *Congoleum Corporation v. ACE American Insurance Company, et al.*, Docket No. MID-L-8908-01 (the "Coverage Action"), pending in the Superior Court of New Jersey, Law Division, Middlesex County (the "State Court").

[3] Seaton Insurance Company ("Seaton") is the only other insurance company which is presently a party to the Coverage Action.  The Debtors and Seaton are in active settlement negotiations which should be completed shortly.  Approval of the Multi-Insurer Settlement and a prospective Seaton settlement will result in dismissal of the Coverage Action upon payment of the respective Settlement Amounts.  The Debtors have also filed a motion to approve an amended settlement with Travelers Casualty and Surety Co., formerly known as The Aetna Casualty and Surety Company ("Travelers"), and St. Paul Fire and Marine Insurance Company ("St. Paul," and together with Travelers, "St. Paul Travelers"), although the claims among and between Congoleum and St. Paul Travelers were previously dismissed from the Coverage Action when the settlement was originally reached in 2006.

4

for the District of New Jersey (the "<u>Bankruptcy Court</u>").  The Debtors continue to

manage and operate their businesses as debtors-in-possession pursuant to §§ 1107

and 1108 of the Bankruptcy Code.  On August 27, 2009, this Court withdrew the

reference in these bankruptcy proceedings pursuant to 28 U.S.C. § 157.  On

October 22, 2009, the Debtors filed the Second Amended Joint Plan of

Reorganization Under Chapter 11 of the Bankruptcy Code of the Debtors, the

Official Asbestos Claimants' Committee and the Official Committee of

Bondholders for Congoleum Corporation, et al., dated as of October 22, 2009 (the

"<u>Plan</u>").  The Debtors expect to file updates to the Plan conforming it to recent

developments.

**<u>MULTI-INSURER SETTLEMENT AGREEMENT</u>**

Pursuant to the Multi-Insurer Settlement, each Participating Insurer and

NJPLIGA and NJSLIGF has agreed to separate Settlement Agreements[4] specifying

all the terms and conditions of its particular settlement.  Feist Decl. ¶ 5.  While

negotiations proceeded at length with respect to the $100 million aggregate amount

of the individual Settlement Agreements, the share payable by each Participating

Insurer and NJPLIGA and NJSLIGF, itself a contentious issue among the insurers

---

[4] The description of the Settlement Agreements in this Motion is a summary.  In the event of inconsistency between that description and the actual terms of the Settlement Agreements, the latter shall control.  All capitalized terms not otherwise defined herein shall have their respective meanings as set forth in the Settlement Agreements.

5

in the Coverage Action, was separately negotiated by the Participating Insurers and NJPLIGA and NJSLIGF.  *Id.*  The Debtors, each Participating Insurer and NJPLIGA and NJSLIGF seek entry of individual orders authorizing and approving each Settlement Agreement.

Pursuant to the Multi-Insurer Settlement, each Participating Insurer and NJPLIGA and NJSLIGF shall be solely responsible for, and obligated to make, payment in the amount set forth below (the "Settlement Amount(s)"):

| Participating Insurers, NJPLIGA and NJSLIGF | Settlement Amount |
|---|---|
| Hartford Parties | $16,500,000 |
| CNA | $16,500,000 |
| Wausau | $11,500,000 |
| OneBeacon | $10,242,733 |
| Munich Re | $8,212,800 |
| MMO | $7,330,750 |
| TIG | $4,849,800 |
| London | $4,127,050 |
| Westport | $2,988,350 |
| Old Republic | $1,991,250 |
| Transport | $1,373,508 |
| Stonewall | $883,759 |
| Navigators | $400,000 |
| U.S. Fire | $50,000 |

6

| | | |
|---|---|---|
| American Centennial | | $50,000 |
| NJPLIGA and NJSLIGF | | $13,000,000 |
| | **Total** | **$100,000,000** |

Pursuant to each Settlement Agreement, each Participating Insurer and NJPLIGA and NJSLIGF shall make payment of its respective Settlement Amount within thirty (30) days of the later of (i) the date the District Court order approving its Settlement Agreement becomes a Final Order or (ii) the date the order confirming a Chapter 11 plan of reorganization containing a § 524(g) injunction becomes a Final Order.[5]  Feist Decl. ¶ 69.

A total of $100 million will be paid to the Plan Trust of which $97 million will be available for the payment of Asbestos Claims and/or to pay other amounts that would be payable by the Plan Trust pursuant to the Plan.[6]  Feist Decl. ¶ 70.

---

[5] CNA, Munich Re and MMO will pay their respective Settlement Amounts in two parts.  They will pay 50% of their respective Settlement Amounts within thirty (30) days of the later of (a) the Approval Date or (b) the date the Confirmation Order becomes a Final Order.  The balance of those respective Settlement Amounts shall be paid on or before January 20 of the calendar year immediately following the year in which the first payment was made.  Feist Decl. ¶ 69.

[6] In addition to the Settlement Amounts to be paid pursuant to the Settlement Agreements, the Plan Trust also shall receive over $75 million from the proceeds of the various other insurance settlements that have been previously approved by the Bankruptcy Court.  Attached to the Feist Decl. as Exhibit P is a chart summarizing the existing court-approved insurance settlement agreements.  Moreover, the contemporaneous motion to approve a settlement with St. Paul Travelers will provide an additional approximately $25 million in insurance proceeds to the Plan Trust.  Feist Decl. ¶ 91.  The $100 million Multi-Insurer

(Continued …)

7

The Plan Proponents of the Plan have agreed that the Plan Trust shall pay to Reorganized Congoleum a total of $3 million for placement in a non-asbestos reserve fund (the "Reserve Fund"), which funds shall be used for payment of claims that are not Asbestos Claims and which arose from the Debtors' operations prior to December 31, 2003 to the extent such claims survive the Reorganization Cases in accordance with the Plan (the "Non-Asbestos Reserve Claims"). *Id.* Any unused balance of the Reserve Fund shall be transferred by the Reorganized Debtors to the Plan Trust and the Reserve Fund shall be terminated on the later of (i) the fifth anniversary of the effective date of the Plan or (ii) the resolution of known Non-Asbestos Reserve Claims that are unresolved as of the fifth anniversary of the effective date of the Plan. *Id.* The pending Plan and Plan Trust Agreement will be updated to reflect such agreement. *Id.*

The Settlement Agreements with the Participating Insurers are structured as "sale and buyback" agreements whereby, upon payment of each Settlement Amount, the Debtors will sell the relevant Subject Policies (as defined below) back to the relevant insurer free and clear of all claims, liens, encumbrances or interests of any other person or entity pursuant to §§ 363(b) and (f) of the Bankruptcy Code (the "363 Sale"), supplemented by a § 105 injunction. *See* 11 U.S.C. §§ 363(b), (f)

---

(… Continued)
   Settlement combined with the prior and pending insurance settlements provides
   substantial funding for the Plan Trust. *Id.*

8

and 105(a); Feist Decl. ¶ 71.  The effect of this "policy buyback" is to fully and finally extinguish and exhaust all rights, duties, limits and coverage under the Subject Policies as if they were never issued.  *Id.*  The Settlement Agreement with NJPLIGA and NJSLIGF is not structured as a sale and buyback agreement; rather, it is structured as a compromise and settlement of the claims of the Debtors and NJPLIGA and NJSLIGF against one another as discussed *infra*.  *Id.*

The Settlement Agreements require that the Plan shall contain injunctive relief, to the fullest extent permissible under Bankruptcy Code § 524(g) and/or other applicable law, in favor of the Participating Insurers and NJPLIGA and NJSLIGF enjoining the prosecution against the Participating Insurers or NJPLIGA and NJSLIGF of any and all current and future asbestos personal injury claims arising from or relating to the Debtors' manufacture, sale, distribution, installation, handling, operation or use of asbestos or asbestos-containing products alone or in combination with any other dust or product, including any contribution claims, direct action claims, or insurance coverage claims (the "524(g) Channeling Injunction").  Feist Decl. ¶ 72.  The Settlement Agreements also provide that the Plan shall include an injunction, to the fullest extent permitted by Bankruptcy Code § 105(a) and/or other applicable law, that permanently enjoins all other claims of all persons and entities against the Participating Insurers or NJPLIGA and NJSLIGF, including tort, extra-contractual claims, contribution claims and direct

9

action claims, provided that they arise out of, are derived from, or are attributable to the Subject Policies (as such Subject Policies are defined in each Settlement Agreement), the subject matter of the Coverage Action or any of the matters within the scope of the releases under the Settlement Agreements (the "105(a) Injunction"). *Id.*

Subject to payment in full of the various Settlement Amounts, the Debtors, the ACC, the Claimants' Representatives and the Participating Insurers will provide mutual releases of all claims, rights, demands, and obligations arising out of, relating to, or in connection with the Subject Policies,[7] including all claims against one another relating to or arising out of the Coverage Action or these bankruptcy proceedings, and any Asbestos-Related Claims, Direct Action Claims or Extra-Contractual Claims, including claims of bad faith, misconduct, failure to act in good faith, violation of any duty of good faith and fair dealing or violation of any insurance fraud or unfair claims practices acts, or similar statutes, regulations

---

[7] The term Subject Policies is defined, as to each Participating Insurer, in its Settlement Agreement.  In general, Subject Policies include those policies of insurance issued by Participating Insurers to Congoleum that are at issue in the Coverage Action, which are specifically identified in an exhibit to each Settlement Agreement.  The term shall also be deemed to include certain known and unknown policies of general liability insurance (including primary, umbrella and excess) issued prior to December 31, 2003 by Participating Insurers to or insuring Congoleum.  The term Subject Policies shall not include the statutory portion of any workers' compensation policy and is subject to certain other limitations as set forth in the individual Settlement Agreements.

500402274v14

or codes to the extent that such Extra-Contractual Claims arise out of or relate to the Subject Policies or asbestos-related personal injury claims against Congoleum. Feist Decl. ¶ 73.

Upon execution of the Settlement Agreements, Congoleum, each Participating Insurer and NJPLIGA and NJSLIGF shall stand down with respect to their claims against each other in the pending Coverage Action. Feist Decl. ¶ 74. Within ten (10) days of the date such Participating Insurer or NJPLIGA and NJSLIGF pays its respective Settlement Amount or pays the first installment of such Settlement Amount in accordance with its individual Settlement Agreement, Congoleum and such Participating Insurer or NJPLIGA and NJSLIGF shall dismiss the Coverage Action with prejudice. *Id.* Absent the Settlement Agreements becoming null and void, Congoleum and each Participating Insurer and NJPLIGA and NJSLIGF shall not initiate or prosecute any other coverage litigation against one another for claims that would fall within the releases described in the Settlement Agreements. *Id.*

In addition, the Participating Insurers and NJPLIGA and NJSLIGF agree that (provided that any applicable deadlines are extended) they (i) shall not file any additional objections in the bankruptcy case, (ii) shall not pursue any objections or appeals they have already made, (iii) shall not serve or pursue any discovery requests in the bankruptcy case and (iv) shall not take any other action, directly or

11

indirectly, to hinder, delay or oppose confirmation of a plan of reorganization that is consistent with the Settlement Agreements. Feist Decl. ¶ 75. Although the Participating Insurers and NJPLIGA and NJSLIGF have agreed that they will not file any additional objections to the Plan (provided that any and all deadlines for any such filing are extended), they are not required to withdraw any objections that they have already made in the bankruptcy case until such time that the Approval Orders have become Final Orders. *Id.* Within three (3) business days after the orders approving the Settlement Agreements have become Final Orders, the Participating Insurers and NJPLIGA and NJSLIGF will withdraw all objections they have filed in the bankruptcy case to confirmation of the Plan, provided that the Plan is consistent with the Settlement Agreements. *Id.*

The Settlement Agreements also provide for ABI and the FCR to consent to each settlement. Feist Decl. ¶ 76. ABI is consenting to a release of any rights in, and agreeing not to seek coverage under policies listed in Exhibit 1 to the Settlement Agreements and policies issued to Congoleum prior to February 28, 1993 that are Subject Policies. *Id.* The Settlement Agreements and Approval Orders expressly provide that, except for any ABI rights in those policies subject to ABI's consent, ABI's rights are not affected, impaired, enjoined, channeled or transferred under any policy issued to or insuring ABI, or any settlement or coverage-in-place agreement to which ABI is a signatory. *Id.*

12

## <u>INDIVIDUAL SETTLEMENT AGREEMENTS</u>

The Parties seek entry of orders substantially in the form attached as Exhibit 2 to each respective Settlement Agreement (i) authorizing and approving the Settlement Agreements; and (ii) authorizing and approving the transactions, injunctions and releases set forth in the Settlement Agreements.  The Debtors submit that each Settlement Agreement represents a fair and reasonable compromise of the individualized disputes by and between the Parties.  Feist Decl. ¶ 68.[8]

The Participating Insurers are in unique and varying positions vis-à-vis the Debtors and have different obligations to the Debtors based on their respective policies, policy periods and policy layers.  What causes one insurer and the Debtors to settle for one particular amount may not be what leads to another settlement.  When examining the propriety of a settlement, one must take into account the unique considerations particular to that insurer, such as where such insurer sits in the coverage tower, the time period covered by the policies, unique policy provisions and the timing of the insurer's settlement.  The Debtors have conducted extensive due diligence on the Subject Policies at issue with respect to each Participating Insurer and NJPLIGA and NJSLIGF, and believe in their best

---

[8] Certain additional signatures on Settlement Agreements are expected to be filed over the next two (2) business days.

business judgment that the Settlement Agreements are fair, reasonable, and are in the best interest of the creditors and the estates. *Id.* The asbestos claimant representatives—the ACC, the FCR and the Claimants' Representatives—were directly involved in negotiating the monetary terms of the Multi-Insurer Settlement and are either parties to or consenting signatories to each of the individual Settlement Agreements. *Id.*

### A.    <u>The Hartford Settlement</u>

On or about January 28, 2010, the Debtors, the ACC, the Claimants' Representatives and the Hartford Parties entered into a certain Settlement Agreement (the "<u>Hartford Settlement Agreement</u>"). Feist Decl. ¶ 6. A copy of the Hartford Settlement Agreement is attached to the Feist Decl. as <u>Exhibit A</u> and the proposed order approving the Hartford Settlement Agreement is annexed to such settlement agreement as Exhibit 2.

The Hartford Parties have nine (9) policies which are subject to the Hartford Settlement Agreement (the "<u>Hartford Policies</u>"). Feist Decl. ¶ 7. Congoleum and the Hartford Parties dispute the Hartford Parties' coverage obligations with respect to the Hartford Policies. *Id.* Of the Hartford Policies, seven (7) are policies issued by First State beginning in 1977. *Id.* Policy 924233, with effective dates from January 1, 1977 to January 1, 1978, policy 925946, with effective dates from January 1, 1978 to January 1, 1979, and policy 927497, with effective dates from

14

January 1, 1979 to January 1, 1980, each provides $4 million in coverage as part of Congoleum's $10 million layer of coverage in excess of $11 million in underlying limits in the respective policy period. *Id.* Similarly, policy 929216, with effective dates from January 1, 1980 to January 1, 1981, policy 930852, with effective dates from January 1, 1981 to January 1, 1982, policy 933238, with effective dates from January 1, 1982 to January 1, 1983, and policy 934313, with effective dates from January 1, 1983 to January 1, 1984, each provides $5 million in coverage as a part of Congoleum's $10 million layer of coverage in excess of $11 million in underlying limits in the respective policy period. *Id.*

The other two (2) policies are Twin City policies, each of which is a higher-level excess policy. Feist Decl. ¶ 8. Policy TXS102624, with effective dates from January 1, 1983 to January 1, 1984, provides (i) $5 million in coverage as part of Congoleum's $55 million layer of coverage in excess of $26 million in underlying limits and (ii) $5 million in coverage as part of Congoleum's $20 million layer of coverage in of $81 million in underlying limits. *Id.* Policy TXS103545, with effective dates from January 1, 1984 to January 1, 1985, provides (i) $5 million in coverage as a part of Congoleum's $55 million layer of coverage in excess of $26 million in underlying limits and (ii) $4 million in coverage as part of Congoleum's $20 million layer of coverage in excess of $81 million in underlying limits. *Id.*

15

Once the applicable underlying limits of these policies are exhausted, Congoleum contends that the Hartford Policies provide up to $51 million in coverage.  Feist Decl. ¶ 9.  The Hartford Parties, however, argue that there are numerous defenses to coverage available, including that Congoleum has materially breached the Hartford Policies, and that, as a result, the Hartford Parties are relieved of certain coverage obligations.  *Id.*  The Hartford Parties also dispute whether there is or would be a sufficient volume of otherwise insurable claims to reach and/or exhaust the relevant coverage limits.  *Id.*

In order to completely resolve and settle all of the outstanding disputes relating to the Hartford Policies by and between the parties, the Hartford Parties have agreed to pay to the Plan Trust a total of $16,500,000 within thirty (30) days of the later of (a) the Approval Date or (b) the date the Confirmation Order becomes a Final Order.  Feist Decl. ¶ 10.  The Debtors believe in their best business judgment that the Hartford Settlement Agreement is fair, reasonable, and is in the best interests of the creditors and the estates.  *Id.*  Accordingly, the Debtors respectfully request that the Court approve the Hartford Settlement Agreement.

**B.    The CNA Settlement**

On or about January 28, 2010, the Debtors, the ACC, the Claimants' Representatives and CNA entered into a certain Settlement Agreement (the "CNA

16

Settlement Agreement"). Feist Decl. ¶ 11. A copy of the CNA Settlement Agreement is attached to the Feist Decl. as Exhibit B and the proposed order approving the CNA Settlement Agreement is annexed to such settlement agreement as Exhibit 2.

CNA has six (6) actual or alleged policies which are subject to the CNA Settlement Agreement (the "CNA Policies"). Feist Decl. ¶ 12. The CNA Policies all are or are alleged to be multi-year excess policies at varying levels. *Id.* In part because each of the CNA Policies has or allegedly has a multi-year policy period, Congoleum and CNA dispute the limits of liability available under each of these policies. *Id.*

Five (5) of the CNA Policies were issued or allegedly issued to Congoleum by Continental Casualty. Feist Decl. ¶ 13. Congoleum and Continental Casualty dispute the existence of two (2) of these policies. *Id.* Congoleum alleges the existence of policy RDU9973958 with effective dates from January 1, 1964 to January 1, 1967, providing $5 million in annual coverage in excess of $500,000 in underlying primary limits. *Id.* CNA disputes the existence of this policy, which issue is contested and unresolved in the Coverage Action. *Id.* Policy RDU943328, with effective dates from January 1, 1967 to January 28, 1970, provides $5 million in annual coverage in excess of $500,000 in underlying primary limits. *Id.* Congoleum alleges the existence of policy RDX-030-809-16-04, with effective

17

dates from January 28, 1970 to February 16, 1973, providing $5 million in annual coverage as part of Congoleum's $10 million layer of coverage in excess of its $5 million first-layer umbrella coverage. *Id.* CNA disputes the existence of this policy, which issue is contested and unresolved in the Coverage Action. *Id.* Policy RDU-8065433, with effective dates from February 16, 1973 to January 1, 1975, provides $10 million in annual first-layer umbrella coverage in excess of $1 million in underlying primary coverage. *Id.* Policy RDX8937036, with effective dates from December 17, 1973 to January 1, 1975, provides $10 million in annual coverage as part of Congoleum's $55 million layer of coverage in excess of $26 million in underlying limits. *Id.*

In addition to the CNA Policies issued or allegedly issued by Continental Casualty listed above, policy EXC102428, issued by Continental Insurance with effective dates from January 1, 1985 to January 1, 1986, provides $10 million in coverage as part of Congoleum's $25 million layer of coverage in excess of $76 million in underlying limits. Feist Decl. ¶ 14.

Once the applicable underlying limits of these policies are exhausted, Congoleum contends that the CNA Policies provide approximately up to $95 million in coverage. Feist Decl. ¶ 15. CNA, however, argues that there are numerous defenses to coverage available, including that Congoleum has materially breached the CNA Policies, and that, as a result, CNA is relieved of certain

18

coverage obligations.  *Id.*  CNA also disputes whether there is or would be a sufficient volume of otherwise insurable claims to reach and/or exhaust the relevant coverage limits.  *Id.*

In order to completely resolve and settle all of the outstanding disputes relating to the CNA Policies by and between the parties, CNA has agreed to pay to the Plan Trust a total of $16,500,000.  Feist Decl. ¶ 16.  CNA shall pay 50% of the Settlement Amount within thirty (30) days of the later of (a) the Approval Date or (b) the date the Confirmation Order becomes a Final Order.  *Id.*  The balance of the Settlement Amount shall be paid on or before January 20 of the calendar year immediately following the year in which the first payment was made.  *Id.*  The Debtors believe in their best business judgment that the CNA Settlement Agreement is fair, reasonable, and is in the best interests of the creditors and the estates.  *Id.*  Accordingly, the Debtors respectfully request that the Court approve the CNA Settlement Agreement.

### C.      The Wausau Settlement

On or about January 28, 2010, the Debtors, the ACC, the Claimants' Representatives and Wausau entered into a certain Settlement Agreement (the "Wausau Settlement Agreement").  Feist Decl. ¶ 17.  A copy of the Wausau Settlement Agreement is attached to the Feist Decl. as Exhibit C and the proposed

19

order approving the Wausau Settlement Agreement is annexed to such settlement agreement as Exhibit 2.

Wausau has seven (7) policies which are subject to the Wausau Settlement Agreement (the "Wausau Policies"). Feist Decl. ¶ 18. Three (3) of these policies are primary level policies. *Id.* Policy 0524-00-084282, with effective dates from January 1, 1973 to January 1, 1974, policy 0525-00-084282, with effective dates from January 1, 1974 to January 1, 1975, and policy 0526-00-084282, with effective dates from January 1, 1975 to January 1, 1976, each provides $1 million in primary coverage that is or was responding on a first-dollar basis to certain of Congoleum's asbestos liabilities for claims arising during the policy periods. *Id.* In August 2002, Wausau notified Congoleum that its primary policies had been exhausted as a result of payments by Wausau. *Id.*

Beyond these primary policies, Wausau has four (4) single-year excess policies at issue in the coverage litigation. Feist Decl. ¶ 19. Policy 5733-00-200275, with effective dates from January 1, 1982 to January 1, 1983, and policy 5734-00-200275, with effective dates from January 1, 1983 to January 1, 1984, each provides $5 million in coverage in excess of Congoleum's $1 million layer of coverage in underlying primary limits in the respective policy period. *Id.* Policy 5736-00-102319, with effective dates from January 1, 1985 to January 1, 1986, provides $5 million in coverage as part of Congoleum's $15 million layer of

20

coverage in excess of $16 million in underlying limits. *Id.* Finally, policy 5736-02-102319, with effective dates from January 1, 1985 to January 1, 1986, provides $7 million in coverage as part of Congoleum's $20 million layer of coverage in excess of $31 million in underlying limits. *Id.*

Once the applicable underlying limits of these policies are exhausted, if applicable, Congoleum contends that the Wausau Policies provide up to $25 million in coverage. Feist Decl. ¶ 20. Wausau, however, argues that there are numerous defenses to coverage available, including that Congoleum has materially breached the Wausau Policies, and that, as a result, Wausau is relieved of certain coverage obligations. *Id.* Wausau also disputes whether there is or would be a sufficient volume of otherwise insurable claims to reach and/or exhaust the relevant coverage limits. *Id.*

In order to completely resolve and settle all of the outstanding disputes relating to the Wausau Policies by and between the parties, Wausau has agreed to pay to the Plan Trust a total of $11,500,000 within thirty (30) days of the later of (a) the Approval Date or (b) the date the Confirmation Order becomes a Final Order. Feist Decl. ¶ 21. The Debtors believe in their best business judgment that the Wausau Settlement Agreement is fair, reasonable, and is in the best interests of the creditors and the estates. *Id.* Accordingly, the Debtors respectfully request that the Court approve the Wausau Settlement Agreement.

### D.   **The OneBeacon Settlement**

On or about January 28, 2010, the Debtors, the ACC, the Claimants'
Representatives and OneBeacon entered into a certain Settlement Agreement (the
"OneBeacon Settlement Agreement").  Feist Decl. ¶ 22.  A copy of the OneBeacon
Settlement Agreement is attached to the Feist Decl. as Exhibit D and the proposed
order approving the OneBeacon Settlement Agreement is annexed to such
settlement agreement as Exhibit 2.

OneBeacon has a single policy which is subject to the OneBeacon
Settlement Agreement (the "OneBeacon Policy").  Feist Decl. ¶ 23.  Policy EY-
9399-004, issued by Employers Commercial Union Insurance Company of
America with effective dates from January 28, 1970 to February 16, 1973, provides
$5 million in annual coverage in excess of $500,000 in underlying primary limits.
*Id.*  Once the applicable underlying limits of this policy are exhausted, Congoleum
contends that the OneBeacon Policy provides approximately up to $15 million in
coverage.  *Id.*  OneBeacon, however, argues that there are numerous defenses to
coverage available, including that Congoleum has materially breached the
OneBeacon Policy, and that, as a result, OneBeacon is relieved of certain coverage
obligations.  *Id.*  OneBeacon also disputes whether there is or would be a sufficient
volume of otherwise insurable claims to reach and/or exhaust the relevant coverage
limits.  *Id.*

22

In order to completely resolve and settle all of the outstanding disputes relating to the OneBeacon Policy and between the parties, OneBeacon has agreed to pay to the Plan Trust a total of $10,242,733 within thirty (30) days of the later of (a) the Approval Date or (b) the date the Confirmation Order becomes a Final Order.  Feist Decl. ¶ 24.  The Debtors believe in their best business judgment that the OneBeacon Settlement Agreement is fair, reasonable, and is in the best interests of the creditors and the estates.  *Id.*  Accordingly, the Debtors respectfully request that the Court approve the OneBeacon Settlement Agreement.

### E.    The Munich Re Settlement

On or about January 28, 2010, the Debtors, the ACC, the Claimants' Representatives and Munich Re entered into a certain Settlement Agreement (the "Munich Re Settlement Agreement").  Feist Decl. ¶ 25.  A copy of the Munich Re Settlement Agreement is attached hereto as Exhibit E and the proposed order approving the Munich Re Settlement Agreement is annexed to such settlement agreement as Exhibit 2.

Munich Re has a single policy which is subject to the Munich Re Settlement Agreement (the "Munich Re Policy").  Feist Decl. ¶ 26.  Policy M-0691611, issued by American Re-Insurance Company (n/k/a Munich Re) with effective dates from February 16, 1973 to January 1, 1976, provides $5 million in annual coverage as part of Congoleum's $10 million layer of coverage in excess of $11 million in

23

underlying limits.  *Id.*  Once the applicable underlying limits of this policy are exhausted, Congoleum contends that the Munich Re Policy provides up to $15 million in coverage.  *Id.*  Munich Re, however, argues that there are numerous defenses to coverage available, including that Congoleum has materially breached the Munich Re Policy, and that, as a result, Munich Re is relieved of certain coverage obligations.  *Id.*  Munich Re also disputes whether there is or would be a sufficient volume of otherwise insurable claims to reach and/or exhaust the relevant coverage limits.  *Id.*

In order to completely resolve and settle all of the outstanding disputes relating to the Munich Re Policy by and between the parties, Munich Re has agreed to pay to the Plan Trust a total of $8,212,800.  Feist Decl. ¶ 27.  Munich Re shall pay 50% of the Settlement Amount within thirty (30) days of the later of (a) the Approval Date or (b) the date the Confirmation Order becomes a Final Order. *Id.*  The balance of the Settlement Amount shall be paid on or before January 20 of the calendar year immediately following the year in which the first payment was made.  *Id.*  The Debtors believe in their best business judgment that the Munich Re Settlement Agreement is fair, reasonable, and is in the best interests of the creditors and the estates.  *Id.*  Accordingly, the Debtors respectfully request that the Court approve the Munich Re Settlement Agreement.

24

F.      **The MMO Settlement**

On or about January 28, 2010, the Debtors, the ACC, the Claimants'

Representatives and MMO entered into a certain Settlement Agreement (the

"MMO Settlement Agreement").  Feist Decl. ¶ 28.  A copy of the MMO

Settlement Agreement is attached to the Feist Decl. as Exhibit F and the proposed

order approving the MMO Settlement Agreement is annexed to such settlement

agreement as Exhibit 2.

MMO has eleven (11) policies which are subject to the MMO Settlement

Agreement (the "MMO Policies").  Feist Decl. ¶ 29.  Each of the MMO Policies is

a single-year, excess-layer policy issued to Congoleum by Employers Mutual

Casualty Company.  *Id.*  Policy MMO70018, with effective dates from January 1,

1978 to January 1, 1979, provides $2 million in coverage as part of Congoleum's

$55 million layer of coverage in excess of $26 million in underlying limits.  *Id.*  In

each of the next four (4) policy years, from 1979 to 1982, MMO issued two (2)

single-year excess policies per year—one lower-attaching and one higher-

attaching—with effective dates from January 1 of the first year to January 1 of the

following year.  *Id.*  During these years, each of the lower-attaching policies[9]

provides $1 million in coverage as part of Congoleum's $10 million layer of

---

[9] The four lower-attaching policies are policy 70606 (1/1/1979-1/1/1980), policy
71201 (1/1/1980-1/1/1981), policy 71653 (1/1/1981-1/1/1982), and policy 73047
(1/1/1982-1/1/1983).  Feist Decl. ¶ 29.

500402274v14

coverage in excess of $11 million in underlying limits and each of the higher-

attaching policies[10] provides $4 million in coverage as part of Congoleum's $55

million layer of coverage in excess of $26 million in underlying limits.  *Id.*  For

two (2) more years beginning in 1983, MMO issued only one excess policy per

year.  *Id.*  Policy 73326, with effective dates from January 1, 1983 to January 1,

1984, provides $5 million in coverage as part of Congoleum's $55 million layer of

coverage in excess of $26 million in underlying limits.  *Id.*  Policy 73526, with

effective dates from January 1, 1984 to January 1, 1985, provides $5 million in

coverage as part of Congoleum's $20 million layer of coverage in excess of $81

million in underlying limits.  *Id.*  Once the applicable underlying limits of these

policies are exhausted, Congoleum contends that the MMO Policies provide up to

$32 million in coverage.  *Id.*  MMO, however, argues that there are numerous

defenses to coverage available, including that Congoleum has materially breached

the MMO Policies, and that, as a result, MMO is relieved of certain coverage

obligations.  *Id.*  MMO also disputes whether there is or would be a sufficient

volume of otherwise insurable claims to reach and/or exhaust the relevant coverage

limits.  *Id.*

---

[10]The four higher-attaching policies are policy 70607 (1/1/1979-1/1/1980), policy
71202 (1/1/1980-1/1/1981), policy 71654 (1/1/1981-1/1/1982), and policy 73048
(1/1/1982-1/1/1983).  Feist Decl. ¶ 29.

In order to completely resolve and settle all of the outstanding disputes relating to the MMO Policies by and between the parties, MMO has agreed to pay to the Plan Trust a total of $7,330,750.  Feist Decl. ¶ 30.  MMO shall pay 50% of the Settlement Amount within thirty (30) days of the later of (a) the Approval Date or (b) the date the Confirmation Order becomes a Final Order.  *Id.*  The balance of the Settlement Amount shall be paid on or before January 20 of the calendar year immediately following the year in which the first payment was made.  *Id.*  The Debtors believe in their best business judgment that the MMO Settlement Agreement is fair, reasonable, and is in the best interests of the creditors and the estates.  *Id.*  Accordingly, the Debtors respectfully request that the Court approve the MMO Settlement Agreement.

### G.     The TIG/U.S. Fire Settlement

On or about January 28, 2010, the Debtors, the ACC, the Claimants' Representatives, TIG and U.S. Fire entered into a certain Settlement Agreement (the "TIG/U.S. Fire Settlement Agreement").  Feist Decl. ¶ 31.  A copy of the TIG/U.S. Fire Settlement Agreement is attached to the Feist Decl. as Exhibit G and the proposed order approving the TIG/U.S. Fire Settlement Agreement is annexed to such settlement agreement as Exhibit 2.

TIG has two (2) policies which are subject to the TIG/U.S. Fire Settlement Agreement (the "TIG Policies").  Feist Decl. ¶ 32.  Each of these policies was

27

issued by International Surplus Lines Insurance Company with effective dates

from January 1, 1985 to January 1, 1986.  *Id.*  Policy XSI10017 provides $5

million in coverage as part of Congoleum's $15 million layer of coverage in excess

of $16 million in underlying limits.  *Id.*  Policy XSI10018 provides $10 million in

coverage as part of Congoleum's $20 million layer of coverage in excess of $31

million in underlying limits.  *Id.*  Once the applicable underlying limits of these

policies are exhausted, Congoleum contends that the TIG Policies provide up to

$15 million in coverage.  *Id.*  TIG, however, argues that there are numerous

defenses to coverage available, including that Congoleum has materially breached

the TIG Policies, and that, as a result, TIG is relieved of certain coverage

obligations.  *Id.*  TIG also disputes whether there is or would be a sufficient

volume of otherwise insurable claims to reach and/or exhaust the relevant coverage

limits.  *Id.*

U.S. Fire has two (2) excess policies which are subject to the TIG/U.S. Fire

Settlement Agreement (the "U.S. Fire Policies").  Feist Decl. ¶ 33.  Policy

3490018299, with effective dates from January 1, 1985 to January 1, 1986, is an

excess multi-marine policy which provides $10 million in coverage as part of

Congoleum's $25 million layer of coverage in excess of $51 million in underlying

limits.  *Id.*  Policy H02317, also with effective dates from January 1, 1985 to

January 1, 1986, is an excess bumbershoot liability policy which provides $5

28

million in coverage as part of Congoleum's $25 million layer of coverage in excess of $76 million in underlying limits. *Id.* Once the applicable underlying limits of these policies are exhausted, Congoleum contends that the U.S. Fire Policies provide up to $15 million in coverage. *Id.* U.S. Fire, however, argues that there are numerous defenses to coverage available, including that Congoleum has materially breached the U.S. Fire Policies, and that, as a result, U.S. Fire is relieved of certain coverage obligations. *Id.* U.S. Fire also disputes whether there is or would be a sufficient volume of otherwise insurable claims to reach and/or exhaust the relevant coverage limits. *Id.*

In order to completely resolve and settle all of the outstanding disputes relating to the TIG Policies and the U.S. Fire Policies by and between the parties, TIG and U.S. Fire have agreed to pay to the Plan Trust a total of $4,849,800 and $50,000 respectively within thirty (30) days of the later of (a) the Approval Date or (b) the date the Confirmation Order becomes a Final Order. Feist Decl. ¶ 34. The Debtors believe in their best business judgment that the TIG/U.S. Fire Settlement Agreement is fair, reasonable, and is in the best interests of the creditors and the estates. *Id.* Accordingly, the Debtors respectfully request that the Court approve the TIG/U.S. Fire Settlement Agreement.

### H. **The London Settlement**

On or about January 28, 2010, the Debtors, the ACC, the Claimants'

Representatives and London entered into a certain Settlement Agreement (the

"London Settlement Agreement").  Feist Decl. ¶ 35.  A copy of the London

Settlement Agreement is attached to the Feist Decl. as Exhibit H and the proposed

order approving the London Settlement Agreement is annexed to such settlement

agreement as Exhibit 2.

London has fifteen (15) actual or alleged policies which are subject to the

London Settlement Agreement (the "London Policies").  Feist Decl. ¶ 36.

Congoleum and London dispute the existence of one (1) of these policies.  *Id.*

Nine (9) of the policies comprise all of Congoleum's excess liability insurance

between November 12, 1953 and February 1, 1961.  *Id.*  Policies K21783, K21782

and K21784, each with effective dates from November 12, 1953 to November 12,

1954, provide $1 million in coverage in excess of $500,000 in underlying primary

limits.  *Id.*  Policies K28288, K28289, K28290 and K28291, each with effective

dates from November 12, 1954 to January 1, 1958, provide $1 million in coverage

in excess of $500,000 in underlying primary limits during those policy years.  *Id.*

Policies CK2458 and CK2459, each with effective dates from January 1, 1958 to

February 1, 1961, provide $1 million in coverage in excess of $500,000 in

underlying primary limits.  *Id.*

30

In subsequent policy years, the London Policies provide certain higher-level excess coverage.  Feist Decl. ¶ 37.  Policy 881/WHL551, with effective dates from April 1, 1976 to April 1, 1977, provides $5 million in coverage in excess of up to $6 million in underlying primary limits.  *Id.*  Policy 881/UJL0389, with effective dates from April 1, 1977 to January 1, 1980, provides $5 million in coverage in excess of $1 million in underlying primary limits.  *Id.*  Policies 881/WJU551, 881/WKT051 and 881/WLT121, also with effective dates from April 1, 1977 to January 1, 1980, provide another $5 million in coverage in excess of policy 881/UJL0389.  *Id.*  Policy 881/UJL0057, with effective dates from January 1, 1977 to January 1, 1978, provides $5 million in coverage as part of Congoleum's $55 million layer of coverage in excess of $26 million in underlying limits.  *Id.*  Finally, Congoleum alleges the existence of policy EL 10355, with effective dates from January 1, 1980 to January 1, 1981, providing $2 million in coverage as part of Congoleum's $55 million layer of coverage in excess of $26 million in underlying limits.  *Id.*  London disputes the existence of this policy, which issue is contested and unresolved in the Coverage Action.  *Id.*

Once the applicable underlying limits of these policies are exhausted, Congoleum contends that the London Policies provide up to $49 million in coverage.  Feist Decl. ¶ 38.  Because all but one of these policies were also subscribed to by entities other than the Certain London Market Insurance

31

Companies, only approximately $12.5 million of those limits were subscribed to by the Certain London Market Insurance Companies which are parties to the London Settlement Agreement.  *Id.*  In addition, London argues that there are numerous defenses to coverage available, including that Congoleum has materially breached the London Policies, and that, as a result, London is relieved of certain coverage obligations.  *Id.*  London also disputes whether there is or would be a sufficient volume of otherwise insurable claims to reach and/or exhaust the relevant coverage limits.  *Id.*

In order to completely resolve and settle all of the outstanding disputes relating to the London Policies by and between the parties, each of the Certain London Market Insurance Companies has agreed to pay to the Plan Trust its several, allocated share of $4,127,050 within thirty (30) days of the later of (a) the Approval Date or (b) the date the Confirmation Order becomes a Final Order. Feist Decl. ¶ 39.  The Debtors believe in their best business judgment that the London Settlement Agreement is fair, reasonable, and is in the best interests of the creditors and the estates.  *Id.*  Accordingly, the Debtors respectfully request that the Court approve the London Settlement Agreement.

## I.    <u>The Westport Settlement</u>

On or about January 28, 2010, the Debtors, the ACC, the Claimants' Representatives and Westport entered into a certain Settlement Agreement (the

"Westport Settlement Agreement").  Feist Decl. ¶ 40.  A copy of the Westport

Settlement Agreement is attached to the Feist Decl. as Exhibit I and the proposed

order approving the Westport Settlement Agreement is annexed to such settlement

agreement as Exhibit 2.

      Westport has three (3) policies which are subject to the Westport Settlement

Agreement (the "Westport Policies"), two (2) of which were issued by the

Manhattan Fire and Marine Insurance Company[11] and the other of which was

issued by Puritan Insurance Company.  Feist Decl. ¶ 41.  Policy ML650447, with

effective dates from January 1, 1978 to January 1, 1979, policy ML651558, with

effective dates from January 1, 1979 to January 1, 1980, and policy ML652264,

with effective dates from January 1, 1980 to January 1, 1981, each provides $5

million in coverage as part of Congoleum's $55 million layer of coverage in excess

of $26 million in underlying limits in the respective policy period.  *Id.*  Once the

applicable underlying limits of these policies are exhausted, Congoleum contends

that the Westport Policies provide up to $15 million in coverage.  *Id.*  Westport,

however, argues that there are numerous defenses to coverage available, including

that Congoleum has materially breached the Westport Policies, and that, as a result,

Westport is relieved of certain coverage obligations.  *Id.*  Westport also disputes

---

[11]The insurer name on these two policies was subsequently changed by
endorsement to Puritan Insurance Company.  Feist Decl. ¶ 41.

whether there is or would be a sufficient volume of otherwise insurable claims to reach and/or exhaust the relevant coverage limits.  *Id.*

In order to completely resolve and settle all of the outstanding disputes relating to the Westport Policies by and between the parties, Westport has agreed to pay to the Plan Trust a total of $2,988,350 within thirty (30) days of the later of (a) the Approval Date or (b) the date the Confirmation Order becomes a Final Order.  Feist Decl. ¶ 42.  The Debtors believe in their best business judgment that the Westport Settlement Agreement is fair, reasonable, and is in the best interests of the creditors and the estates.  *Id.*  Accordingly, the Debtors respectfully request that the Court approve the Westport Settlement Agreement.

### J.  **The Old Republic Settlement**

On or about January 28, 2010, the Debtors, the ACC, the Claimants' Representatives and Old Republic entered into a certain Settlement Agreement (the "Old Republic Settlement Agreement").  Feist Decl. ¶ 43.  A copy of the Old Republic Settlement Agreement is attached to the Feist Decl. as Exhibit J and the proposed order approving the Old Republic Settlement Agreement is annexed to such settlement agreement as Exhibit 2.

Old Republic has two (2) policies which are subject to the Old Republic Settlement Agreement (the "Old Republic Policies").  Feist Decl. ¶ 44.  Policy OZX11607, with effective dates from January 1, 1981 to January 1, 1982, and

34

policy OZX11787, with effective dates from January 1, 1982 to January 1, 1983, each provides $5 million in coverage as part of Congoleum's $55 million layer of coverage in excess of $26 million in underlying limits. *Id.* Policies OZX11607 and OZX11787 also provide $5 million in coverage as part of Congoleum's $20 million layer of coverage in excess of $81 million in underlying limits. *Id.* Once the applicable underlying limits of these policies are exhausted, Congoleum contends that the Old Republic Policies provide up to $20 million in coverage. *Id.* Old Republic, however, argues that there are numerous defenses to coverage available, including that Congoleum has materially breached the Old Republic Policies, and that, as a result, Old Republic is relieved of certain coverage obligations. *Id.* Old Republic also disputes whether there is or would be a sufficient volume of otherwise insurable claims to reach and/or exhaust the relevant coverage limits. *Id.*

In order to completely resolve and settle all of the outstanding disputes relating to the Old Republic Policies by and between the parties, Old Republic has agreed to pay to the Plan Trust a total of $1,991,250 within thirty (30) days of the later of (a) the Approval Date or (b) the date the Confirmation Order becomes a Final Order. Feist Decl. ¶ 45. The Debtors believe in their best business judgment that the Old Republic Settlement Agreement is fair, reasonable, and is in the best

35

interests of the creditors and the estates. *Id.* Accordingly, the Debtors respectfully request that the Court approve the Old Republic Settlement Agreement.

### K.   **The Transport Settlement**

On or about January 28, 2010, the Debtors, the ACC, the Claimants' Representatives and Transport entered into a certain Settlement Agreement (the "Transport Settlement Agreement").  Feist Decl. ¶ 46.  A copy of the Transport Settlement Agreement is attached to the Feist Decl. as Exhibit K and the proposed order approving the Transport Settlement Agreement is annexed to such settlement agreement as Exhibit 2.

Transport has two (2) high-level excess policies which are subject to the Transport Settlement Agreement (the "Transport Policies").  Feist Decl. ¶ 47. Policy TEL 900359, with effective dates from January 1, 1984 to January 1, 1985, provides $10 million in coverage as part of Congoleum's $55 million layer of coverage in excess of $26 million of underlying limits.  *Id.*  Policy TEL 01129C, with effective dates from January 1, 1985 to July 15, 1985, provides $5 million in coverage as part of Congoleum's $25 million layer of coverage in excess of $51 million of underlying limits.  *Id.*  Once the applicable underlying limits of these policies are exhausted, Congoleum contends that the Transport Policies provide up to $15 million in coverage.  *Id.*  Transport, however, argues that there are numerous defenses to coverage available, including that Congoleum has materially

36

breached the Transport Policies, and that, as a result, Transport is relieved of

certain coverage obligations.  *Id.*  Transport also disputes whether there is or would

be a sufficient volume of otherwise insurable claims to reach and/or exhaust the

relevant coverage limits.  *Id.*

In order to completely resolve and settle all of the outstanding disputes

relating to the Transport Policies and between the parties, Transport has agreed to

pay to the Plan Trust a total of $1,373,508 within thirty (30) days of the later of (a)

the Approval Date or (b) the date the Confirmation Order becomes a Final Order.

Feist Decl. ¶ 48.  The Debtors believe in their best business judgment that the

Transport Settlement Agreement is fair, reasonable, and is in the best interests of

the creditors and the estates.  *Id.*  Accordingly, the Debtors respectfully request that

the Court approve the Transport Settlement Agreement.

## L.     **The Stonewall Settlement**

On or about January 28, 2010, the Debtors, the ACC, the Claimants'

Representatives and Stonewall entered into a certain Settlement Agreement (the

"Stonewall Settlement Agreement").  Feist Decl. ¶ 49.  A copy of the Stonewall

Settlement Agreement is attached to the Feist Decl. as Exhibit L and the proposed

order approving the Stonewall Settlement Agreement is annexed to such settlement

agreement as Exhibit 2.

500402274v14

Stonewall has a single policy which is subject to the Stonewall Settlement Agreement (the "Stonewall Policy"). Feist Decl. ¶ 50. Policy 36000045, with effective dates from January 1, 1976 to January 1, 1977, provides $5 million as part of Congoleum's $10 million layer of coverage in excess of $11 million in underlying limits. *Id.* Once the applicable underlying limits of this policy are exhausted, Congoleum contends that the Stonewall Policy provides up to $5 million in coverage. *Id.* Stonewall, however, argues that there are numerous defenses to coverage available, including that Congoleum has materially breached the Stonewall Policy, and that, as a result, Stonewall is relieved of certain coverage obligations. *Id.* Stonewall also disputes whether there is or would be a sufficient volume of otherwise insurable claims to reach and/or exhaust the relevant coverage limits. *Id.*

In order to completely resolve and settle all of the outstanding disputes relating to the Stonewall Policy and between the parties, Stonewall has agreed to pay to the Plan Trust a total of $883,759 within thirty (30) days of the later of (a) the Approval Date or (b) the date the Confirmation Order becomes a Final Order. Feist Decl. ¶ 51. The Debtors believe in their best business judgment that the Stonewall Settlement Agreement is fair, reasonable, and is in the best interests of the creditors and the estates. *Id.* Accordingly, the Debtors respectfully request that the Court approve the Stonewall Settlement Agreement.

### M.    The Navigators Settlement

On or about January 28, 2010, the Debtors, the ACC, the Claimants'

Representatives and Navigators entered into a certain Settlement Agreement (the

"Navigators Settlement Agreement").  Feist Decl. ¶ 52.  A copy of the Navigators

Settlement Agreement is attached to the Feist Decl. as Exhibit M and the proposed

order approving the Navigators Settlement Agreement is annexed to such

settlement agreement as Exhibit 2.

Navigators has a single policy which is subject to the Navigators Settlement

Agreement, policy 85-L-1116/01 (the "Navigators Policy").  Feist Decl. ¶ 53.  The

Navigators Policy[12] is a subscription policy, which Navigators contends was issued

severally, but not jointly, by Colonia Insurance Company, United Reinsurance

Company of New York and Navigators Insurance Company.  *Id.*  The Navigators

Policy, with effective dates from January 1, 1985 to January 1, 1986, provides $5

million in coverage as part of Congoleum's $25 million layer of coverage in excess

of $76 million in underlying limits.  *Id.*  Once the applicable underlying limits of

these policies are exhausted, Congoleum contends that the Navigators Policy

provides up to $5 million in coverage.  *Id.*  Navigators, however, argues that there

are numerous defenses to coverage available, including that Congoleum has

---

[12]For informational purposes only: Navigators has assigned this policy internal
    tracking number NY85NMC/L111601.  Feist Decl. ¶ 53.

500402274v14

materially breached the Navigators Policy, and that, as a result, Navigators is relieved of certain coverage obligations.  *Id.*  Navigators also disputes whether there is or would be a sufficient volume of otherwise insurable claims to reach and/or exhaust the relevant coverage limits.  *Id.*

In order to completely resolve and settle all of the outstanding disputes relating to the Navigators Policies by and between the parties, Navigators has agreed to pay to the Plan Trust a total of $400,000 within thirty (30) days of the later of (a) the Approval Date or (b) the date the Confirmation Order becomes a Final Order.  Feist Decl. ¶ 54.  The Debtors believe in their best business judgment that the Navigators Settlement Agreement is fair, reasonable, and is in the best interests of the creditors and the estates.  *Id.*  Accordingly, the Debtors respectfully request that the Court approve the Navigators Settlement Agreement.

### N.   **The American Centennial Settlement**

On or about January 28, 2010, the Debtors, the ACC, the Claimants' Representatives and American Centennial entered into a certain Settlement Agreement (the "American Centennial Settlement Agreement").  Feist Decl. ¶ 55. A copy of the American Centennial Settlement Agreement is attached to the Feist Decl. as Exhibit N and the proposed order approving the American Centennial Settlement Agreement is annexed to such settlement agreement as Exhibit 2.

American Centennial has a single policy which is subject to the American Centennial Settlement Agreement (the "American Centennial Policy").  Feist Decl. ¶ 56.  Policy CC-01-58-52, with effective dates from January 1, 1984 to January 1, 1985, provides $1 million in coverage as part of Congoleum's $20 million layer of coverage in excess of $81 million in underlying limits.  *Id.*  Once the applicable underlying limits of this policy are exhausted, Congoleum contends that the American Centennial Policy provides up to $1 million in coverage.  *Id.*  American Centennial, however, argues that there are numerous defenses to coverage available, including that Congoleum has materially breached the American Centennial Policy, and that, as a result, American Centennial is relieved of certain coverage obligations.  *Id.*  American Centennial also disputes whether there is or would be a sufficient volume of otherwise insurable claims to reach and/or exhaust the relevant coverage limits.  *Id.*

In order to completely resolve and settle all of the outstanding disputes relating to the American Centennial Policies by and between the parties, American Centennial has agreed to pay to the Plan Trust a total of $50,000 within thirty (30) days of the later of (a) the Approval Date or (b) the date the Confirmation Order becomes a Final Order.  Feist Decl. ¶ 57.  The Debtors believe in their best business judgment that the American Centennial Settlement Agreement is fair, reasonable, and is in the best interests of the creditors and the estates.  *Id.*

41

Accordingly, the Debtors respectfully request that the Court approve the American Centennial Settlement Agreement.

### O.    The NJPLIGA-NJSLIGF Settlement

On or about January 28, 2010, the Debtors, the ACC, the Claimants' Representatives, NJPLIGA and NJSLIGF entered into a certain Settlement Agreement (the "NJPLIGA-NJSLIGF Settlement Agreement").  Feist Decl. ¶ 58. A copy of the NJPLIGA-NJSLIGF Settlement Agreement is attached to the Feist Decl. as Exhibit O and the proposed order approving the NJPLIGA-NJSLIGF Settlement Agreement is annexed to such settlement agreement as Exhibit 2.

Created by the New Jersey Property-Liability Insurance Guaranty Association Act, N.J.S.A. 17:30A-1, *et seq.*, NJPLIGA manages and administers claims which are asserted against certain insolvent insurance companies and their policyholders.  Feist Decl. ¶ 59.  NJPLIGA contends that it is obligated to pay claims to the extent such claims fall within the definition of a "covered claim" as provided for by the statute.  *See* N.J.S.A. 17:30A-5(d); Feist Decl. ¶ 59.  NJPLIGA describes itself as a private, non-profit, unincorporated legal entity dependent upon revenues received through statutory assessments charged to all member insurers. *Id.*  Although NJPLIGA indicates that it will pay any claim which meets the definition of a "covered claim," NJPLIGA limits recovery on any claim to a maximum statutory benefit of the lesser of the policy limits or $300,000.  *Id.*  As

42

described below, Congoleum has claims against NJPLIGA involving six (6)

different insolvent insurers and a total of over thirty (30) individual policies.  *Id.*

Because the policy limits on each implicated policy far exceed the statutory limits

and because its claim or claims against each is "covered" under the statute,

Congoleum contends that it is at least due the statutory maximum for each

insolvent policy in each policy year.  *Id.*   NJPLIGA, on the other hand, contends

that Congoleum cannot establish the statutory prerequisites for a "covered claim."

*Id.*   Under the NJPLIGA-NJSLIGF Settlement Agreement, Congoleum is still

entitled to pursue claims against insolvent insurers in liquidation proceedings,

although it is unlikely that Congoleum would be able to obtain recoveries from

insolvent insurers comparable with those from solvent insurers.  *Id.*

Congoleum claims that it is entitled to benefits from NJPLIGA as a result of

six (6) high-level excess policies issued by the insolvent insurer Integrity Insurance

Company.  Feist Decl. ¶ 60.  Policy XL200500, with effective dates from January

1, 1979 to January 1, 1980, policy XL207014, with effective dates from January 1,

1983 to January 1, 1984, and policy XL207970, with effective dates from January

1, 1984 to January 1, 1985, each provides $5 million in coverage as part of

Congoleum's $55 million layer of coverage in excess of $26 million in underlying

limits in the respective policy period.  *Id.*  Policy XL207970 also provides $1

million in coverage as part of Congoleum's $10 million layer of coverage in excess

43

of $11 million in underlying limits. *Id.* Policy XL201439, with effective dates from January 1, 1980 to January 1, 1981, policy XL201522, with effective dates from January 1, 1981 to January 1, 1982, and policy XL203766, with effective dates from January 1, 1982 to January 1, 1983, each provides $6 million in coverage as part of Congoleum's $55 million layer of coverage in excess of $26 million in underlying limits in the respective policy periods. *Id.* Finally, policy XL210163, with effective dates from January 1, 1985 to January 1, 1986, provides $3 million in coverage as part of Congoleum's $20 million layer of coverage in excess of $31 million in underlying limits. *Id.*

Congoleum claims that it is entitled to benefits from NJPLIGA as a result of eleven (11) high-level excess policies issued by the insolvent insurer Midland Insurance Company ("Midland"). Feist Decl. ¶ 61. Policy XL1110170044735, with effective dates from October 12, 1972 to January 1, 1976, provides coverage as part of Congoleum's $55 million layer of coverage in excess of $25 million in underlying limits. *Id.* Policy XL1110170044735 provides $20 million in coverage from October 12, 1972 to December 17, 1973, $25 million in coverage from December 17, 1973 to January 1, 1975, and $30 million in coverage from January 1, 1975 to January 1, 1976. *Id.* In addition, from 1976 to 1984, Midland issued the following policies as a series of one-year excess policies: XL145821 (1976; $30 million), XL152158 (1977; $23 million), XL148361 (1978; $23 million),

XL160344 (1979; $8 million), XL706593 (1980; $5 million), XL723759 (1981; $5 million), XL724778 (1982; $5 million), XL748705 (1983; $10 million), and XL770108 (1984; $10 million). *Id.* Each policy was effective from January 1 of that year to January 1of the following year and each provides coverage as part of a Congoleum's $55 million layer of coverage in excess of $26 million in underlying limits. *Id.* Between January 1, 1984 and January 1, 1985, Midland also issued Congoleum a second policy, XL770107, which provides $3 million in coverage as part of Congoleum's $10 million layer of coverage in excess of $11 million in underlying limits. *Id.*

Congoleum claims that it is entitled to benefits from NJPLIGA as a result of three (3) first-level excess policies issued by the insolvent insurer Mission Insurance Company. Feist Decl. ¶ 62. Policy M81757, with effective dates from January 1, 1975 to April 1, 1976, provides $10 million in coverage in excess of $1 million of underlying primary limits. *Id.* Policy M831963, with effective dates from April 1, 1976 to April 1, 1977, provides $5 million in coverage in excess of $1 million of underlying primary limits. *Id.* Policy M856066, with effective dates from January 1, 1980 to January 1, 1981, provides $5 million in limits in excess of $1 million of underlying primary limits. *Id.*

Congoleum claims that it is entitled to benefits from NJPLIGA as a result of a single policy, HEC-979-13-74, issued by the insolvent insurer The Home

45

Insurance Company.  Feist Decl. ¶ 63.  This multi-year excess policy, with effective dates from January 28, 1970 to February 16, 1973, provides Congoleum with $5 million in annual coverage as part of Congoleum's $10 million layer of cover in excess of up to $6 million in underlying limits.  *Id.*

Congoleum claims that it is entitled to benefits from NJPLIGA as a result of eleven (11) excess policies issued by the insolvent insurer Transit Casualty Company.  Feist Decl. ¶ 64.  Policy SCU955066, with effective dates from January 1, 1979 to January 1, 1980, and policy SCU955427, with effective dates from January 1, 1980 to January 1, 1981, each provides $10 million in coverage as part of Congoleum's $55 million layer of coverage in excess of $26 million in underlying limits in the respective policy period.  *Id.*  Policy SCU955786, with effective dates from January 1, 1981 to January 1, 1982, and policy SCU956122, with effective dates from January 1, 1982 to January 1, 1983, each provides $5 million in coverage in excess of $6 million in underlying limits in the respective policy period.  *Id.*  Policy SCU55787, with effective dates from January 1, 1981 to January 1, 1982, and policy SCU956123, with effective dates from January 1, 1982 to January 1, 1983, each provides $10 million in coverage as part of Congoleum's $55 million layer of coverage in excess of $26 million in underlying limits in the respective policy period.  *Id.*  Policy SCU956394, with effective dates from January 1, 1983 to January 1, 1984, and policy SCU956652, with effective dates

46

from January 1, 1984 to January 1, 1985, each provides $5 million in coverage in excess of $6 million in underlying limits in the respective policy period. *Id.* Policy SCU956395, with effective dates from January 1, 1983 to January 1, 1984, and policy SCU956653, with effective dates from January 1, 1984 to January 1, 1985, each provides $5 million in coverage in excess of $21 million in underlying limits in the respective policy period. *Id.* Policy SCU957115, with effective dates from January 1, 1985 to January 1, 1986, provides $4 million in coverage as part of Congoleum's $10 million layer of coverage in excess of $6 million in underlying limits. *Id.*

Congoleum claims that it is entitled to benefits from NJPLIGA as a result of a single excess policy issued by the insolvent insurer Western Employers Insurance Company. Feist Decl. ¶ 65. Policy EX10-0185-20348, with effective dates from January 1, 1985 to January 1, 1986, provides $5 million in coverage as part of Congoleum's $15 million layer of coverage in excess of $16 million in underlying limits. *Id.*

In addition to the policies set forth above, Congoleum claims that it is entitled to benefits from NLSLIGF as a result of a single policy issued to Congoleum by the insolvent surplus insurer Holland-America Insurance Company. Feist Decl. ¶ 66. Created by the New Jersey Surplus Lines Insurance Guaranty Fund Act, N.J.S.A. 17:22-6.70a, *et seq.*, NLSLIGF manages and administers

claims of insolvent surplus lines insurers that were eligible to transact insurance business in the State of New Jersey at the time the policy was issued. *Id.* Policy R83678, with effective dates from January 1, 1981 to January 1, 1982, provides $5 million in coverage in excess of $1 million in underlying primary limits. *Id.*

Congoleum contends that it has a claim for coverage against NJPLIGA and NLSLIGF under the respective statutes, while NJPLIGA and NLSLIGF contend that Congoleum fails to satisfy the relevant statutory requirements and therefore is not entitled to coverage. Feist Decl. ¶ 67. In order to completely resolve and settle all of the outstanding disputes relating to NJPLIGA-NJSLIGF by and between the parties, NJPLIGA and NJSLIGF have agreed to pay to the Plan Trust a total of $13,000,000 within thirty (30) days of the later of (a) the Approval Date or (b) the date the Confirmation Order becomes a Final Order. *Id.* The Debtors believe in their best business judgment that the NJPLIGA-NJSLIGF Settlement Agreement is fair, reasonable, and is in the best interests of the creditors and the estates. *Id.* Accordingly, the Debtors respectfully request that the Court approve the NJPLIGA-NJSLIGF Settlement Agreement.

## ARGUMENT

I.   **THE SETTLEMENT AGREEMENTS SHOULD BE APPROVED PURSUANT TO BANKRUPTCY RULE 9019**

This Court has the right and the power to approve the Settlement Agreements. *See* Fed R. Bankr. P. 9019(a); 11 U.S.C. § 363. Specifically,

48

Bankruptcy Rule 9019(a) provides, in pertinent part, that on a motion by a debtor, and after notice and hearing, "the court may approve a compromise or settlement."

Settlements and compromises are "a normal part of the process of reorganization." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (*quoting Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)). Indeed, to "minimize litigation and expedite the administration of a bankruptcy estate, '[c]ompromises are favored in bankruptcy.'" *In re Martin*, 91 F.3d 389, 393 (3rd Cir. 1996) (*quoting Collier on Bankruptcy* ¶ 9019.03[1] (15th ed. 1993)).

"A bankruptcy court may approve a settlement where it is supported by adequate consideration, is fair and equitable, and is in the best interests of the estate." *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994) (*quoting TMT Trailer Ferry, Inc.*, 390 U.S. at 424). In determining whether to approve a proposed settlement, a bankruptcy court need not decide the numerous issues of law and fact raised by the settlement, but should instead "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." *In re Jasmine, Ltd.*, 258 B.R. 119, 123 (D.N.J. 2000) (*quoting In re Neshaminy Office Bldg. Assocs.*, 62 B.R. 798, 803 (E.D. Pa.1986)).

In deciding whether a particular settlement falls within the "range of reasonableness," courts consider the following factors:  (i) the probability of success in the litigation; (ii) the likely difficulties of collection; (iii) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and (iv) the paramount interest of the creditors.  *See In re Martin*, 91 F.3d at 393.

The Debtors believe that the Multi-Insurer Settlement and the individual Settlement Agreements are well above "the lowest point in the range of reasonableness" and therefore should be approved.  Feist Decl. ¶ 68; *see also In re Jasmine*, 258 B.R. at 123 (*quoting In re Neshaminy*, 62 B.R. at 803).  The Multi-Insurer Settlement and the individual Settlement Agreements provide the best opportunity for the present and future asbestos claimants to receive real value in a timely fashion, especially with a confirmation schedule in place for the Plan.  Feist Decl. ¶ 68.

A.      **First Factor:  The Probability of Success in Litigation**

The Coverage Action was scheduled to be tried in three phases.  Feist Decl. ¶ 81.[13]  The central issue in Phase 1 was whether there was coverage for settlements in the pre-petition Claimant Agreement.  *Id.*  Phase 2 originally was

---

[13]The description of the Coverage Action set forth herein reflects the Debtors' views and positions.  The Participating Insurers do not necessarily agree with those views and positions.

supposed to address whether and to what extent the insurers were obligated to

provide insurance coverage for the 131 Pre-Petition Settlement Agreements, as

well as other remaining coverage issues, such as trigger, allocation and other

defenses.  *Id.*  At the insurers' request, however, the court in the Coverage Action

entered a Case Management Order expanding the scope of Phase 2 to include a

determination of whether Congoleum has coverage for any and all past, present

and future asbestos claims.  *Id.*  Phase 3 of the Coverage Action was to include

issues relating to bad faith, if appropriate.  *Id.*

The trial regarding Phase 1 issues lasted approximately eleven months.

Feist Decl. ¶ 82.  On May 18, 2007, the State Court issued a decision and judgment

ruling that the Claimant Agreement was an unreasonable agreement, not made in

good faith, and therefore Congoleum's insurers had no obligation to provide

insurance coverage for the Claimant Agreement.  *Id.*

In March 2009, the State Court determined that it would commence Phase 2

of the Coverage Action.  Feist Decl. ¶ 83.  The Participating Insurers and

NJPLIGA and NJSLIGF have asserted numerous defenses to liability and

counterclaims for affirmative relief in the Coverage Action including:

- The Pre-Petition Settlement Agreements, the Claimant Agreement,
  subsequent bankruptcy litigation settlements, the proposed Trust
  Distribution Procedures (the "TDP") under prior plans and the Plan
  (collectively, the "Congoleum Agreements and Proposed Plans"),
  were not entered into in good faith and/or were not reasonable;

- The Congoleum Settlements breached the cooperation clause and the no voluntary payment clause of the policies;

- The Congoleum Settlements do not exhaust underlying insurance;

- The Congoleum Settlements violate the Participating Insurers' right to settle; and

- There is no coverage under the policies for asbestos claims settled by the Congoleum Settlements, including the proposed TDP.

Feist Decl. ¶ 83.

Advancing these arguments and others, on July 30, 2009, the Participating Insurers filed a motion for summary judgment in the Coverage Action seeking a declaration, among other things, that the Debtors have materially breached their insurance policies and, as a result, that the insurers are relieved of all of their coverage obligations under the Subject Policies for claims resolved pursuant to the Claimant Agreement.  Feist Decl. ¶ 84.  The State Court denied the insurers' summary judgment motion, and a trial on the merits of their claims was scheduled to begin in February 2010.  *Id.*  A stand down of litigation has been in place since November 2009 pending finalization of the Multi-Insurer Settlement Agreement. *Id.*  Although Congoleum believes that it will prevail in the Coverage Action, the outcome of this litigation is far from certain.  *Id.*  If the Participating Insurers are successful on their claims, Congoleum (or the Plan Trust) risks losing *all* of its insurance coverage for present and future asbestos claims.  *Id.*  There is no guarantee that Congoleum will successfully defend the causes of action brought— and to be brought—against it by the Participating Insurers in the next phases of the

52

Coverage Action.  *Id.*  The Debtors submit that entering into the Settlement

Agreements now for a total amount of $100 million is an optimum resolution

compared to the expense of continued litigation and the risks of trial.  *Id.*  This

Court, therefore, should conclude that the first factor supports approval of the

Settlement Agreements.

### B.   Second Factor:  The Likely Difficulties of Collection

Many of the Participating Insurers are high-level excess insurance carriers

with policies that have varying high-level attachment points.  Feist Decl. ¶ 85.  In

order to collect the full combined aggregate limits of the Policies, the Participating

Insurers contend that the Debtors would have to incur over $1.2 billion in total

losses or claims allocated over various years of coverage before the their Subject

Policies would be triggered and exhausted.  *Id.*; *see also Carter-Wallace, Inc. v.

Admiral Ins. Co.,* 154 N.J. 312 (1998).  It is likely that it will take many years

before the Plan Trust will allow $1.2 billion in total losses or claims required to

trigger and exhaust the Subject Policies, if it is possible to reach such amount at all.

Feist Decl. ¶ 85.

In addition, any outcome of the Coverage Action at the trial level will

almost certainly be appealed and further coverage disputes will also likely arise.

Feist Decl. ¶ 86.  Even if the Debtors prevailed in the Coverage Action, it likely

will take many years before the Participating Insurers and NJPLIGA and NJSLIGF

make payments on account of their Subject Policies.  *Id.*  In contrast, the

Settlement Agreements provide certainty that the Plan Trust will receive $100

million within a year after entry of a Final Order confirming the Plan ($3 million of

which will be dedicated to the Reserve Fund).  *Id.*  For each of these reasons, the

Debtors submit that this factor also weighs in favor of settlement.

### C.    Third Factor:  The Complexity of the Litigation Involved

The Coverage Action has become more complex over time, not less.  Feist

Decl. ¶ 87.  During the course of the litigation, over 100 depositions have been

taken and many tens of thousands of documents have been produced.  *Id.*  The

calculations of policy limits and the determination of which insurer is responsible

for which amounts and in what layer of coverage involves extraordinarily complex

legal and factual issues.  *Id.*  The Coverage Action has been underway for

approximately eight (8) years already and only the first phase has been completed.

*Id.*  Phase 1 of the Coverage Action dealt only with the insurers' liability under the

Claimant Agreement.  *Id.*  Phase 2 of the Coverage Action has yet to be tried.  *Id.*

As seen in the summary judgment briefing submitted by the Participating Insurers

in July 2009, they are attempting in Phase 2 of the Coverage Action to obtain a

ruling of material breach by Congoleum and a declaration regarding whether and

to what extent Congoleum has rights to coverage for any and all asbestos-related

54

claims. *Id.* Thus, Phase 2 of the litigation arguably is more critical to the Debtors than the litigation in Phase 1 of the Coverage Action. *Id.*

In addition, the Participating Insurers and NJPLIGA and NJSLIGF have opposed the Debtors' reorganization efforts at virtually every stage of these bankruptcy cases. Feist Decl. ¶ 88. The Debtors, the Participating Insurers and NJPLIGA and NJSLIGF have spent many millions of dollars over the years in this bankruptcy litigation. *Id.* The cost of trying both the bankruptcy case and the Coverage Action at the same time is enormous. *Id.* Congoleum, the Participating Insurers and NJPLIGA and NJSLIGF, therefore, desire to settle their disputes now so that they are not forced to litigate both the bankruptcy case and the Coverage Action for years to come. *Id.* Pursuant to the Settlement Agreements, if the agreements are approved by this Court and become final, non-appealable orders, the Participating Insurers and NJPLIGA and NJSLIGF have agreed to withdraw any pending objections in the reorganization proceeding and desist from further objections (provided that the Plan is not inconsistent with the Settlement Agreements). *Id.* Thus, the approval of the Settlement Agreements will streamline plan confirmation proceedings and pave the way for Congoleum's emergence from bankruptcy. *Id.* Accordingly, the Debtors submit that the third factor also supports approval of the Settlement Agreements.

**D.**     **Fourth Factor:  The Paramount Interest of the Creditors**

The Debtors believe that the Settlement Agreements provide a significant and valuable benefit to the Debtors' estates and their creditors.  Feist Decl. ¶ 89. The Debtors, in their business judgment, believe that the creditors of the estates would be better served by an agreement that secures payment of $100 million within a short period following confirmation of the Plan, rather than possibly receiving an undetermined amount at an unknown point in the future.  *Id.*  This is especially true given the scope of Phase 2.  *Id.*  The insurers were successful in Phase 1 of the Coverage Action.  *Id.*  If they are successful in Phase 2 of the Coverage Action, the State Court could determine that Congoleum has no rights to coverage from the Participating Insurers for Congoleum's asbestos claims.  *Id.*  If the Coverage Action were not resolved before confirmation, the litigation would have to continue post-confirmation with the Plan Trust stepping into the shoes of the Debtors.  *Id.*  While the Debtors believe that they would be successful in their claims for asbestos coverage, they believe that it is far better to settle the disputes with the Participating Insurers and NJPLIGA and NJSLIGF for $100 million, rather than taking the risk of losing all insurance coverage under the Subject Policies in the future.  *Id.*

Collectively, these Settlement Agreements represent the estates' surest chance of payment for asbestos personal injury claims under the Subject Policies.

500402274v14

Feist Decl. ¶ 90.  Accordingly, the Debtors submit that the terms and conditions of the Settlement Agreements are fair and reasonable in light of the costs, potential risks and delays associated with continued litigation in the Coverage Action.  *Id.*

The Debtors further submit that each of the Settlement Agreements was negotiated at arms' length and is in the best interests of the Debtors' estates.  Feist Decl. ¶ 92.  The ACC, the FCR and the Claimants' Representatives were integrally involved in the negotiation of the monetary component of the Multi-Insurer Settlement.  *Id.*  Each of the individual Settlement Agreements has been reviewed and signed (either as a party or a consentor) by the ACC, the FCR and the Claimants' Representatives.  *Id.*  Thus, all of the official court-approved representatives of the present and future asbestos claimants as well as the Claimants' Representatives support approval of the Settlement Agreements.  As a result, this Court should conclude that the fourth factor, in addition to all other factors under the *Martin* test, supports approval of the Settlement Agreements.

## II.    THE SALE OF THE POLICIES IS PERMITTED PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE

Each of the Settlement Agreements with the Participating Insurers includes a "buyback" provision, pursuant to which the Debtors agree to transfer the Subject Policies back to the Participating Insurers, free and clear of all Interests, in exchange for the individual Settlement Amounts.  The full consummation of the sale of the Subject Policies will (a) transfer the Subject Policies back to the

57

relevant Participating Insurer, (b) will extinguish any right by any Person to bring any claim against any Participating Insurer with respect to the Subject Policies, and (c) will transfer any claims, liens, encumbrances or interests by any entity with respect to the Subject Policies to the proceeds of the sale pursuant to Bankruptcy Code § 363(f).

The Third Circuit, along with the vast majority of other courts, has held that insurance policies are property of a debtor's bankruptcy estate. *See*, *e.g.*, *First Fid. Bank v. McAteer*, 985 F.2d at 116. *See also MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d at 92 ("Numerous courts have determined that a debtor's insurance policies are property of the estate, subject to the bankruptcy court's jurisdiction."), *cert. denied*, 488 U.S. 868 (1988); *Minoco Group of Cos. v. First State Underwriters Agency*, 799 F.2d at 519; *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d at 1001. As such, the Debtors' interests in the Subject Policies are subject to sale under Bankruptcy Code § 363(b)(1), which permits a debtor-in-possession, after notice and a hearing, to sell estate property out of the ordinary course of business.

Several of the Debtors' prior insurance settlement agreements have been structured in this same manner. For example, in early 2008, the Debtors sought to restructure the original settlement agreement that they had entered into with Mt. McKinley Insurance Company and Everest Reinsurance Company (collectively, "Mt. McKinley") as a sale and buyback of the Debtors' rights, title and interests in

58

the subject policies pursuant to §§ 363(f) and (h) of the Bankruptcy Code, coupled

with an injunction issued pursuant to § 105(a).  Pursuant to the terms of the

restructured Mt. McKinley settlement, the Debtors sold their interests in the

insurance policies issued by Mt. McKinley back to Mt. McKinley free and clear of

all claims, liens and interests under § 363(f).  In conjunction with the sale, the

Bankruptcy Court issued an immediate injunction pursuant to §§ 363(f) and 105(a)

of the Bankruptcy Code which permanently stayed, restrained or enjoined any

party from taking action against Mt. McKinley for the purpose of recovering

payment on account of any claims or interests under the policies sold.[14]  The

Bankruptcy Court approved a similar policy buyback agreement with Century

Indemnity Company on September 20, 2006.[15]  The Debtors, therefore, submit that

structuring the Settlement Agreements in this manner is appropriate and meets all

of the requirements of the Bankruptcy Code.

---

[14] *See In re Congoleum Corp.,* Case No. 03-51524 (KCF) (Bankr. D.N.J. February 19, 2008) Order Approving Amended and Restated Settlement Agreement and Release Between the Debtors and Mt. McKinley Insurance Company and Everest Reinsurance Company (the "Amended Mt. McKinley Order") (Bankr. Doc. No. 6211).

[15] *See*, *In re Congoleum Corp.,* Case No. 03-51524 (KCF) (Bankr. D.N.J. September 20, 2006) Order Approving the Settlement and Buyback Agreement and Releases by and Between the Congoleum Entitles and the Century Entities (the "Century Order") (Bankr. Doc. No. 4572).

500402274v14

## A.    A Sale Free and Clear of Existing Interests, If Any, Is Permitted Pursuant to § 363(f)

This Court unquestionably has the power under § 363(f) to approve the sale of the Subject Policies as part of the Settlement Agreements free and clear of any claims, liens encumbrances an interests so long as the sale (1) satisfies the requirements of Bankruptcy Code § 363(f), and (2) provides adequate protection for any holder of an interest in the property being sold.  *See* 11 U.S.C. § 363(e). Section 363(f) of the Bankruptcy Code permits the Debtors to sell assets free and clear of claims, liens, encumbrances and interests if:

    (1)   applicable nonbankruptcy law permits sale of such property free and clear of such interest;

    (2)   such entity consents;

    (3)   such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

    (4)   such interest is in a bona fide dispute; or

    (5)   such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

Section 363(f) is drafted in the disjunctive.  Thus, satisfaction of any one of the conditions enumerated therein will suffice to warrant the Debtors' sale of the Subject Policies to the Participating Insurers free and clear of all Claims, liens and

interests, so long as any holder of an interest in the Policies is adequately protected.  In this case, the Debtors are aware of only one asserted lien on the proceeds of the Subject Policies, the lien granted in favor of the Collateral Trustee on all Asbestos Insurance Collateral.  Feist Decl. ¶ 77.  This lien, however, was avoided by the Bankruptcy Court pursuant to § 544 of the Bankruptcy Code.[16]  Furthermore, each of the Participating Insurers has represented in its Settlement Agreement that it is unaware of any pending Insurance Coverage Claims against the Subject Policies other than those lodged by Debtors, so it appears that there are no outstanding claims against the Subject Policies by former affiliates or any other person or entity with an interest in them.  *Id.*  To the extent that any other entity asserts an interest in the Subject Policies released by the Debtors, the Debtors submit that one or more of Sections 363(f)(1), (2) and/or (5) apply and permit the sale.  In particular, pursuant to each Settlement Agreement, those holders of Interests against any of the Subject Policies who do not object or who withdraw any such objection to this Motion have consented pursuant to Bankruptcy Code § 363(f)(2); any claimed Interest is in bona fide dispute under Bankruptcy Code §

---

[16]In its July 27, 2007 summary judgment opinion, the Bankruptcy Court ruled that the security interests in insurance that were granted to the Collateral Trustee for the benefit of the settled Claimants pre-bankruptcy were ineffective and unenforceable against Congoleum's insurance policies or the proceeds of those policies because the attempts to create a security interest were outside the scope of Article 9 of the Uniform Commercial Code.  *See* Opinion, *In re Congoleum Corp., et al.* (Adv. Pro. No. 05-06245) (Bankr. D.N.J. July 27, 2007).

363(f)(4); and each holder of an Interest in the Subject Policies can be compelled, in a legal or equitable proceeding, to accept  a money satisfaction of such Interest as contemplated by Bankruptcy Code § 363(f)(5).

A sale of the Subject Policies back to the Participating Insurers free and clear of all Interests in exchange for the total Settlement Amount will generate the greatest value for the Plan Trust and, thus, is in the best interests of the Debtors and their estates.  Feist Decl. ¶ 78.  Each Participating Insurer has indicated that it would not purchase its respective Subject Policies, or pay the Settlement Amount it has agreed to pay, were the sale of the Subject Policies back to it not free and clear of all Interests of all persons and entities.  *Id.*  Similarly, the ACC and the Claimants' Representatives have indicated that they would not have agreed to the Settlement Agreements without the injunction each party will receive pursuant to each Settlement Agreement.  *Id.*  In addition, the Debtors would not have agreed to the Settlement Agreements without the injunctions they will receive pursuant to each Settlement Agreement.  *Id.*

### B.   An Injunction Is Permitted by § 105(a) to Implement the § 363 Sale

The Debtors seek an injunction pursuant to Bankruptcy Code § 105(a) to implement the sale of the Subject Policies free and clear of all claims, liens, encumbrances and interests under Bankruptcy Code § 363(f).  Section 105(a) of the Bankruptcy Code expressly provides courts the equitable power to "issue any

order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  This section has been construed to give courts broad authority to provide equitable relief appropriate to assure the orderly conduct of reorganization proceedings.  The equitable powers authorized by § 105(a), however, cannot be used "to create substantive rights that would otherwise be unavailable under the Code . . . and must be exercised within the parameters of the Code itself."  *Combustion Engineering Inc.,* 391 F.3d 190, 236 (3d Cir. 2004) (citations omitted).  An injunction pursuant to § 105(a), therefore, is appropriate if it is used to effectuate other provisions of the Bankruptcy Code, such as § 363.  *See*, *e.g.*, *MacArthur Co. v. Johns-Manville Corp.,* 837 F.2d 89 (2d Cir. 1988).

In this case, the Debtors seek the 105(a) Injunction in order to implement the sale of the Subject Policies free and clear of all claims, liens, encumbrances and interests pursuant to § 363(f) of the Bankruptcy Code.  The Participating Insurers have agreed to pay their Settlement Amounts only if they can have certainty that they will be released fully from, and have injunctive protection against, all claims, including non-asbestos claims, that may be based on, or derive from, their Subject Policies.  Feist Decl. ¶ 79.  Indeed, inherent in the Settlement Agreements is the understanding that the Participating Insurers and NJPLIGA and NJSLIGF will not have to pay twice on account of the disputed coverage obligations that they are now settling.  *Id.*

Similar injunctions have been approved previously in these Chapter 11 cases. *See*, *e.g.*, Century Order at 14, Amended Mt. McKinley Order at 10. Similar injunctions have also been approved in other asbestos bankruptcies. *See*, *e.g.*, *In re Burns and Roe Enters., Inc.,* No. 00-41610 (RG) (Bankr. D.N.J. Feb. 17, 2005) Order Approving Settlement and Buyback Agreement and Enjoining Certain Claims Against the Hartford Parties.

With respect to the asbestos-related claims that are being settled under the Settlement Agreements, the § 524(g) asbestos channeling injunction that will issue upon plan confirmation will channel all asbestos-related claims and demands under the Subject Policies to the Plan Trust. Certain of the Settlement Agreements, however, also settle other non-asbestos claims that ordinarily will not benefit from a § 524(g) channeling injunction. The Debtors, therefore, also seek a 105(a) Injunction to protect the Participating Insurers against all non-asbestos claims under the Subject Policies.

To the extent that any Person or Entity has an interest in the Subject Policies that has been released, such interest is adequately protected as required by § 363(e) of the Bankruptcy Code by the attachment of such interest to the proceeds of the sale. Moreover, the Interests, if any, of any insurer (other than the applicable Participating Insurer) with respect to any of the Subject Policies is adequately protected because each Settlement Agreement provides that the Debtors will

64

reduce any judgment or settlement against or with any such insurer to the extent

necessary to eliminate such insurer's claim for contribution, subrogation,

indemnification or the like against the Participating Insurer.

     **C.**    **The Participating Insurers are Entitled to Protection**
              **Under § 363(m) of the Bankruptcy Code**

Section 363(m) of the Bankruptcy Code provides that a sale of assets

properly conducted under § 363(f) cannot later be undone if the purchaser is one

who purchases assets in good faith. *See* 11 U.S.C. § 363(m); *In re Mark Bell*

*Furniture Warehouse, Inc.,* 992 F.2d 7, 8 (1st Cir. 1993); *In re Willemain v. Kivitz,*

764 F.2d 1019, 1023 (4th Cir. 1985); *In re Vanguard Oil & Serv. Co.,* 88 B.R. 576,

580 (E.D.N.Y. 1988).

The Debtors submit that the Settlement Agreements with the Participating

Insurers are the result of arms' length negotiations and are entitled to the

protections of § 363(m).  Feist Decl. ¶ 80.  The Parties have not engaged in any

conduct that would cause or permit the Settlement Agreements to be avoided under

Bankruptcy Code § 363(n), such as entering into an agreement to control the price

of the Settlement Amounts.  *Id.  See Ramsay v. Vogel*, 970 F.2d 471 (8th Cir.

1992); *In re New York Trap Rock Corp.*, 42 F.3d 747 (2d Cir. 1994).  Thus, the

sale of the Subject Policies would not be avoidable under § 363(n) of the Code.

# NOTICE

Notice of the Debtors' motion to approve the Settlement Agreements has been provided to all creditors under Bankruptcy Rule 2002(a), including:  (i) the Asbestos Claimants' Committee; (ii) the FCR; (iii) counsel to all known holders of Asbestos Claims (as defined in the Plan) as reflected in the proofs of claim filed in these Chapter 11 cases, claims submitted in connection with the Claimant Agreement, or ballots submitted in connection with these Chapter 11 cases; (iv) all known holders of Asbestos Claims whose counsel is not included within the preceding clause who, as of at least ten (10) business days prior to the filing of the Motion became known through filing of a proof of claim or otherwise; (v) the Claimants' Representatives; (vi) the Collateral Trustee of the Congoleum Collateral Trust established pursuant to a Collateral Trust Agreement dated April 16, 2003; (vii) all existing or former parties in the Coverage Action; (viii) all other entities known by Congoleum to have provided general liability insurance to Congoleum prior to 1990; (ix) all other persons entitled to or allegedly entitled to insurance coverage and/or other benefits under the Subject Policies known to Congoleum; (x) the Office of the United States Trustee; (xi) ABI and counsel to ABI; (xii) counsel to the Bondholders' Committee; (xiii) all parties who have filed a notice of appearance in these Chapter 11 cases; and (xiv) the "Core Service List" and the "Master Service List," each as defined in the Order Establishing Case

500402274v14

Management and Administrative Procedures, dated February 25, 2004, and the "Master E-Mail Service List," as defined in the Order (1) Amending the Order Establishing Case Management and Administrative Procedures Entered on February 25, 2004 and the Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals Entered on February 10, 2004 and (2) Allowing Notice by E-Mail and Establishing Procedures Therefor, dated September 6, 2005.  In addition, at the request of the Participating Insurers, to ensure the broadest notice possible, the Debtors have published notice of the Motion and the hearing in the national edition of *USA Today*, with the Participating Insurers paying the cost of the notice.

For purposes of the foregoing, the Debtors request that this Court confirm the prior rulings in these cases that notice to an attorney for the holder of an Asbestos Claim constitutes notice to such holder for purposes of notice of the Motion.  The Debtors believe that such notice of the Motion set forth herein is appropriate and sufficient and is in accordance with the requirements of the Bankruptcy Rules including Bankruptcy Rules 2002 and 9019, the Bankruptcy Code and applicable law.  The Debtors respectfully submit that no further notice of the Motion is required.

## CONCLUSION

The Debtors respectfully request that this Court enter the orders, substantially in the form of the orders submitted herewith:  (i) authorizing and approving the individual Settlement Agreements; and (ii) granting such other and further relief as is just and proper.


Dated:  January 28, 2010           Respectfully submitted,

**OKIN, HOLLANDER & DeLUCA, L.L.P.**

/s/ *Gregory S. Kinoian*
One Parker Plaza
Fort Lee, New Jersey 07024
(201) 947-7500
Paul S. Hollander (PH-2681)
Gregory S. Kinoian (GK-7386)

and

**PILLSBURY WINTHROP SHAW
PITTMAN LLP**
1540 Broadway
New York, New York 10036
(212) 858-1000
Richard L. Epling (*pro hac vice* admission)
Kerry A. Brennan (*pro hac vice* admission)

Attorneys for Congoleum Corporation, et al.,
Debtors and Debtors-in-Possession

500402274v14