# Exhibit A

# Confirmation Brief

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: CONGOLEUM CORPORATION, <br><br> Debtors. | Civil Action No. 09-4371 (JAP) <br><br> Bankr. Case No. 03-51524 |

### PLAN PROPONENTS' MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF THE FOURTH AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF <u>THE BANKRUPTCY CODE DATED AS OF MARCH 11, 2010</u>

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................1

FACTS ..................................................................................................3

    A.   Overview of the Plan ..............................................3

    B.   Acceptance of the Plan .........................................6

    C.   Objections to Confirmation of the Plan...................8

ARGUMENT ........................................................................................9

  I.   The Plan Satisfies the Requirements of § 1129 of the Bankruptcy
     Code..................................................................................9

    A.   The Plan Meets Each Requirement for Confirmation Under
       § 1129(a) of the Bankruptcy Code ................................9

      1.   Section 1129(a)(1): The Plan Satisfies the
          Requirements of §§ 1122 and 1123 of the Bankruptcy
          Code ................................................................10

      2.   Section 1129(a)(2): The Plan Proponents Have
          Complied with the Requirements of the Bankruptcy
          Code ................................................................18

      3.   Section 1129(a)(3): The Plan Has Been Proposed in
          Good Faith and Not By Any Means Forbidden by
          Law ................................................................20

      4.   Section 1129(a)(4): The Plan Provides that Payments
          Made by the Debtors for Services or Costs and
          Expenses Are Subject to Court Approval...........................24

      5.   Section 1129(a)(5): The Plan Proponents Have
          Disclosed or Will Disclose All Necessary Information
          Regarding Directors, Officers and Insiders ........................25

      6.   Section 1129(a)(6): The Plan Does Not Contain Rate
          Changes Subject to the Jurisdiction of Any
          Governmental Regulatory Commission ............................27

      7.   Section 1129(a)(7): The Plan Is in the Best Interests
          of the Debtors' Creditors and Interest Holders...................27

      8.   Section 1129(a)(8): The Plan Is Supported by
          Impaired Classes Entitled To Vote ......................................34

i

9.   Section 1129(a)(9):  The Plan Provides for Payment in Full of All Allowed Priority Claims ....................................37

10.  Section 1129(a)(10):  At Least One Class of Impaired Claims Has Accepted the Plan...............................................39

11.  Section 1129(a)(11):  The Plan Is Feasible .........................40

12.  Section 1129(a)(12):  All Statutory Fees Have Been or Will Be Paid.......................................................................40

13.  Section 1129(a)(13):  The Plan Adequately and Properly Treats Retiree Benefits..........................................41

B.   The Plan Meets Each Requirement for Confirmation Under §§ 1129(b) and (d) of the Bankruptcy Code .............................41

1.   Section 1129(b):  The Plan Satisfies the "Cram Down" Requirements of the Bankruptcy Code ..................41

2.   Section 1129(d):  The Plan's Purpose Is Consistent with the Bankruptcy Code ...................................................45

II.   The Modifications to the Plan Are Immaterial and Do Not Require Resolicitation of the Plan...........................................................................45

III.  The Plan Satisfies the Requirements for Entry of the Asbestos Channeling Injunction Under § 524(g) of the Bankruptcy Code............47

A.   The Plan Trust Satisfies the Structure and Funding Requirements of § 524(g)(2)(B)(i) of the Bankruptcy Code ...........................................................................................47

1.   The Plan Trust Will Assume the Liabilities of the Debtors................................................................................48

2.   The Plan Trust Will Be Funded in Part by Securities of the Debtors.........................................................................49

3.   The Plan Trust Will Own a Majority of the Voting Shares of Reorganized Congoleum ....................................50

4.   The Plan Trust Will Use Its Assets To Pay Claims and Demands ...........................................................................50

500522999v5

B.   The Debtors' History, the Nature of Asbestos-Related
     Litigation and the Facts of These Chapter 11 Cases
     Support the Findings of Fact Required for the Court To
     Issue the Asbestos Channeling Injunction Pursuant to §
     524(g) of the Bankruptcy Code ...................................................51

     1.   Section 524(g)(2)(B)(ii)(II):  The Debtors Are Likely
          To Be Subject to Substantial Future Demands for
          Payment.................................................................................51

     2.   Section 524(g)(2)(B)(ii)(II):  The Actual Amounts,
          Numbers, and Timing of Future Demands Cannot be
          Determined...........................................................................53

     3.   Section 524(g)(2)(B)(ii)(III):  The Pursuit of Future
          Demands Outside the Procedures Prescribed by the
          Plan Is Likely To Threaten the Plan's Purpose To
          Deal Equitably with Claims and Future Demands ..............54

C.   The Plan Trust Satisfies the Disclosure, Claimant-Support
     and Equality of Treatment Requirements of §
     524(g)(2)(B)(ii) of the Bankruptcy Code ...................................56

     1.   Section 524(g)(2)(B)(ii)(IV)(aa):  The Terms of the §
          524(g) Injunction Are Set Out in the Plan and
          Disclosure Statement ..........................................................56

     2.   Section 524(g)(2)(B)(ii)(IV)(bb):  A Separate Class of
          Claimants Whose Claims Are To Be Addressed by the
          Plan Trust Has Been Established and at Least 75% of
          Such Claimants Have Voted in Favor of the Plan ..............57

     3.   The Plan Complies with § 524(g)(2)(B)(ii)(V) and
          Operates Through Mechanisms To Ensure that
          Present Claims and Future Demands Are Treated in
          Substantially the Same Manner ..........................................57

D.   The Plan's Asbestos Channeling Injunction Complies with
     the Requirements of § 524(g) of the Bankruptcy Code .............60

     1.   The Court May Extend the Asbestos Channeling
          Injunction to Third Parties ..................................................61

     2.   Entry of the Asbestos Channeling Injunction Is Fair
          and Equitable with Respect to Future Asbestos
          Claimants ..............................................................................64

iii

E.    The Plan Trust Has the Elements of a Qualified Settlement Fund (QSF) ...................................................................66

IV.   The Anti-Suit Injunction Satisfies the Requirements of § 105(a) of the Bankruptcy Code ...............................................................68

V.    The Assumption or Rejection of Executory Contracts and Unexpired Leases Under the Plan Should Be Approved ........................74

VI.   The Settlements Made During the Reorganization Are Fair and Reasonable and Satisfy the Requirements of § 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019 ...........................................76

A.    The Litigation Settlement Agreement, As Amended, Should be Approved ..................................................................79

B.    The Intercompany Settlement Should be Approved ..................83

VII.  The Plan's Release, Exculpation and Related Provisions Are Reasonable and Comply with Applicable Law .......................................85

A.    The Plan's Discharge and the Discharge Injunction Should Be Approved ......................................................................86

B.    The Plan's Exculpation Provision Should be Approved .............87

C.    The Plan's Release of Holders of Plan Trust Asbestos Claims Should Be Approved ....................................................90

VIII. Objections of Certain Claimants Who Were Parites to Either Pre-Petition Settlement Agreements or the Claimant Agreement Should Be Overruled ...........................................................................92

A.    Background of Settlements with the Shein and Thompson Claimants ......................................................................95

B.    Summary of Objections ..........................................................101

C.    The Plan Properly Classifies the Claims of the Thompson and Shein Claimants Pursuant to the Law of the Case .............103

D.    The Thompson Claimants and the Shein Claimants Have Been Bound by Class Vote to the Treatment in the Plan ..........108

E.    The Due Process Objections Are Without Merit and Should Be Overruled ...............................................................112

CONCLUSION .......................................................................................113

iv

# TABLE OF AUTHORITIES

*In re 203 North LaSalle Street Ltd. P'ship*,
    190 B.R. 567 (Bankr. N.D. Ill. 1995) ..................................................................43

*In re 11,111, Inc.*,
    117 B.R. 471 (Bankr. D. Minn. 1990) ...............................................................43

*In re ABB Lummus Global Inc.*,
    No. 06-10401, 2006 WL 2052409 (Bankr. D. Del. June 29, 2006) .......... 11, 103

*In re Adelphia Communications*,
    368 B.R. 140 (Bankr. S.D.N.Y. 2007)............................................................ 7, 37

*AL Tech Specialty Steel Corp. v. Allegheny International Credit Corp.*,
    104 F.3d 601 (3d Cir. 1997) ........................................................................... 107

*Allied Technology, Inc. v. R.B. Brunemann & Sons, Inc.*,
    25 B.R. 484 (Bankr. D. Ohio 1982)....................................................................75

*In re American Family Enterprises*,
    256 B.R. 377 (D.N.J. 2000) ....................................................................... 71, 102

*In re American Solar King Corp.*,
    90 B.R. 808 (Bankr. W.D. Tex. 1988)................................................................46

*In re AOV Industries, Inc.*,
    792 F.2d 1140 (D.C. Cir. 1986).........................................................................11

*Arizona v. California*,
    460 U.S. 605 (1983)........................................................................................ 107

*In re Armstrong World Industries, Inc.*,
    432 F.3d 507 (3d Cir. 2005) .................................................................... 42, 44

*In re Armstrong World Industries, Inc.*,
    348 B.R. 136 (D. Del. 2006)........................................................... 86, 88, 104

v

500522999v5

*In re Arrowmill Development Corp.*,
    211 B.R. 497 (Bankr. D.N.J. 1997) ............................................................ 91, 92

*Bank of America National Trust & Savings Association v. 203 North LaSalle
    Street P'ship*,
    526 U.S. 434 (1999).........................................................................................27

*In re Barney & Carey Co.*,
    170 B.R. 17 (Bankr. D. Mass 1994) .................................................................43

*In re Best Products Co.*,
    177 B.R. 791 (S.D.N.Y.1995) ..........................................................................77

*Brewster v. Board of Education of Lynwood Unified School District*,
    149 F.3d 971 (9th Cir. 1998) ......................................................................... 111

*In re Cajun Electric Power Cooperative, Inc.*,
    230 B.R. 715 (Bankr. M.D. La. 1999).............................................................77

*In re Celotex Corp.*,
    204 B.R. 586 (Bankr. M.D. Fla. 1996).............................................................46

*In re Chateaugay Corp.*,
    89 F.3d 942 (2d Cir. 1996) ........................................................................... 103

*In re Combustion Engineering, Inc.*,
    391 F.3d 190 (3d Cir. 2004) ................................................................... *passim*

*In re Congoleum Corp.*,
    362 B.R. 167 (Bankr. D.N.J. 2007) ......................................................... *passim*

*In re Congoleum Corp.*,
    No. 03-51524, 2009 WL 499262 (Bankr. D.N.J. Feb. 26, 2009)......................99

*In re Congoleum Corp.*,
    No. 033-51524, 2008 WL 4186899 (Bankr. D.N.J. Sept. 2, 2008)................ 110

*In re Congoleum Corp.*,
    No. 03-51524, 2007 WL 2177680 (Bankr. D.N.J. July 27, 2007) ............. 13, 94

500522999v5

*In re Congoleum Corp.*,
  Adv. Pro. No. 05-06245, 2007 WL 4571086 (Bankr. D.N.J. Dec. 28, 2007). 100

*In re Continental Airlines,*
  203 F.3d 203 (3d Cir. 2000) ....................................................................... 72, 90

*In re Coram Healthcare Corp.*,
  315 B.R. 321 (Bankr. D. Del. 2004)..............................................................91

*CoreStates Bank v. United Chemical Technologies, Inc.*,
  202 B.R. 33 (E.D. Pa. 1996) ..........................................................................22

*In re Drexel Burnham Lambert Group, Inc.*,
  138 B.R. 723 (Bankr. S.D.N.Y. 1992)............................................................23

*Elliot v. Kiesewetter*,
  98 F.3d 47 (3d Cir. 1994) ............................................................................ 112

*Eastern Pilots Merger Committee v. Continental Airlines, Inc. (In re Continental Airlines, Inc.)*,
  279 F.3d 226 (3d Cir. 2002) ....................................................................... 107

*In re Federal Mogul Global, Inc.*,
  293 B.R. 124 (Bankr. D. Del. 2003)..............................................................75

*In re G-1 Holdings, Inc.*,
  420 B.R. 216 (D.N.J. 2009) .............................................................. 78, 86, 88

*In re Genesis Health Ventures, Inc.*,
  266 B.R. 591 (Bankr. D. Del. 2001)................................................................9

*In re Great Bay Hotel & Casino, Inc.*,
  251 B.R. 213 (Bankr. D.N.J. 2000) ....................................................... *passim*

*Group of Institutional Investors v. Chicago, Milwaukee, St. Paul, & Pacific R.R. Co.*,
  318 U.S. 523 (1943)........................................................................................75

*Heins v. Ruti-Sweetwater, Inc. (In re Ruti-Sweetwater, Inc.)*,
  836 F.2d 1263, (10th Cir. 1988) ................................................................ 7, 37

vii

*In re Holywell Corp.*,
    913 F.2d 873 (11th Cir. 1990) ................................................................... 11, 103

*In re Jasmine, Ltd.*,
    258 B.R. 119 (D.N.J. 2000) ................................................................ 78, 82, 85

*In re Jersey City Medical Center*,
    817 F.2d 1055 (3d Cir. 1987) ............................................................................11

*John Hancock Mutual Life Insurance Co. v. Route 37 Business Park Associates*,
    987 F.2d 154 (3d Cir. 1993) .............................................................................10

*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986)................................................................18

*In re Kaiser Aluminum Corp.*,
    No. 02-10429 (Bankr. D. Del. Feb. 6, 2006) ....................................................71

*Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
    843 F.2d 636 (2d Cir. 1988) .............................................................................10

*In re Lisanti Foods, Inc.*,
    329 B.R. 491 (D.N.J. 2005) ................................................................................9

*In re Longardner & Associates, Inc.*,
    855 F.2d 455 (7th Cir. 1988) .......................................................................... 112

*In re Market Square Inn, Inc.*,
    978 F.2d 116 (3d Cir. 1992) .............................................................................75

*In re Martin*,
    91 F.3d 389 (3d Cir. 1996) ................................................................ 77, 82, 85

*McCormick v. Banc One Leasing Corp. (In re McCormick)*,
    49 F.3d 1524 (11th Cir. 1995) ..........................................................................22

*In re Monclava Care Ctr., Inc.*,
    254 B.R. 167, 171 (Bankr. N.D. Ohio 2000)................................................. 111

viii

*In re Montgomery Ward Holding Corp.*,
306 B.R. 489 (Bankr. D. Del. 2004) .............................................................. 112

*In re Mount Vernon Plaza Community Urban Redevelopment Corp. I*,
79 B.R. 305 (Bankr. S.D. Ohio 1987) .............................................................46

*In re Neshaminy Office Building Associates*,
62 B.R. 798 (E.D. Pa.1986) ............................................................................78

*In re New Century TRS Holdings*,
390 B.R. 140 (Bankr. D. Del. 2008) ................................................................77

*In re Ngan Gung Restaurant*,
254 B.R. 566 (Bankr. S.D.N.Y. 2000)..............................................................21

*NLRB v. Bildisco & Bildisco*,
465 U.S. 513 (1984)................................................................................... 21, 75

*In re Nutritional Sourcing Corp.*,
398 B.R. 816 (Bankr. D. Del. 2008) ................................................................77

*In re Oakwood Homes Corp.*,
449 F.3d 588 (3d Cir. 2006) ............................................................................27

*In re Owens Corning*,
No. 00-03837 (Bankr. D. Del. Sept. 26, 2006).......................................... 71, 88

*Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v.
Anderson*,
390 U.S. 414 (1968)..........................................................................................77

*In re PWS Holding Corp.*,
228 F.3d 224 (3d Cir. 2000) ................................................................ 88, 89, 90

*SEC v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert
Group, Inc.)*,
130 B.R. 910 (S.D.N.Y. 1991) ........................................................................71

*In re Specialty Equipment Companies*,
3 F.3d 1043 (7th Cir. 1993) .............................................................................90

ix

*In re Szostek,*
  886 F.2d 1405 (3d Cir. 1989) ............................................................................37

*Tindall v. Mavrode (In re Mavrode),*
  205 B.R. 716 (Bankr. D.N.J. 1997) .................................................................78

*In re Toy & Sports Warehouse, Inc.,*
  37 B.R. 141 (Bankr. S.D.N.Y. 1984)................................................................18

*In re TransWorld Airlines, Inc.,*
  185 B.R. 302 (Bankr. E.D. Mo. 1995)..............................................................46

*United Artists Theatre Co. v. Walton (In re United Artists Theatre Co.),*
  315 F.3d 217 (3d Cir. 2003) ...................................................................... 72, 90

*In re U.S. Mineral Products Co.,*
  No. 01-2471, 2005 WL 5898300 (Bankr. D. Del. Nov. 29, 2005)....................11

*In re USA Commercial Mortgage Co.,*
  No. 06-10725, 2007 WL 2571947 (D. Nev. Aug. 29, 2007).................. 110, 111

*In re Winn-Dixie Stores, Inc.,*
  356 B.R. 813 (Bankr. M.D. Fla. 2006) ................................................ 9, 104, 110

*In re Zenith Electronics Corp.,*
  241 B.R. 92 (Bankr. D. Del. 1999) .......................................................... 21, 91

## STATUTES

11 U.S.C. § 105 ............................................................................... *passim*

11 U.S.C. § 330 ..........................................................................................24

11 U.S.C. § 331 ..........................................................................................24

11 U.S.C. § 363 ..........................................................................................68

11 U.S.C. § 365 ..........................................................................................74

x

11 U.S.C. § 503 .................................................................................... 24, 38

11 U.S.C. § 507 ...........................................................................................38

11 U.S.C. § 524 ................................................................................ *passim*

11 U.S.C. § 1103 .........................................................................................89

11 U.S.C. § 1122 .............................................................................. *passim*

11 U.S.C. § 1123 .............................................................................. *passim*

11 U.S.C. § 1125 .................................................................................. 18, 19

11 U.S.C. § 1126 .............................................................................. *passim*

11 U.S.C. § 1127 .......................................................................... 45, 46, 47

11 U.S.C. § 1129 .............................................................................. *passim*

11 U.S.C. § 1141 .............................................................................. *passim*

28 U.S.C. § 1930 ................................................................................ 40, 41

Banruptcy Abuse Prevention & Consumer Prvention Act of 2005, Pub. L.
109-8, 119 Stat. 23 (2005) .................................................................................38

# RULES

Fed. R. Bankr. P. 3019 ............................................................ 45, 46, 47

Fed. R. Bankr. P. 9019 .................................................................. *passim*

# OTHER AUTHORITIES

26 C.F.R. § 1.468B-1 ...............................................................................67

H.R. REP. NO. 95-595 (1977).......................................................... 10, 18

H.R. REP. NO. 103-835 (1994)..............................................................................48

S. REP. NO. 95-989 (1978) .............................................................. 10, 18

7 *Collier on Bankruptcy* ¶ 1129 (15th ed. rev. 2008) .............................. 9, 108, 111

Stephen J. Carroll, *et al.*, *Asbestos Litigation,* RAND Institute for Civil Justice,
2005..............................................................................................................54

Steven J. Parent, *Judicial Creativity in Dealing with Mass Torts in Bankruptcy*,
13 GEORGE MASON U. L. REV. 381 (1990)........................................................53

## PRELIMINARY STATEMENT

The Plan represents the culmination of numerous rulings by this Court and Bankruptcy Court, court-supervised mediation efforts, and substantial settlements and compromises among the Debtors, their creditor constituencies and others to reach a fair and equitable resolution of the myriad of complex issues presented by this asbestos reorganization. Over the course of these Reorganization Cases,[1] the Debtors and each of their creditor constituencies, the Official Asbestos Claimants' Committee (the "Asbestos Claimants' Committee"), the Official Committee of Bondholders for Congoleum Corporation *et al.* (the "Bondholders' Committee"), and the legal representative for future asbestos demands (the "Futures Representative"), have worked diligently to address and resolve the key issues in order to formulate and confirm a § 524(g) plan of reorganization. After years of complex and hotly-contested litigation, the efforts of all of these parties have led to numerous settlements and compromises, many of which have already been court approved.

The Plan seeks to provide the greatest and fairest recovery for all of the estates' creditors while at the same time maintaining the company's operations for the benefit of all. The cornerstone of the Plan is a global settlement providing for the resolution and equal treatment of all present asbestos claims and future

---

[1] All capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Plan.

1

demands and the provision of approximately $235 million in insurance proceeds and 50.1% of Reorganized Congoleum's equity to the Plan Trust for the benefit of such claimants.  In addition, as will be demonstrated in connection with the Confirmation Hearing, the Plan comprehensively restructures the Debtors' balance sheet and will allow the Debtors to emerge from bankruptcy with less debt and free of any asbestos liability, which will be channeled to the Plan Trust.  Under the Plan, the cash and liquidity from Reorganized Congoleum's business operations will permit it to pay the Bondholders, who have agreed to reduce their claims under the Senior Notes, and to resolve other non-asbestos liabilities.  Congoleum will be able to emerge from bankruptcy as a viable, profitable company and more than 500 jobs in the Trenton, New Jersey area will be preserved.

Creditors have had substantial input into the development of the settlements and compromises that comprise the Plan and have accepted it in overwhelming numbers.  In fact, the Plan received a greater than 90% acceptance rate in all Classes of those voting in both number and amount.  The overwhelming support of creditors demonstrates the Plan Proponents' good faith in proposing the Plan. Moreover, following the distribution of Plan solicitation materials to more than 150,000 parties with estimated claims aggregating billions of dollars, only two objections to the Plan were filed, and one of the objectors failed to file a final objection.  As will be demonstrated herein, the lone objecting party's arguments

500522999v5

are legally unsupportable and contrary to the law of these Reorganization Cases. Numerous prior rulings in these cases have held that all holders of Asbestos Personal Injury Claims are "substantially similar" and should be classified in a single class.  The Asbestos Personal Injury Claims in Class 7 have overwhelmingly approved the Plan, and such class vote binds dissenting members of that class.  As a result, the objections should be overruled.

For each of the reasons set forth herein, the Plan Proponents submit that the Plan can, and should, be confirmed.

## FACTS

The pertinent and salient facts relating to the Debtors' Chapter 11 cases and the Plan are set forth in the Disclosure Statement, the Plan, and the Declaration of Howard N. Feist, III (the "Feist Decl.").  The detailed background of these Reorganization Cases and the Plan are not repeated here, but relevant facts, as necessary, will be referred to in connection with the discussion of applicable legal principles.[2]

### A.     Overview of the Plan

Consistent with a global settlement negotiated among the Debtors, the Bondholders' Committee, the Futures Representative, the Asbestos Claimants Committee, and Claimants' Counsel, the Plan provides for a reorganization of

---

[2] "Ex. __" shall refer to the exhibits contained in the Confirmation Hearing Exhibit Appendix (the "Confirmation Appendix").

500522999v5

Congoleum that is supported by every official committee or representative

appointed to represent the Debtors' various creditor constituencies and future

asbestos claims.  Among other things, the Plan will establish and adequately fund

the Plan Trust, which will resolve all Asbestos Personal Injury Claims pursuant to

standard trust distribution procedures.  The Plan also permits Congoleum to

reorganize with sustainable debt levels for the benefit of all parties-in-interest.  The

key terms of the Plan are summarized below:

> (i)  <u>Ownership of Reorganized Congoleum</u>.  The Debtors shall
> convey 100% ownership of Reorganized Congoleum, together
> with all of the assets of Reorganized Congoleum, to the Plan
> Trust and the holders of the Senior Note Claims.  50.1% of the
> New Common Stock of Reorganized Congoleum shall be
> issued to the Plan Trust for the benefit of holders of Asbestos
> Personal Injury Claims.  49.9% of the New Common Stock
> shall be issued to holders Senior Note Claims on a pro rata
> basis.

> (ii)  <u>New Senior Notes</u>.  On the Effective Date, Reorganized
> Congoleum shall issue to holders of Senior Note Claims, on a
> pro rata basis, new 9% senior secured notes due December 31,
> 2017 (the "<u>New Senior Notes</u>") in the principal amount of $33
> million.  There shall be no interest accruing or due and
> payable on the principal amount of the New Senior Notes for
> the first six months after the Effective Date.

> (iii)  <u>Plan Trust Funding</u>.  On the Effective Date of the Plan, the
> Plan Trust shall own 50.1% of Reorganized Congoleum,
> including 50.1% of all of the assets of Reorganized
> Congoleum.  The Plan Trust shall also receive payments,
> some over time, totaling approximately $235 million from

500522999v5

court-approved Asbestos Insurance Settlement Agreements.[3] In addition, pursuant to the Insurance Assignment Agreement, the Plan Trust shall receive all of the Debtors' rights to additional asbestos coverage that are not the subject of any settlement.

(iv) <u>Treatment of Asbestos Claims</u>.  All Asbestos Personal Injury Claims are classified in Class 7 and all holders of Asbestos Personal Injury Claims shall have their claims resolved by the Plan Trust in the same manner.  Specifically, all Pre-Petition Settled Claimants, including the Litigation Settlement Claimants, in full satisfaction of each Asbestos Personal Injury Claim and any and all rights pursuant to any Pre-Petition Settlement Agreement, Claimant Agreement, Security Agreement, Collateral Trust Agreement or any and all other agreements and amendments thereto with respect to the pre-packaged plan of reorganization filed by the Debtors on December 31, 2003 (the "<u>Pre-Packaged Plan</u>"), shall be restored to the *status quo ante* and treated in the same manner as all other holders of Asbestos Personal Injury Claims in Class 7.  The Pre-Petition Settled Claimants in Class 7 shall receive *pari passu* treatment under the Plan without regard to any lien, security interest or other claim to priority treatment whatsoever (each Pre-Petition Settled Claimant will need to reapply to the Plan Trust to satisfy the TDP including medical, exposure, statutes of limitation and other requirements).

(v) <u>Avoidance Actions</u>.  The Omnibus Avoidance Action and Sealed Avoidance Action—complex, hotly contested and lengthy litigations with respect to the propriety of the Pre-

---

[3] The District Court approved a $25 million settlement between the Debtors and Travelers Casualty and Surety Company formerly known as The Aetna Casualty and Surety Company, and St. Paul Fire and Marine Insurance Company (the "<u>Travelers Settlement</u>") [Dkt. No. 468].  The Futures Representative did not consent to the Travelers Settlement, has reserved all rights in that regard on behalf of future asbestos claimants, and has filed an appeal of the order approving the Travelers Settlement, which is currently pending before the United States Court of Appeals for the Third Circuit.

5

Petition Settlement Agreements and Claimant Agreement that formed the basis of Congoleum's Pre-Packaged Plan—have been resolved pursuant to the terms of the Litigation Settlement Agreement, as amended, and will be dismissed within 30 days after the Effective Date.

For the reasons discussed herein, the Plan Proponents submit that the Plan satisfies the confirmation requirements of the Bankruptcy Code.

## B.      Acceptance of the Plan

The Plan has received the overwhelming support of the Debtors' creditors, including the holders of Asbestos Personal Injury Claims.  As discussed herein, on March 12, 2010, after notice and a hearing, this Court approved the Debtors' proposed Disclosure Statement and the Debtors' proposed voting procedures with respect to the Plan.  *See* Orders Approving Disclosure Statement and Voting Procedures, Exs. 26, 28.  In accordance with this Court's orders and the requirements of the Bankruptcy Code, the Voting Agent sent solicitation packages, including the Plan, Disclosure Statement, a ballot and other material, to all known holders of Claims entitled to vote on the Plan, including to all known holders of Asbestos Personal Injury Claims.  *See* Declaration of Kathleen M. Logan Certifying Methodology for Tabulating Votes, and Results of Voting on Fourth Amended Joint Plan, dated May 20, 2010 (the "Ballot Certification"), Ex. 17.

Pursuant to § 1129(a)(8) of the Bankruptcy Code, all Classes of Claims and Equity Interests in which there were Claims or Equity Interests that voted on the

6

Plan have either accepted the Plan or are unimpaired. *See* Ballot Certification, Ex. 17 ¶¶ 22-23. Pursuant to § 1126(c) of the Bankruptcy Code, a class of claims has accepted a plan if such plan has been accepted by creditors "that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors . . . ." 11 U.S.C. § 1126(c). The following Classes of Claims and Equity Interests voted to accept the Plan by at least two-thirds in amount and more than one-half in number: (i) Class 4 (Senior Note Claims); (ii) Class 6 (ABI Claims) (iii) Class 7 (Asbestos Personal Injury Claims); and (iv) Class 8 (Asbestos Property Damage Claims). *See* Ballot Certification, Ex. 17 ¶¶ 22-23. No valid ballots were cast by Class 9 Claimants. *See id.* ¶ 24. However, an impaired class that fails to vote on a plan and does not object to confirmation is deemed to accept the plan for purposes of meeting the requirements of § 1129(a)(8). *See Heins v. Ruti-Sweetwater, Inc. (In re Ruti-Sweetwater, Inc.)*, 836 F.2d 1263, 1266 (10th Cir. 1988) (non-voting, non-objecting members of a class are deemed to accept the plan); *In re Adelphia Commc'ns*, 368 B.R. 140, 261-62 (Bankr. S.D.N.Y. 2007) (same). Accordingly, § 1129(a)(8) of the Bankruptcy Code has been satisfied with respect to all such Classes of Claims and Equity Interests.

In addition, because the Plan contemplates the issuance of an injunction pursuant to § 524(g) of the Bankruptcy Code, § 524(g)(2)(B)(ii)(IV) requires that

7

separate classes of asbestos-related claims accept the Plan by at least 75% of those voting.  The Plan provides for two separate classes that address asbestos claims: (i) Class 7 (Asbestos Personal Injury Claims); and (ii) Class 8 (Asbestos Property Damage Claims).  As set forth in the Ballot Certification, over 95% of those voting in Class 7 voted to accept the Plan, and over 92% of those voting in Class 8 voted to accept the Plan.  *See* Ballot Certification, Ex. 17 ¶ 23.  Accordingly, the super-majority acceptance requirements of § 524(g) have also been satisfied.

### C.    Objections to Confirmation of the Plan

The Debtors received a timely final objection to confirmation of the Plan from David C. Thompson, P.C.  (the "Thompson Objection"), Ex. 23.  The Shein Law Center, Ltd. filed a preliminary objection to confirmation (the "Shein Preliminary Objection") (Ex. 21), but did not file a final objection as required by the Pre-Trial Order (Ex. 29).  The parties filing preliminary and final objections represent a small minority of holders of Asbestos Personal Injury Claims that entered into Pre-Petition Settlement Agreements and the Claimant Agreement with the Debtors.  As discussed in more fully *infra* in Part VIII, the Plan Proponents submit that the Objections are wholly without merit and should be overruled.[4]

---

[4]  The Debtors also received a timely objection from Travelers (Ex. 24) solely concerning a footnote in Exhibit H to the Plan (Ex. 8) (Schedule of Settling Asbestos Insurance Companies) in which the Futures Representative reserves his rights.  Travelers does not object to confirmation of the Plan.

500522999v5

# ARGUMENT

## I.   THE PLAN SATISFIES THE REQUIREMENTS OF § 1129 OF THE BANKRUPTCY CODE

### A.   The Plan Meets Each Requirement for Confirmation Under § 1129(a) of the Bankruptcy Code

In order for this Court to confirm the Plan, the Plan Proponents must establish, by a preponderance of the evidence, that each of the requirements of § 1129(a) of the Bankruptcy Code has been satisfied.  *See In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 598-99 (Bankr. D. Del. 2001) ("To confirm a proposed Chapter 11 plan of reorganization, the proponent bears the burden of establishing the plan's compliance with each of the thirteen elements of 11 U.S.C. § 1129(a)."); *In re Lisanti Foods, Inc.*, 329 B.R. 491, 497 (D.N.J. 2005) ("Section 1129(a) contains thirteen paragraphs, each of which contains a separate requirement that must be met in order to confirm the plan.") (quoting 7 *Collier on Bankruptcy* ¶ 1129.01).  As the evidence proffered in connection with the Confirmation Hearing will demonstrate, all applicable requirements of § 1129(a) of the Bankruptcy Code have been satisfied by a preponderance of the evidence.  *See In re Winn-Dixie Stores, Inc.*, 356 B.R. 813, 817 (Bankr. M.D. Fla. 2006) ("The Debtors have met their burden of proving each of the elements of Bankruptcy Code section 1129 by a preponderance of the evidence, which is the applicable standard.").  Accordingly, the Plan should be confirmed.

9

1.    Section 1129(a)(1):  The Plan Satisfies the Requirements of §§ 1122 and 1123 of the Bankruptcy Code

Section 1129(a)(1) of the Bankruptcy Code provides that a plan of reorganization may be confirmed only if the plan "complies with the applicable provisions of this title."  11 U.S.C. § 1129(a)(1).  Legislative history and case law instruct that this provision requires that a plan comply with §§ 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and interests and the contents of a plan.  *See* H.R. REP. NO. 95-595, at 412 (1977) ("Paragraph (1) [of section 1129(a)] requires that the plan comply with the applicable provisions of chapter 11, such as section 1122 and 1123, governing classification and contents of plan."); S. REP. NO. 95-989, at 126 (1978) (same).  *See also John Hancock Mut. Life Ins. Co. v. Rte. 37 Bus. Park Assocs.*, 987 F.2d 154, 158 (3d Cir. 1993) (addressing compliance with §§ 1122 and 1123 in the context of plan confirmation); *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 648-49 (2d Cir. 1988) (reciting legislative history).  As demonstrated below, the Plan complies fully with the requirements of both §§ 1122 and 1123 of the Bankruptcy Code.

a.    *The Plan Complies with § 1122 of the Bankruptcy Code: Substantially Similar Classification of Claims*

Section 1122(a) of the Bankruptcy Code provides that a plan may group claims and interests in several separate classes so long as all claims or interests in a

particular class are "substantially similar" to the other claims or interests in such class.  Specifically, § 1122 provides:

> (a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.

11 U.S.C. § 1122.  Claims or interests in a single class need not be identical, but rather should be similar in legal character or effect with respect to the debtor.  *See In re AOV Indus., Inc.*, 792 F.2d 1140, 1150-51 (D.C. Cir. 1986) ("Foremost among [the classification requirements] is the notion that the focus of the classification is the legal character of the claim as it relates to the assets of the debtor.") (emphasis removed).

Generally, courts are permitted "considerable discretion to classify claims and interests according to the facts and circumstances of the case."  *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 224 (Bankr. D.N.J. 2000) (quoting *In re Holywell Corp.*, 913 F.2d 873, 880 (11th Cir. 1990)).  Courts in the Third Circuit will uphold a plan's classification of claims and interests so long as there is a "reasonable basis" for the classification and such is "fair and reasonable."  *See, e.g.*, *In re ABB Lummus Global Inc.*, No. 06-10401, 2006 WL 2052409, at *13 (Bankr. D. Del. June 29, 2006); *In re U.S. Mineral Prods. Co.*, No. 01-2471, 2005 WL 5898300, at *18 (Bankr. D. Del. Nov. 29, 2005).  *See also In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1060-61 (3d Cir. 1987).

11

The Plan properly classifies claims and interests in accordance with § 1122. The Plan designates the following nine Classes of Claims based upon the differences in the Claims' legal nature and/or priority:  Class 1 (Priority Claims), Class 2 (Lender Secured Claims), Class 3 (Other Secured Claims), Class 4 (Senior Note Claims), Class 5 (Workers' Compensation Claims), Class 6 (ABI Claims), Class 7 (Asbestos Personal Injury Claims), Class 8 (Asbestos Property Damage Claims) and Class 9 (General Unsecured Claims).  The Plan also designates two classes of interests:  Class 10 (Congoleum Interests) and Class 11 (Subsidiary Interests).

The number of Classes reflects the diverse characteristics of the Claims against and Interests in the Debtors.  In addition, the legal rights under the Bankruptcy Code of each member within a particular Class are substantially similar to the other members of such Class.  The Thompson and Shein Claimants (defined below) argue, without citing any legal support or addressing the Bankruptcy Court's prior rulings that, because they entered into either Pre-Petition Settlement Agreements or the Claimant Agreement with the Debtors, they are not similar to the holders of other Asbestos Personal Injury Claims, should be classified separately, and they imply that they should receive different treatment. *See* Thompson Objection, Ex. 23 at 11-15; *see also* Shein Preliminary Objection, Ex. 21 at 2-3.  This Court should overrule these unfounded arguments.  For the

12

reasons set forth herein, the classification of all Asbestos Personal Injury Claims together in Class 7 is not only permissible under § 1122(a) of the Bankruptcy Code, but is required pursuant to prior orders of the Bankruptcy Court, which are now law of the case.  *See In re Congoleum Corp.*, No. 03-51524, 2007 WL 2177680, at * 2  (Bankr. D.N.J. July 27, 2007) Ex. 51 (July 2007 Objection Decision) ("[T]he Court regards all pre-judgment asbestos claims as similarly situated.  The only proper criterion for differentiating between the pre-judgment claims is their disease level."); *see also In re Congoleum Corp.*, 362 B.R. 167, 183 (Bankr. D.N.J. 2007), Ex. 48 ("Tenth Plan Opinion") (holding that regardless of whether claimants entered into pre-petition settlements with Congoleum, "[t]he legal character of these claims is the same for those cases that were on the eve of trial and those that may arise in the future: they are personal injury claims based on alleged exposure to asbestos contained in Congoleum products").

The Plan Proponents submit that the Plan's classification of Claims and Interests—including the classification of all Asbestos Personal Injury Claims into Class 7—is fair and reasonable and complies with the requirements of § 1122 of the Bankruptcy Code and the prior rulings of the Bankruptcy Court.

> b.  *The Plan Complies with § 1123(a) of the Bankruptcy Code:  Mandatory Plan Provisions*

Section 1123(a) of the Bankruptcy Code sets forth seven mandatory provisions that a plan must include.  Specifically, § 1123(a) requires that a plan:

(i) designate classes of claims and interests; (ii) specify unimpaired classes of claims and interests; (iii) specify treatment of impaired classes of claims and interests; (iv) provide for equality of treatment within each class; (v) provide adequate means for the plan's implementation; (vi) prohibit the issuance of nonvoting equity securities and provide an appropriate distribution of voting power among the classes of securities; and (vii) contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of the reorganized company's officers and directors. *See* 11 U.S.C. § 1123(a). As explained below, the Plan includes each of the provisions mandated by § 1123(a) of the Bankruptcy Code.

> (i) *Section 1123(a)(1)-(4):  Classification and Treatment of Claims*

Article II of the Plan designates Classes of Claims and Interests as required by § 1123(a)(1) of the Bankruptcy Code.[5] *See* Plan § 2.3. Section 2.3 of the Plan specifies that Classes 1, 2, 3, 5, and 11 are unimpaired by the Plan, as required by § 1123(a)(2). *See id.* Section 4.1 of the Plan specifies that Claims and Interests in Classes 4, 6, 7, 8, 9, and 10 are impaired and describes the treatment of each such Class in accordance with § 1123(a)(3) of the Bankruptcy Code. Finally, as

---

[5]  Section 1123(a)(1) of the Bankruptcy Code provides that classes of Administrative Claims and Priority Tax Claims not be classified separately. The treatment accorded Administrative Claims and Priority Tax Claims is set forth in Article III of the Plan.

required by § 1123(a)(4) of the Bankruptcy Code, the treatment of each Claim or Interest within a Class is the same as the treatment as each other Claim or Interest in such Class, unless the holder of a Claim or Interest agrees to less favorable treatment. *See* Plan Art. IV.

> (ii)   *Section 1123(a)(5):  Adequate Means for Implementation of the Plan*

Section 1123(a)(5) of the Bankruptcy Code requires that a plan provide "adequate means for the plan's implementation."  11 U.S.C. § 1123(a)(5).  Article V of the Plan describes the corporate governance of Reorganized Congoleum, the creation of the Plan Trust, the transfer of consideration to the Plan Trust and other information relating to the creation and operation of the Plan Trust.  In addition, implementation of the Plan Trust and distributions by the Plan Trust to holders of Asbestos Claims are ensured by the mechanisms set forth in the Plan Trust Agreement and the TDP.  Article VI of the Plan implements the mechanism by which non-asbestos claims will be paid under the Plan.  Further, other Plan provisions, such as Article VIII regarding the treatment of executory contracts and unexpired leases and settlements, set forth various transactions that will enable the Debtors to effectuate the Plan's terms.  Each of the above Plan provisions, together with the Plan Documents, ensure that the Plan can be implemented successfully.  Accordingly, the Plan satisfies the requirements of § 1123(a)(5) of the Bankruptcy Code.

15

> (iii) *Section 1123(a)(6): Prohibition Against the Issuance of Nonvoting Equity Securities and Adequate Provisions for Voting Power of Classes of Securities*

Section 1123(a)(6) requires that a plan provide that the charter of the reorganized debtor will include a provision "prohibiting the issuance of nonvoting equity securities" and requires that there will be "an appropriate distribution of voting power" with respect to the reorganized debtor. 11 U.S.C. § 1123(a)(6). The Amended and Restated Certificate provides, among other things, that Reorganized Congoleum "shall not issue nonvoting capital stock to the extent prohibited by Section 1123 of the Bankruptcy Code." *See* Exhibit K to Plan (Amended and Restated Certificate), Ex. 11 at 3; *see also* Plan § 5.3. In addition, the Stockholders' Agreement provides that there will be only one class of equity in Reorganized Congoleum, and that each share of the New Common Stock is entitled to equal voting rights. *See* Exhibit L to Plan (Stockholders' Agreement), Ex. 12 at § 5.3. Accordingly, the Plan satisfies the requirements of § 1123(a)(6) of the Bankruptcy Code.

> (iv) *Section 1123(a)(7): Selection of Directors and Officers in a Manner Consistent with the Interests of Creditors and Security Holders and Public Policy*

Section 1123(a)(7) requires that a plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or

16

trustee under the plan and any successor to such officer, director, or trustee." 11

U.S.C. § 1123(a)(7). Pursuant to Section 5.4 of the Plan, the initial board of

directors of Reorganized Congoleum shall consist of five directors. One of such

directors shall be selected by the Bondholders' Committee, three of such directors

shall be selected jointly by the Futures Representative and the Asbestos Claimants'

Committee, and one of such directors shall be Reorganized Congoleum's chief

executive officer. The identity of four out of five of the initial board members was

disclosed in the Plan Supplement filed on May 5, 2010 and the final member will

be disclosed prior to confirmation. Each member of the initial board is required to

serve in accordance with the Amended and Restated Certificate and the Amended

and Restated Bylaws of Reorganized Congoleum, as the same may be amended

from time to time. Subsequently, Reorganized Congoleum's board of directors

shall be elected in accordance with Reorganized Congoleum's governing

documents. Accordingly, the Plan satisfies the requirements of § 1123(a)(7) of the

Bankruptcy Code.

> c.   *The Plan Complies with § 1123(d) of the Bankruptcy Code: Cure of Defaults*

Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a

plan to cure a default the amount necessary to cure the default shall be determined

in accordance with the underlying agreement and applicable nonbankruptcy law."

11 U.S.C. § 1123(d). Section 8.1 of the Plan provides that any defaults of the

17

Debtors with respect to such assumed executory contracts or leases existing as of the Effective Date shall be cured in the ordinary course of Reorganized Congoleum's business promptly after any such default becomes known.  All default disputes (if any) with respect to executory contracts and unexpired lease assumed by Reorganized Congoleum will be resolved pursuant to applicable law. Accordingly, the Plan complies with § 1123(d) of the Bankruptcy Code.

> 2.  Section 1129(a)(2):  The Plan Proponents Have Complied with the Requirements of the Bankruptcy Code

Section 1129(a)(2) focuses on the process by which a plan was proposed. Section 1129(a)(2) of the Bankruptcy Code requires that a plan proponent "compl[y] with the applicable provisions of [the Bankruptcy Code]."  11 U.S.C. § 1129(a)(2).  Legislative history and case law instruct that the principal purpose of § 1129(a)(2) is to ensure that a plan proponent complies with the disclosure and solicitation requirements set forth in §§ 1125 and 1126 of the Bankruptcy Code. *See* H.R. REP. NO. 95-595, at 412 (1977); S. REP. NO. 95-989, at 126 (1978).  *See also In re Johns-Manville Corp.*, 68 B.R. 618, 630 (Bankr. S.D.N.Y. 1986); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984).

Section 1125(b) of the Bankruptcy Code permits solicitation of a plan only upon "adequate information" having been disclosed to creditors, as such term is defined in § 1125(a) to require, among other things, such information that would

18

enable a hypothetical investor of the debtor to make an informed judgment about

the plan.  Specifically, § 1125(b) provides:

> An acceptance or rejection of a plan may not be solicited after the
> commencement of the case under [the Bankruptcy Code] from a
> holder of a claim or interest with respect to such claim or interest,
> unless, at the time of or before such solicitation, there is transmitted to
> such holder the plan or a summary of the plan, and a written
> disclosure statement approved, after notice and a hearing, by the court
> as containing adequate information . . . .

11 U.S.C. § 1125(b).  By order dated March 12, 2010 (the "Disclosure Statement

Order") (Ex. 26), after notice and a hearing, this Court approved the Disclosure

Statement with respect to the Plan pursuant to § 1125(b) of the Bankruptcy Code.

In addition, by another order dated March 12, 2010 (the "Voting Procedures

Order") (Ex. 28), after notice and a hearing, this Court approved the Debtors'

proposed voting procedures with respect to the Plan, including:  (i) the scope of

solicitation for the Plan; (ii) the procedures for voting and tabulation of ballots; (iii)

the forms of the ballots; (iv) the contents of the solicitation package (the

"Solicitation Materials") and the service thereof; (v) the form of notice of the

Confirmation Hearing; and (vi) the procedures for allowance of claims for voting

purposes in connection with the solicitations of the Plan.

In accordance with the Voting Procedures Order, the Debtors commenced

solicitation of the Plan on or about March 26, 2010.  *See* Ballot Certification, Ex.

17 ¶ 7.  The Solicitation Materials, including, among other things, the Plan,

Disclosure Statement, a ballot and other materials, were transmitted to each holder of a Claim or Interest entitled to vote on the Plan as required by the Voting Procedures Order.  The Plan Proponents did not solicit acceptances of the Plan from any creditor or equity interest holder prior to the transmission of the Solicitation Materials, as approved by this Court.  Feist Decl. ¶ 76.

The Debtors have complied with all solicitation and disclosure requirements set forth in the Bankruptcy Code, the Bankruptcy Rules, and the Voting Procedures Order.  Such compliance is evidenced in the record by, among other things, the Certificates of Services with Respect to Solicitation of the Fourth Amended Joint Plan, dated April 16, 2010 (Ex. 18) and the Ballot Certification (Ex. 17).  Based upon the foregoing, the requirements of § 1129(a)(2) of the Bankruptcy Code have been satisfied.

        3.      Section 1129(a)(3):  The Plan Has Been Proposed in Good Faith and Not By Any Means Forbidden by Law

Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  Although the Code does not define "good faith" in the context of § 1129(a)(3), the Third Circuit has stated that "[f]or purposes of determining good faith under § 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."  *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 247 (3d Cir.

500522999v5

2004) (citations omitted); *see also Great Bay Hotel & Casino*, 251 B.R. at 238

("Courts have found a plan to be proposed in good faith where it:  (1) fosters a

result consistent with the Code's objectives, (2) has been proposed with honesty

and good intentions and with a basis for expecting that reorganization can be

effected, or (3) is supportable based on the totality of the circumstances.")

(citations omitted); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 107 (Bankr. D. Del.

1999) ("The good faith standard requires that the plan be proposed with honesty,

good intentions and a basis for expecting that a reorganization can be effected with

results consistent with the objectives and purposes of the Bankruptcy Code.").

     In this regard, the Supreme Court has held that "[t]he fundamental purpose

of reorganization is to prevent a debtor from going into liquidation, with an

attendant loss of jobs and possible misuse of economic resources."  *NLRB v.*

*Bildisco & Bildisco*, 465 U.S. 513, 528 (1984).  Indeed, courts have stressed the

importance of payment of creditors in Chapter 11 cases.  *See In re Ngan Gung*

*Rest.*, 254 B.R. 566, 571 (Bankr. S.D.N.Y. 2000) ("[A] clear purpose of Chapter 11

is to benefit all parties, including the debtor and its creditors, by providing a

breathing space to enable a debtor to reorganize . . . [in which] the debtor proposes

a plan . . . to maximize value for the general benefit of all creditors, thus avoiding a

mad scramble for assets.").

The requirement of good faith must be viewed in light of the totality of the circumstances surrounding the formulation of a Chapter 11 plan. *See McCormick v. Banc One Leasing Corp. (In re McCormick)*, 49 F.3d 1524, 1526 (11th Cir. 1995) ("The focus of a court's inquiry is the plan itself, and courts must look to the totality of the circumstances surrounding the plan, . . . keeping in mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start."); *CoreStates Bank v. United Chem. Techs., Inc.*, 202 B.R. 33, 57 (E.D. Pa. 1996) (applying totality of circumstances standard).

The Plan satisfies these requirements of § 1129(a)(3).  The Plan, the culmination of more than six years of vigorously contested litigation and numerous prior attempts at consensual reorganization, fairly achieves a result that is wholly consistent with the objectives and purposes of the Bankruptcy Code.  The objectives of § 524(g) of the Bankruptcy Code are (i) to channel asbestos-related liability to an adequately funded trust to permit an equitable resolution of claims, and (ii) to preserve value by permitting the debtor-company to continue its operations.  As set forth in the Plan, pursuant to § 524(g) of the Bankruptcy Code, all of the Debtors' liability for Asbestos Claims will be channeled to the Plan Trust, which will be adequately funded by approximately $235 million from insurance settlements, other rights to insurance, as well as over 50% of the equity of Reorganized Congoleum.  Meanwhile, the company's operations will be

22

preserved for the benefit of all creditors (asbestos and non-asbestos creditors alike), and nearly six hundred jobs will be maintained here in New Jersey. These objectives of § 524(g) will be achieved openly and fairly by this Plan.

As the evidence proffered in connection with the Confirmation Hearing will demonstrate, the Plan is a result of vigorous, arm's-length bargaining among and between the Debtors, the Asbestos Claimants Committee, the Futures Representative and the Bondholders' Committee. Indeed, the official representatives of each creditor constituency and future asbestos claimants in these cases are Plan Proponents and support the Plan fully. Each of these parties-in-interest, along with the Claimants' Counsel, worked tirelessly to create a global compromise that would allow the Debtors to emerge from bankruptcy as a viable company and to provide the best possible return for all of their creditors.

Moreover, the Plan has been accepted by creditors in numbers far in excess of the statutory requirements. The fact that the creditors have voted to accept the Plan—and have done so in overwhelming numbers—argues powerfully in favor of the Plan's good faith. *See In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 769 (Bankr. S.D.N.Y. 1992) (finding that the fact that the plan was accepted overwhelmingly by all classes of impaired creditors and two out of three classes of equity holders was an important factor leading to a determination of good faith).

The Plan itself, the arm's-length negotiations among the Debtors and the other Plan Proponents leading to the Plan's formulation, including the negotiation of the Litigation Settlement Agreement, as amended, and the various Asbestos Insurance Settlement Agreements, as well as the overwhelming support of creditors all demonstrate the Plan Proponents' good faith in proposing the Plan. For each of the reasons set forth herein, the Plan Proponents submit that the Plan has been proposed in good faith and complies with the requirements of § 1129(a)(3) of the Bankruptcy Code.

><b>4.</b>   Section 1129(a)(4):  The Plan Provides that Payments Made by the Debtors for Services or Costs and Expenses Are Subject to Court Approval

Section 1129(a)(4) of the Bankruptcy Code requires that:

> Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

11 U.S.C. § 1129(a)(4).  All fees incurred in these Chapter 11 cases either have been, or will be, fully disclosed and subject to Court approval.  Section 13.3(g) of the Plan provides that the Court will retain jurisdiction after the Effective Date to hear and determine all applications for allowance of compensation for professionals and the reimbursement of expenses under §§ 330, 331 and 503(b) of the Bankruptcy Code.  Plan § 13.3(g).

24

In addition, Article III of the Plan provides for the payment of various Administrative Claims, including Claims for professional fees, which are subject to Bankruptcy Court approval and the standards of the Bankruptcy Code.  In addition, the Plan also provides that the Indenture Trustee's receipt of reasonable compensation and the reimbursement of actual and necessary expenses pursuant to the terms of the Indenture, which are payable by the Debtors pursuant to Article III of the Plan, shall be subject to a "reasonableness" standard, and upon any objection, review by the Court.  Plan § 7.2.

Pursuant to Section 5.15 of the Plan, the Court also held a hearing on April 20, 2010 to determine the reasonableness of the expenses paid pre-petition by the Debtors to the Claimants' Counsel pursuant to the Claimant Agreement.  By an opinion and order dated May 7, 2010 [Dkt. Nos. 599, 600], this Court determined that the Debtors' payment of these expenses was, and is, reasonable pursuant to § 1129(a)(4) of the Bankruptcy Code.  Accordingly, for the foregoing reasons, the Plan Proponents submit that the Plan complies with the requirements of § 1129(a)(4) of the Bankruptcy Code.

> 5.    Section 1129(a)(5):  The Plan Proponents Have Disclosed or Will Disclose All Necessary Information Regarding Directors, Officers and Insiders

Section 1129(a)(5) of the Bankruptcy Code requires that a plan disclose the identity of those individuals who will serve as directors and officers of the

reorganized debtor, the identity of any insider to be employed or retained by the reorganized debtor, and the nature of any compensation proposed to be paid to such insider.  In addition, under § 1129(a)(5)(A)(ii) of the Bankruptcy Code, the appointment or continuation in office of any directors or officers must be consistent with the interests of creditors, equity security holders and public policy.

As noted *supra* in Part I.A.1 discussing § 1123(a)(7) of the Bankruptcy Code, pursuant to Section 5.4 of the Plan, the initial board of directors of Reorganized Congoleum shall consist of five directors.  One of such directors shall be selected by the Bondholders' Committee, three of such directors shall be selected jointly by the Futures Representative and the Asbestos Claimants' Committee, and one of such directors shall be Reorganized Congoleum's chief executive officer.  The identity of four out of five of the initial board members was disclosed in the Plan Supplement filed on May 5, 2010.  The identity of the final director will be disclosed prior to confirmation.  In addition, the identities of the officers of Reorganized Congoleum were also disclosed in the Plan Supplement filed on May 5, 2010.  Accordingly, the Plan satisfies the requirements of § 1129(a)(5) of the Bankruptcy Code.

500522999v5

6.      Section 1129(a)(6):  The Plan Does Not Contain Rate Changes
        Subject to the Jurisdiction of Any Governmental Regulatory
        Commission

Section 1129(a)(6) of the Bankruptcy Code requires that "[a]ny

governmental regulatory commission with jurisdiction, after confirmation of the

plan, over the rates of the debtor has approved any rate change provided for in the

plan, or such rate change is expressly conditioned on such approval."  11 U.S.C. §

1129(a)(6).  Section 1129(a)(6) is not applicable to the Plan because the Debtors'

businesses do not involve the establishment of rates over which any regulatory

commission has jurisdiction or will have jurisdiction after Confirmation.

7.      Section 1129(a)(7):  The Plan Is in the Best Interests of the
        Debtors' Creditors and Interest Holders

Section 1129(a)(7) of the Bankruptcy Code requires that a plan must be in

the "best interests" of creditors and interest holders.  11 U.S.C. § 1129(a)(7).  The

"best interests" test requires that, with respect to each impaired class of claims or

interests, each member of such class either (i) has accepted the plan or (ii) will

receive or retain property of a value not less than what such holder would receive

or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

*See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S.

434, 440 (1999); *In re Oakwood Homes Corp.*, 449 F.3d 588, 597-98 (3d Cir.

2006).

27

As § 1129(a)(7) itself makes clear, the best interests test is applicable only to non-accepting holders of impaired claims and interests.  *See* 11 U.S.C. § 1129(a)(7).  The Court, therefore, must determine whether holders of Impaired Claims and Interests would fare better under the Plan, or under a Chapter 7 liquidation.  In order to make this determination, the Court must estimate the dollar amount that would be generated from the liquidation of the Company's assets and properties in the context of a Chapter 7 liquidation case.  The cash amount that would be available for satisfaction of the Allowed Claims and Allowed Interests of the Company would consist of the proceeds resulting from the disposition of the assets of the Company, augmented by the cash held by the Company at the time of the commencement of a Chapter 7 case.  Such cash amount would be reduced by the costs and expenses of the liquidation and by any additional Administrative Claims and Priority Claims that would result from the termination of the Company's business and the use of a Chapter 7 proceeding for the purposes of liquidation.

The Debtors retained SSG Capital Advisors, LLC ("SSG") to prepare a liquidation analysis of the Company's assets as of January 31, 2010 (the "Liquidation Analysis"), Ex. 14.  SSG determined that the net liquidation value of the Company would range between $55 million and $72 million.  Ex. 14 at 1.  It is important to note, however, that the Liquidation Analysis does not take into

28

account the effect of the Company's asbestos liability upon any liquidating asset sale.  Feist Decl. ¶ 79.  Thus, the liquidation value of Congoleum could be substantially less than the $55 to $72 million estimation because it could be difficult to sell the assets of a debtor that has present and future asbestos liabilities. *Id.*

Liquidation under Chapter 7 would trigger substantial additional claims against these estates that have not yet been asserted in these cases.  Feist Decl. ¶ 79.  For example, the following additional new claims would be asserted against the estates in a liquidation case (the "New Claims"):[6]

| Type of Claim | Value of Claim |
|---|---|
| Non-Current Pension Liability | $26,286,000 |
| Post-Retirement Liability | $11,117,000 |
| Other Liabilities | $12,268,000 |
| | |
| Total Additional New Claims | $49,671,000 |

Thus, approximately $49,671,000 in New Claims—claims that would otherwise be paid over time or waived in a reorganization—could be asserted against the estates in a liquidation.  Feist Decl. ¶ 80.

---

[6] A breakdown of the New Claims was given in Congoleum's last annual report. *See* Congoleum's 2009 Annual Report on Form 10-K for the year ending December 31, 2009 (the "2009 Annual Report"), Ex. 69.  In addition to the New Claims listed above, pursuant to the Intercompany Agreement, ABI has agreed to waive its claims against the estates, estimated at $1.8 million, which could be asserted in a Chapter 7 liquidation.

29

The New Claims would be in addition to the claims that already are being addressed under the Plan.  Feist Decl. ¶ 80.  For example, in a liquidation scenario, the Debtors will be in immediate default under the terms of the Indenture governing the Old Senior Notes.  *Id.* ¶ 79.  Under the terms of the Indenture, the Debtors are obligated to pay at least the entire $100 million principal amount which was due in 2008.  *Id.*  The claims of the Bondholders, together with the New Claims, alone will be well in excess of the $55 to $72 million in value that may be received in a Chapter 7 liquidation.

Moreover, these numbers do not take into account asbestos Claims and future Demands.  Although estimates of the value of the Debtors' asbestos liability have varied widely, a recent indicator of the magnitude of Congoleum's present and future asbestos liability can be seen from the Ballot Certification.  *See* Ballot Certification, Ex. 17.  Approximately 80,000 holders of Asbestos Personal Injury Claims cast ballots to accept or reject the Plan or prior Joint Plan.  *Id.* ¶ 22.  The claimants selected a disease level with a corresponding dollar value as provided for in the TDP.  The dollar amount accepting the Plan was approximately $1.7 billion, while approximately $59 million voted to reject the Plan.  *Id.*  The Debtors acknowledge that such dollar amounts were used for voting purposes only and the evidence in support of such claims and their disease level has not been scrutinized; however, it is indicative of the magnitude of claims that may be asserted against

30

Congoleum.  Moreover, these amounts reflect only the *present claimants who actually voted* on the Plan.  The Debtors are aware of approximately 65,000 other present claimants who requested solicitation packages, but did not vote on the Joint Plan.  Feist Decl. ¶ 81.   Thus, the dollar amount of the present asbestos claims (not including future claims) would likely be in excess of $1 billion.

While there are presently insurance settlements in the amount of $235 million that would be paid to the Plan Trust pursuant to this § 524(g) Plan, many of those settlements are contingent upon confirming a § 524(g) plan of reorganization that treats claimants equally, although some of those insurers have the option to contribute their respective settlement amounts to the estate in a liquidation scenario.  In a Chapter 7 liquidation, it is likely that any recovery by asbestos creditors would be diminished in comparison to their recovery under the Plan.  The asbestos creditors would lose the equity they would receive in Reorganized Congoleum and the ongoing value of such equity.  There would undoubtedly be long term contested litigation on many fronts with respect to the distribution of available insurance proceeds including:  (i) intra-creditor disputes as to whether certain asbestos creditors with pre-petition settlement agreement should receive priority over other asbestos creditors, (ii) the resumption of the Avoidance Actions and commencement of other avoidance actions by the potential Chapter 7 trustee to set aside the Pre-Petition Settlement Agreements, Claimant Agreement and other

31

agreements relating to the Pre-Packaged Plan, (iii) the continuation of the

Coverage Action and refusal by insurers, based on certain decisions in the

Coverage Action, to allow any insurance proceeds to be used to fund any claims

settled in the Pre-Petition Settlement Agreements or Claimant Agreement, and (iv)

the commencement anew of additional coverage litigation against certain of the

Debtors' insurers who decline to settle.  It could be years before the insurance pool

is determined and distribution mechanisms agreed.  The transaction costs of such

multi-faceted litigation would diminish the likely recovery of asbestos creditors

from such insurance assets.

In a liquidation, all liabilities—including the costs associated with

administering the Chapter 7 estate—would have to be satisfied out of the same

pool of finite resources.  Given the massive amount of liabilities that would be

asserted against the estates in a liquidation, it is abundantly clear that such pool of

assets would not be sufficient to satisfy the present claims that will be asserted

against the Debtors' estates.  Creditors would not receive the benefit of

Reorganized Congoleum's annual cash flow, and the Company would not be able

to pay even post-petition claims in the ordinary course.  Feist Decl. ¶ 82.  Such

claims would have to be satisfied out of the same pool of finite assets that would

be used to pay administrative claims, asbestos claims and pre-petition non-asbestos

claims that would no longer be reduced to their compromised amounts set forth in the Plan.

In contrast, all creditors, including asbestos personal injury creditors, will receive a superior recovery under the Plan than in a Chapter 7 liquidation proceeding. Under the Plan, the Debtors will be in a position to use their cash flow to pay their post-petition and some pre-petition unsecured claims in the ordinary course, such as (i) employee claims; (ii) unfunded pension liabilities; (iii) post-retirement benefit liabilities; (iv) workers compensation claims; (v) environmental clean-up costs; (vi) contract claims; (vii) lease obligations; and (viii) other indebtedness such as trade claims. Feist Decl. ¶ 83. Under the Plan, the Bondholders have agreed to reduce their claims under the Senior Notes and will receive an approximately 33% recovery, plus the value of their 49.9% equity ownership of Reorganized Congoleum, in full satisfaction of the Senior Note Claims. *See* Plan §§ 4.1(d), 1.2. Under the Plan, all holders of Asbestos Personal Injury Claims—including future claimants—will submit their claims to the Plan Trust, which will be funded by, among other things, 50.1% of Reorganized Congoleum. The Plan Trust will determine the allowed value of such claims based on the criteria set forth in the TDP. All holders of Asbestos Personal Injury Claims will then receive a certain Payment Percentage of their allowed claim, which Payment Percentage will be established by the Plan Trustee in accordance with the

33

TDP.  Accordingly, at present it cannot be determined what percentage recovery holders of Asbestos Personal Injury Claims will receive under the Plan, although others have suggested that the holders of Asbestos Personal Injury Claims will receive no more than 10-15% on account of their claims.  While members of Class 10 (Congoleum Interests) will receive no recovery under the Plan, the Plan Proponents submit that such interest holders would also receive no recovery in the event of the Debtors' liquidation pursuant to Chapter 7.

It is apparent that all creditors will fare far better under the Plan than in a Chapter 7 liquidation.  The Plan Proponents submit that the members of each Class of Impaired Claims will receive more under the Plan than they would receive if the Debtors were liquidated under Chapter 7.  Accordingly, the Plan satisfies the best interests test with respect to every dissenting member of every impaired class and therefore satisfies the requirements of § 1129(a)(7) of the Bankruptcy Code.

8.     Section 1129(a)(8):  The Plan Is Supported by Impaired Classes Entitled To Vote

As discussed previously in Section B, a plan can be confirmed if each class votes to accept the plan or is not impaired under the plan.  *See* § 1129(a)(8).  As discussed more fully below in Part I.B.1, to the extent any class of claims or interests rejects, or is deemed to reject the plan, confirmation is available pursuant to the "cram down" provisions of § 1129(b).  A class of claims accepts a plan if the holders of at least two-thirds in dollar amount and more than one-half in number

34

vote to accept the plan, counting only those creditors that actually vote. 11 U.S.C. § 1126(c). A class of interests accepts a plan if holders of at least two-thirds of the amount of interests vote to accept the plan, counting only those interest holders that actually vote. 11 U.S.C. § 1126(d). In addition, with respect to Class 7 (Asbestos Personal Injury Claims), § 524(g) of the Bankruptcy Code provides that, of the claimants who vote, at least 75% must vote to accept the Plan.

Class 1 (Priority Claims), Class 2 (Lender Secured Claims), Class 3 (Other Secured Claims), Class 5 (Workers' Compensation Claims) and Class 11 (Subsidiary Interests) are unimpaired and are conclusively deemed to have accepted the Plan pursuant to § 1126(f) of the Bankruptcy Code. Accordingly, as to such Unimpaired and accepting Classes, the requirements of § 1129(a)(8) of the Bankruptcy Code have been satisfied.

Class 4 (Senior Note Claims), Class 6 (ABI Claims), Class 7 (Asbestos Personal Injury Claims), and Class 8 (Asbestos Property Damage Claims) are impaired and were entitled to vote to accept or reject the Plan. As set forth in the chart below, all of these Classes voted to accept the Plan by more than one-half in number and two-thirds in dollar amount pursuant to § 1126(c) of the Bankruptcy Code. In addition, Class 7 (Asbestos Personal Injury Claims) voted to accept the Plan in excess of 75% as required by § 524(g). Accordingly, with respect to Class 4 (Senior Note Claims), Class 6 (ABI Claims), Class 7 (Asbestos Personal Injury

35

Claims), and Class 8 (Asbestos Property Damage Claims), the voting requirements

of § 1129(a)(8) of the Bankruptcy Code have been satisfied.

The following summarizes the results of such tabulation:

| VOTING CLASS | Number of Holders Accepting | % of Holders Accepting | Dollar ($) Amount Accepting | % of $ Amount Accepting |
|---|---|---|---|---|
| Class 4 (Senior Note Claims) | 33 | 100% | $96,150,000 | 100% |
| Class 6 (ABI Claims) | 1 | 100% | $1,000,000 | 100% |
| Class 7 (Asbestos Personal Injury Claims) | 77,116 | 95.01% | $1,681,896,600 | 96.6% |
| Class 8 (Asbestos Property Damage Claims) | 12 | 92.31% | $123,932.77 | 90.52% |

*See* Ballot Certification, Ex. 17 ¶¶ 22-23.

Class 9 (General Unsecured Claims) is also impaired and was entitled to

vote to accept or reject the Plan.  Only two ballots were received from Class 9

Claimants.  Ballot Certification, Ex. 17 ¶ 24.  While both ballots were cast  in favor

of the Plan, they could not be counted under the Voting Procedures Order because

the claimants were required to file a motion for temporary allowance of his or

claims and did not do so.  *See id.*  A class that does not cast any votes on a plan of

36

reorganization is deemed to accept the plan for the purposes of § 1129(a)(8). *See*

*In re Ruti-Sweetwater, Inc.*, 836 F.2d at 1266 (deeming non-voting, non-objecting

class to accept plan); *In re Adelphia Commc'ns*, 368 B.R. at 261-62 (determining

that non-voting class would be deemed an accepting class because "creditor

democracy" should not be "frozen as a consequence of the disinterest of others");

*In re Szostek*, 886 F.2d 1405, 1413 (3d Cir. 1989) (adopting *Ruti-Sweetwater*'s

treatment of non-voting classes as accepting class). In this case, no General

Unsecured Claimant has objected to confirmation or voted to reject the Plan.

Accordingly, the Plan Proponents submit that § 1129(a)(8) of the Bankruptcy Code

has been satisfied with respect to Class 9 (General Unsecured Claims).

Finally, Class 10 (Congoleum Interests) is not receiving or retaining any

property under the Plan. As a result, Class 10 is deemed to have rejected the Plan

pursuant to § 1126(g) of the Bankruptcy Code. As discussed *infra* in Part I.B, the

Plan may be "crammed down" on the Class of Interests.

9.    Section 1129(a)(9): The Plan Provides for Payment in Full of
        All Allowed Priority Claims

Section 1129(a)(9) of the Bankruptcy Code requires that certain priority

claims be paid in full on the effective date of a plan, unless parties agree to

different treatment of their claims.[7]  In particular, pursuant to § 1129(a)(9)(A),

holders of claims of a kind specified in §§ 507(a)(1) and (a)(2)—generally

administrative claims allowed under § 503(b)—must receive cash equal to the

allowed amount of such claims on the effective date of the plan, unless such

holders agree to different treatment.  *See* 11 U.S.C. § 1129(a)(9)(A).

Section 1129(a)(9)(B) requires that each holder of a claim of a kind

specified in §§ 507(a)(3), (a)(4), (a)(5), (a)(6) and (a)(7)—generally wage,

employee benefit, and deposit claims entitled to priority—must receive deferred

cash payments under the Plan of a value equal to the allowed amount of such

claim.  *See* 11 U.S.C. § 1129(a)(9)(B)(i).  Finally, § 1129(a)(9)(C) provides that

the holder of a claim of a kind specified in § 507(a)(8)—i.e., priority tax claims—

must receive deferred cash payments over a period not to exceed six years after the

date of assessment of the claim, the present value of which equals the allowed

amount of the claim.  *See* 11 U.S.C. § 1129(a)(9)(C).

The Plan satisfies these requirements.  Section 3.2 of the Plan provides that

each holder of an Allowed Administrative Claim shall receive cash equal to the

---

[7]  The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 enacted
certain amendments to the Bankruptcy Code including, § 1129(a)(9).  *See* Pub.
L. No. 109-008, 119 Stat. 23 (2005).  The majority of these amendments,
including the amendments to § 1129(a)(9), only apply to cases filed after October
17, 2005, and therefore do not apply to these Chapter 11 cases.  For the
convenience of this Court, Ex. 35 provides a the text of §§ 1129(a)(9), 503 and
507 that were in effect before the 2005 amendments were made and that are
applicable to this case.

unpaid portion of such Allowed Administrative Claim upon the Distribution Date unless such holder agrees to a lesser amount.  In addition, pursuant to Section 3.3 of the Plan, and in accordance with § 1129(a)(9)(C) of the Bankruptcy Code, all Allowed Priority Tax Claims shall be paid (i) cash equal to the unpaid portion of such claim upon the Distribution Date; (ii) such other amount as to which the applicable Debtor and such holder agree in writing; or (iii) deferred cash payments having a value equal to such claim over a period not exceeding six years after the date of the assessment of such claim.

As also discussed *infra* in Part I.A.11, to assist Reorganized Congoleum's emergence from Chapter 11, the Debtors have proposed a payment plan with counsel to the Debtors, the Asbestos Claimants' Committee, the Bondholders' Committee and the Futures Representative pursuant to which certain attorneys' fees and expenses would be paid pursuant to a promissory note.  If the parties agree to such proposal, the consensual resolution of the parties' administrative claims would be consistent with § 1129(a)(9), which specifically permits a creditor to agree to different treatment.  *See* 11 U.S.C. § 1129(a)(9).  Accordingly, the Plan satisfies § 1129(a)(9) of the Bankruptcy Code.

> 10.    Section 1129(a)(10):  At Least One Class of Impaired Claims
> Has Accepted the Plan

Section 1129(a)(10) of the Bankruptcy Code requires that at least one Impaired Class of Claims must accept the Plan by the requisite vote.  As shown in

the Ballot Certification, each Impaired Class of creditors entitled to vote has voted

in favor of the Plan.  Accordingly, the Plan satisfies § 1129(a)(10) of the

Bankruptcy Code.

          11.    <u>Section 1129(a)(11):  The Plan Is Feasible</u>

Section 1129(a)(11) of the Bankruptcy Code provides that a plan of

reorganization may be confirmed only if "[c]onfirmation of the plan is not likely to

be followed by the liquidation, or the need for further financial reorganization, of

the debtor or any successor to the debtor under the plan, unless such liquidation or

reorganization is proposed in the plan."  11 U.S.C. § 1129(a)(11).  The Debtors

currently are preparing updated cash flow projections that will be proffered in

connection with confirmation.  In addition, the Debtors have retained SSG to

perform a feasibility analysis when the projections have been completed.  The

projections and feasibility analysis will be filed prior to confirmation.  As the

evidence proffered in connection with the Confirmation Hearing will demonstrate,

confirmation of the Plan is not likely to be followed by the liquidation of, or need

for further financial reorganization of, the Debtors, Reorganized Congoleum or any

successor to Reorganized Congoleum under the Plan.

          12.    <u>Section 1129(a)(12):  All Statutory Fees Have Been or Will Be Paid</u>

Section 1129(a)(12) of the Bankruptcy Code requires payment of "[a]ll fees

payable under § 1930 of title 28, as determined by the court at the hearing on

40

confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan."  11 U.S.C. § 1129(a)(12).  Section 13.4 of the Plan provides that all fees payable pursuant 28 U.S.C. § 1930 "shall be paid by the Debtors on or before the Effective Date and thereafter by Reorganized Congoleum as due until the Reorganization Cases are closed, converted or dismissed."  Accordingly, the Plan satisfies § 1129(a)(12) of the Bankruptcy Code.

> 13. Section 1129(a)(13):  The Plan Adequately and Properly Treats Retiree Benefits

Section 1129(a)(13) of the Bankruptcy Code requires that a plan provide for "the continuation after its effective date of payment of all retiree benefits."  11 U.S.C. § 1129(a)(13).  Section 8.5 of the Plan provides that Reorganized Congoleum shall continue all retiree benefits after the Effective Date for the duration of the period that the Debtors originally obligated themselves to provide such benefits.  Accordingly, the Plan satisfies § 1129(a)(13) of the Bankruptcy Code.

## B. The Plan Meets Each Requirement for Confirmation Under §§ 1129(b) and (d) of the Bankruptcy Code

> 1. Section 1129(b):  The Plan Satisfies the "Cram Down" Requirements of the Bankruptcy Code

Class 10 (Congoleum Interests) consists of all the equity interests in Congoleum outstanding immediately prior to the Effective Date, including shares of common stock and any options, warrants, or other rights to acquire equity

ownership interests in Congoleum.  *See* Plan § 1.2 (definition of Congoleum

Interests).  Class 10 is receiving no recovery pursuant to the Plan.  *See* Plan §

4.1(j).  As a result, Class 10 is deemed to have rejected the Plan.  *See* 11 U.S.C. §

1126(g).  Under § 1129(b), even if an impaired class is deemed to reject the plan,

or if an impaired class votes to reject a plan, the court nevertheless may "cram

down" the plan over the dissenting vote of an impaired class as long as the plan

does not "discriminate unfairly" and is "fair and equitable" with respect to such

dissenting class or classes.  *See* 11 U.S.C. § 1129(b).

It is commonplace in Chapter 11 cases that equity receives no recovery

under a plan.  The only circumstance in which the shareholders of a debtor would

be entitled to any distribution under a Chapter 11 plan is if all unsecured creditors

receive a full recovery on account of their pre-petition claims.  *See generally* 11

U.S.C. § 1129(b)(2)(B); *see also In re Armstrong World Indus., Inc.*, 432 F.3d 507,

512 (3d Cir. 2005) (creditors must be paid in full before equity interests can retain

any interests for any purpose).  In the present case, Congoleum's unsecured

claims—i.e., Class 4 (Senior Note Claims) and Class 7 (Asbestos Personal Injury

Claims—are receiving far less than a full recovery.  As set forth below, the Court

may confirm the Plan because it does not "discriminate unfairly" and is "fair and

equitable" with respect to Class 10 (Congoleum Interests).  *See* 11 U.S.C. §

1129(b).

> a.   *The Plan Does Not Discriminate Unfairly Against the Class 10 Congoleum Interests*

The unfair discrimination standard of § 1129(b) ensures that a plan does not unfairly discriminate against a dissenting class with respect to the value it will receive under a plan when compared to the value given to all other similarly situated classes.  *In re Barney & Carey Co.*, 170 B.R. 17, 25 (Bankr. D. Mass 1994).  Section 1129(b)(1) does not prohibit discrimination between classes.  Rather, it prohibits discrimination that is unfair.  *See In re 11,111, Inc.*, 117 B.R. 471, 478 (Bankr. D. Minn. 1990).  The Bankruptcy Code does not provide a definition of "unfair discrimination," leaving courts to determine what might be "unfair" on a case-by-case basis.  *See In re 203 N. LaSalle St. Ltd. P'ship*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established"), *rev'd on other grounds*, 526 U.S. 434 (1999).  The weight of judicial authority, however, holds that a plan discriminates unfairly in violation of § 1129(b) only if similar claims are treated differently without a reasonable basis for the disparate treatment.  *See Greate Bay Hotel & Casino*, 251 B.R. at 228 ("The hallmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination.").

43

In the present case, the members of Class 10 (Congoleum Interests) are dissimilar to the members of every other Class under the Plan.  No other Class holds Congoleum's equity interests.  Pursuant to the Plan, the Congoleum Interests shall be cancelled and the holders of the Congoleum Interests shall retain and receive nothing on account of such Interests.  As explained below, if unsecured claims are impaired under a plan, the Bankruptcy Code requires that *all* equity interests must be canceled.  *See* 11 U.S.C. § 1129(b)(2)(ii); *see also In re Armstrong World Indus.*, 432 F.3d at 512 (referred to as the "absolute priority rule," the rule requires that "creditors . . . be paid before the stockholders could retain [equity interests] for any purpose whatever.").  In the present case, the Plan's treatment of Class 10 is necessary because all of the other unsecured claims in the case are impaired and are receiving a recovery of less than 100%.  Accordingly, the Plan and does not unfairly discriminate within the meaning of § 1129(b)(1) of the Bankruptcy Code.

> b.    *The Plan is Fair and Equitable with Respect to the Class 10 Congoleum Interests*

Pursuant to § 1129(b)(2)(ii) of the Bankruptcy Code, a plan is "fair and equitable" with respect to dissenting equity interest holders if "the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan."  11 U.S.C. § 1129(b)(2)(ii); *In re Armstrong World Indus.*, 432 F.3d at 513 ("The plain language of the statute makes it clear that a

44

plan cannot give property to junior claimants over the objection of a more senior class that is impaired.").  In the instant case, there is no class junior to Class 10 (Congoleum Interests).  Accordingly, the Plan is fair and equitable within the meaning of § 1129(b)(2) of the Bankruptcy Code with respect to the Class 10 Congoleum Interests.

> 2.    Section 1129(d):  The Plan's Purpose Is Consistent with the Bankruptcy Code

Section 1129(d) of the Bankruptcy Code provides that a court may not confirm a plan if the principal purpose of the plan is to avoid taxes or the application of Section 5 of the Securities Act of 1933.  The Plan satisfies § 1129(d) because its principal purpose is not to avoid taxes or the application of Section 5 of the Securities Act of 1933.

## II.    MODIFICATIONS TO THE PLAN ARE IMMATERIAL AND DO NOT REQUIRE RESOLICITATION OF THE PLAN

The Plan Proponents hereby request a determination from the Court that the modifications to the Plan (the "Modifications") that were filed with the Court on May 5, 2010 as part of the Plan Supplement do not require the resolicitation of any holders of Claims or Interests.  Section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019 allow the proponent of a plan to modify a plan at any time before confirmation as long as the plan as modified satisfies all requirements concerning plan contents, the classification of claims an interests and disclosure

45

requirements.  11 U.S.C. §§ 1127(a), (c).  Once modified, "the plan as modified

becomes the plan."  11 U.S.C. § 1127(a).  Section 1127(d) further provides that

"any holder of a claim or interest that has accepted or rejected a plan is deemed to

have accepted or rejected, as the case may be, such plan as modified, unless, within

the time fixed by the court, such holder changes such holder's previous acceptance

or rejection."  11. U.S.C. § 1127(d).

Bankruptcy Rule 3019 explains when it is necessary to resolicit parties who

have previously voted on the plan:

> In a . . . chapter 11 case, after a plan has been accepted and before its
> confirmation, the proponent may file a modification of the plan.  If the
> court finds after hearing on notice . . . that the proposed modification
> does not adversely change the treatment of the claim of any creditor
> . . . who has not accepted in writing the modification, it shall be
> deemed accepted by all creditors . . . who have previously accepted
> the plan.

Fed. R. Bankr. P. 3019; *see also In re Am. Solar King Corp.*, 90 B.R. 808. 825

(Bankr. W.D. Tex. 1988).  Courts interpreting Bankruptcy Rule 3019 have held

that the resolicitation of acceptances on a plan of reorganization is not required

with respect to a modified plan unless the modifications "materially and adversely

affect" the treatment of claims or equity interests.  *See*, *e.g.*, *In re Celotex Corp.*,

204 B.R. 586, 608-09 (Bankr. M.D. Fla. 1996); *In re TransWorld Airlines, Inc.*,

185 B.R. 302, 322 (Bankr. E.D. Mo. 1995); *In re Mount Vernon Plaza Cmty.*

*Urban Redev. Corp. I*, 79 B.R. 305, 306 (Bankr. S.D. Ohio 1987).

As is evidenced by the Modifications themselves, which were set forth in detail in the Plan Supplement filed on May 5, 2010, such Modifications are technical changes or clarifications that have been made by the Plan Proponents in their continuing review of the Plan or in response to informal requests for clarification made by parties-in-interest.  The Modifications do not materially or adversely affect or change the treatment of any Claim against or Interest in any Debtor.

Moreover, the Modifications were filed seven days before the deadline to file objections to the Plan, thereby providing adequate notice and opportunity to object.  No party has objected to the Modifications.  The impaired Classes entitled to vote on the Plan are not adversely affected by the Modifications in any way, and no other Claim or Interest is impaired as a result of the Modifications. Accordingly, the Plan Proponents request that the Court, pursuant to § 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, determine that the Modifications do not require resolicitation of previously-cast votes to accept or reject the Plan.

**III.    THE PLAN SATISFIES THE REQUIREMENTS FOR ENTRY OF THE ASBESTOS CHANNELING INJUNCTION UNDER § 524(g) OF THE BANKRUPTCY CODE**

**A.    The Plan Trust Satisfies the Structure and Funding Requirements of § 524(g)(2)(B)(i) of the Bankruptcy Code**

Section 524(g) of the Bankruptcy Code provides a court with the authority to enjoin entities from taking legal action to recover, either directly or indirectly,

47

from a debtor and certain non-debtor parties, any asbestos claim or demand, if the plan of reorganization establishes a trust to resolve and pay such claims. 11 U.S.C. § 524(g)(1). This provision was enacted by Congress in 1994 and is designed to facilitate the granting of the broad-ranging injunctive relief required to resolve a company's significant asbestos-related liabilities in a fair, comprehensive, and global manner. H.R. REP. NO. 103-835, at 40-41 (1994). To receive such an injunction, the trust to which such claims and demands are channeled must meet the structure and funding requirements of § 524(g)(2)(B)(i) of the Bankruptcy Code. For the reasons set forth below, the Plan and the Plan Trust satisfy those requirements.

    1.   <u>The Plan Trust Will Assume the Liabilities of the Debtors</u>

*First*, § 524(g)(2)(B)(i)(I) requires that an asbestos trust assume the asbestos liabilities of a debtor that, as of the Petition Date, has been named as a defendant in actions to recover damages for asbestos-related claims. 11 U.S.C. § 524(g)(2)(B)(i)(I). This requirement is satisfied because the Plan Trust will, by the terms of the Plan Documents, assume all of the Debtors' liabilities for all Asbestos Personal Injury Claims that have been asserted against the Debtors. *See* Plan § 5.1(e); *see also* Exhibit E to Plan (Plan Trust Agreement), Ex. 5. In addition, as of the Petition Date, over 91,000 unresolved Asbestos Personal Injury Claims were pending against Congoleum. *See* Feist Decl. ¶ 7.

48

    2.     The Plan Trust Will Be Funded in Part by Securities of the Debtors

*Second*, § 524(g)(2)(B)(i)(II) requires that an asbestos-claims trust "be funded in whole or in part by the securities of 1 or more debtors involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends." 11 U.S.C. § 524(g)(2)(B)(i)(II). In accordance with this subsection, the Plan provides that the Plan Trust is to be funded by the Plan Trust Assets, which include, among other things (and subject to the provisions of the Plan): (i) the Plan Trust Common Stock to be distributed under the Plan, which comprises 50.1% of the New Common Stock of Reorganized Congoleum; (ii) the Asbestos Insurance Rights; (iii) all rights of the Debtors under, and all proceeds of, the Asbestos Insurance Settlement Agreements; (iv) the proceeds of the Asbestos In-Place Insurance Coverage; (v) the proceeds of the Asbestos Insurance Actions; (vi) the proceeds of the Asbestos Insurance Action Recoveries; (vii) the rights granted to the Plan Trust pursuant to the Insurance Assignment Agreement; and (viii) the Asbestos Property Damage Insurance Rights. *See* Plan § 1.2 (definition of Plan Trust Assets). Because the Plan Trust is to be funded with a majority of the common stock of Reorganized Congoleum and will have all rights to receive dividends or other distributions on account of such stock ownership, the requirements of § 524(g)(2)(B)(i)(II) have been satisfied.

49

3.      The Plan Trust Will Own a Majority of the Voting Shares of
        Reorganized Congoleum

*Third*, § 524(g)(2)(B)(i)(III) requires that the asbestos trust own (or, by the exercise of rights granted under the Plan, be entitled to own if specified contingencies occur) a majority of the voting shares of the reorganized debtor, its parent or its subsidiary.  11 U.S.C. § 524(g)(2)(B)(i)(III).  As set forth in Section 5.1(b) of the Plan, on the Effective Date or as soon thereafter as possible, Reorganized Congoleum shall issue the Plan Trust Common Stock to the Plan Trust in accordance with the Plan.  Plan § 5.1.  The Plan Trust Common Stock will consist of 50.1% of the New Common Stock of Reorganized Congoleum and will constitute the majority of the voting shares of Reorganized Congoleum.  *See* Exhibit L to Plan (Stockholders' Agreement), Ex. 12 at § 5.3.  Thus, the distribution of the Plan Trust Common Stock to the Plan Trust satisfies the requirements of § 524(g)(2)(B)(i)(III) because the Plan Trust will own a majority of the voting shares of Reorganized Congoleum.

4.      The Plan Trust Will Use Its Assets To Pay Claims and
        Demands

*Fourth*, § 524(g)(2)(B)(i)(IV) requires an asbestos trust to "use its assets or income to pay claims and demands."  11 U.S.C. § 524(g)(2)(B)(i)(IV).  This requirement is satisfied because the Plan provides that the Plan Trust will assume all liability and responsibility for all Asbestos Personal Injury Claims and will use

50

its assets to satisfy such claims in accordance with the Plan, Plan Trust Agreement, and the TDP.  *See* Exhibit E to Plan (Plan Trust Agreement), Ex. 5 §§ 2.2, 2.3; *see also* Plan § 5.1(e).  Accordingly, based on the foregoing provisions of the Plan and the other Plan Documents, the Plant Trust satisfies the structure and funding requirements for an asbestos trust set forth in § 524(g)(2)(B)(i) of the Bankruptcy Code.

> **B.      The Debtors' History, the Nature of Asbestos-Related Litigation and the Facts of These Chapter 11 Cases Support the Findings of Fact Required for the Court To Issue the Asbestos Channeling Injunction Pursuant to § 524(g) of the Bankruptcy Code**

Section 524(g)(2)(B)(ii) of the Bankruptcy Code requires that the court make certain factual findings to support the issuance of a channeling injunction under § 524(g)(1)(A).  As set forth below, the Debtors' history, the nature of asbestos-related litigation and the facts of these Chapter 11 cases all support the findings required for the issuance of the Asbestos Channeling Injunction pursuant to § 524(g)(1)(A) of the Bankruptcy Code.

> 1.      Section 524(g)(2)(B)(ii)(II):  The Debtors Are Likely To Be Subject to Substantial Future Demands for Payment

To support entry of a channeling injunction under § 524(g)(1)(A), a court must find that the Debtors will be "subject to substantial future demands for payment arising out of the same or similar conduct or events that gave rise to the claims that are addressed by the injunction."  11 U.S.C. § 524(g)(2)(B)(ii)(I).  As

51

set forth in the Feist Declaration, the Debtors' history as a defendant in asbestos-related litigation supports this finding.  In response to the bankruptcy filings of many previously targeted asbestos defendants in the late 1990s, the asbestos plaintiffs' bar began targeting companies that were historically on the periphery of asbestos litigation.[8]  Feist Decl. ¶ 5.  As of December 31, 1999, there were approximately 6,000 known claimants with Asbestos Personal Injury Claims pending against Congoleum.  The number of known claimants with pending asbestos personal injury claims against the Company doubled from 2000 to 2001, and doubled again from 2001 to 2002.  Feist Decl. ¶ 7.  By June 2003, Congoleum faced approximately 91,000 known asbestos personal injury claims and by February 2004, that number had grown to approximately 103,000.  *Id.*  In the years since Congoleum filed for bankruptcy, the number of known claimants with asbestos personal injury claims against Congoleum has increased significantly.  Feist Decl. ¶ 9.  As a result of the solicitation process for prior plans and this Plan,

---

[8]  In 2000, Owens Corning, E.J. Bartells, Burns & Roe Enterprises, Babcock & Wilcox and Armstrong World Industries declared bankruptcy; in 2001 Washington Group International, W.R. Grace, U.S. Mineral, U.S. Gypsum, Swan Transportation, Skinner Engine, G-1 Holdings, Federal Mogul, Eastco Industrial Safety Corp. and Bethlehem Steel declared bankruptcy; in 2002 Shook & Fletcher, Porter Hayden, Plibrico, North American Refractories, MacArthur Companies, Kaiser Aluminum and Chemical, J.T. Thorpe, ARTRA, ACandS, A-Best and A.P. Green declared bankruptcy; and in 2003 Muralo Co. and Combustion Engineering declared bankruptcy.

500522999v5

the database maintained by the Voting Agent contains approximately 200,000 unique social security numbers for asbestos claimants.  *Id.*

Based on the long latency period of asbestos-related disease and the substantial number of unresolved asbestos personal injury claims pending as of the Petition Date, Congoleum undoubtedly will be subject to substantial future demands for payment arising out of the same conduct or events that gave rise to the Asbestos Personal Injury Claims if reorganization pursuant to § 524(g) were unavailable.  *See also* Steven J. Parent, *Judicial Creativity in Dealing with Mass Torts in Bankruptcy*, 13 GEORGE MASON U. L. REV. 381, 382 (1990) ("Because of the countless number of individuals exposed to asbestos, the long latency period, and the variety of asbestos-related diseases, the demands of mature asbestos tort litigation challenge the traditional notion that civil litigation focuses on individual rights and victim compensation.").  Accordingly, the Plan's Asbestos Channeling Injunction satisfies the requirements of § 524(g)(2)(B)(ii)(I) of the Bankruptcy Code.

> 2.     Section 524(g)(2)(B)(ii)(II):  The Actual Amounts, Numbers, and Timing of Future Demands Cannot be Determined

To support entry of a channeling injunction, the court must also find that the actual amounts, numbers, and timing of such future demands cannot be determined.  11 U.S.C. § 524(g)(2)(B)(ii)(II).  The long latency period of asbestos-related diseases and the substantial number of asbestos personal injury claims that

had been asserted in the past and that remained unresolved on the Petition Date

makes clear that the actual number and amount of future Demands in respect of

alleged asbestos-related personal injuries to which the Debtors would be subject,

and the timing of the assertion of such Demands, cannot be determined definitively

by the Debtors or their advisors.  Feist Decl. ¶ 81.  *See also* Stephen J. Carroll, *et*

*al.*, *Asbestos Litigation*, RAND Institute for Civil Justice (2005), Ex. 70 at xix

("[E]stimating the numbers of asbestos-related deaths and diseases is complicated

by the long latency periods associated with asbestos injuries.  Typically, 20 to 40

years elapse between the first exposure to asbestos and disease manifestation.").

Accordingly, there is support for the finding required by § 524(g)(2)(B)(ii)(II) of

the Bankruptcy Code.

> 3.     Section 524(g)(2)(B)(ii)(III):  The Pursuit of Future Demands Outside the Procedures Prescribed by the Plan Is Likely To Threaten the Plan's Purpose To Deal Equitably with Claims and Future Demands

Section 524(g)(2)(B)(ii)(III) of the Bankruptcy Code requires the

Bankruptcy Court to find that "pursuit of such demands outside the procedures

prescribed by such plan is likely to threaten the plan's purpose of dealing equitably

with claims, including future demands."  11 U.S.C. § 524(g)(2)(B)(ii)(III).  In the

present case, if the holders of Asbestos Personal Injury Claims and Demands were

to pursue such claims and demands outside the procedures set forth in the Plan, the

Debtors would be forced back into the tort system as unusually prominent

defendants as a result of the Reorganization Cases. The Debtors could reasonably expect large numbers of lawsuits to be asserted against them in short order, given that the automatic stay has prevented the assertion of such claims against any of the Debtors for nearly six years. Those lawsuits would present the Debtors with an enormous burden immediately upon their departure from Chapter 11.

Moreover, given the inherent nature of mass tort litigation, each lawsuit against a Debtor would present the potential for a massive adverse judgment that could, by itself or in tandem with other judgments, severely impact the Debtors' businesses and the value of the stock contributed to the Plan Trust, including causing defaults under whatever financing the Debtors were able to obtain without addressing their asbestos liabilities. It is precisely to address this risk that the Debtors commenced the Reorganization Cases in the first place, and it is precisely to ensure that such risk is resolved in these cases that issuance of the § 524(g) injunction is a necessary condition to both confirmation and effectiveness of the Plan. Put simply, absent the iron-clad protection afforded by a § 524(g) injunction, the Debtors cannot complete a successful reorganization, and would almost certainly face further insolvency proceedings in the near term, with attendant costs and inefficiencies that can only harm creditors of the Debtors, including holders of Asbestos Personal Injury Claims and Demands.

C. **The Plan Trust Satisfies the Disclosure, Claimant-Support and Equality of Treatment Requirements of § 524(g)(2)(B)(ii) of the Bankruptcy Code**

In addition to the requirements concerning the debtor's history with respect to asbestos-related claims and evidence of future demands, § 524(g)(2)(B)(ii) of the Bankruptcy Code requires that the asbestos trust satisfy certain disclosure, claimant-support and equality of treatment requirements. As discussed below, the Plan satisfies the Bankruptcy Code's requirements for the entry of the Asbestos Channeling Injunction pursuant to § 524(g)(1)(A) of the Bankruptcy Code.

1. Section 524(g)(2)(B)(ii)(IV)(aa):  The Terms of the § 524(g) Injunction Are Set Out in the Plan and Disclosure Statement

The Bankruptcy Code requires a court to find that the terms of the proposed asbestos channeling injunction, including provisions barring actions against third parties, are set out in the Plan and in any disclosure statement supporting the plan. 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(aa).  Section 11.6 of the Plan and Section 6.11(g) of the Disclosure Statement plainly set out the provisions of the proposed Asbestos Channeling Injunction.  The description of the Asbestos Channeling Injunction either appears in bold letters or is underlined in a manner designed to bring attention to the provision.  Accordingly, the Plan and Disclosure Statement satisfy the disclosure requirements of § 524(g)(2)(B)(ii)(IV)(aa) of the Bankruptcy Code.

500522999v5

2. **Section 524(g)(2)(B)(ii)(IV)(bb):  A Separate Class of Claimants Whose Claims Are To Be Addressed by the Plan Trust Has Been Established and at Least 75% of Such Claimants Have Voted in Favor of the Plan**

The Bankruptcy Code requires that the Plan establish a separate class or classes of claimants whose claims are to be addressed by the asbestos trust, and that at least 75% of those voting in each such class vote in favor of the Plan.  11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).  The Plan classified together all holders of Asbestos Personal Injury Claims (Class 7), and classified together all holders of Asbestos Property Damage Claims (Class 8).  As set forth in the Ballot Certification, over 95% of those voting in Class 7 voted to accept the Plan, and over 92% of those voting in Class 8 voted to accept the Plan.  *See* Ballot Certification, Ex. 17 ¶ 23.  Accordingly, the Plan satisfies the claimant-support requirements of § 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code.

3. **The Plan Complies with § 524(g)(2)(B)(ii)(V) and Operates Through Mechanisms To Ensure that Present Claims and Future Demands Are Treated in Substantially the Same Manner**

Pursuant to § 524(g)(2)(B)(ii)(V) of the Bankruptcy Code, in order to enter an asbestos channeling injunction, a court is required to find that:

> the trust will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of present claims and future demands, or other comparable mechanisms, that provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner.

57

11 U.S.C. § 524(g)(2)(B)(ii)(V).

The operation and payment mechanisms of the Plan Trust have been carefully crafted to permit the Plan Trust to compensate fairly holders of Asbestos Personal Injury Claims while at the same time preserving funds for future Demands.  As set forth in Section 4.1(g) of the Plan, the TDP (Exhibit G to the Plan) (Ex. 7), and the Plan Trust Agreement (Exhibit E to the Plan) (Ex. 5), all Asbestos Personal Injury Claims, regardless of whether the holders of such Claims are Pre-Petition Settled Claimants, shall be determined and paid in the same manner pursuant to the terms of the Plan Trust Agreement and the TDP.  The TDP contains mechanisms that provide reasonable assurance that the Plan Trust will value, and be in a financial position to pay, present Claims in substantially the same manner as future Demands that involve similar Claims.

For example, the TDP establishes a schedule of eight asbestos-related diseases, along with specific liquidated values, anticipated average values and caps on liquidated values, to further the Plan Trust's goal of "paying all claimants over time as equivalent a share as possible of the value of their claims based on historical values for substantially similar claims in the tort system."  *See* Exhibit G to Plan (TDP), Ex. 7 § 2.1.  Payments to holders of Asbestos Personal Injury Claims for all but one of the eight asbestos-related diseases will be based on the liquidated value of such claim times the Payment Percentage then in effect.  *See*

58

TDP § 5.3.[9]  The Payment Percentage will be established upon the creation of the

Plan Trust and will be reevaluated periodically based on (i) current estimates of the

number, types and values of Asbestos Personal Injury Claims; (ii) the value of the

assets then-available to the Plan Trust for payment on account of Asbestos

Personal Injury Claims; (iii) all anticipated administrative and legal expenses; and

(iv) any other material matters that are reasonably likely to affect the sufficiency of

funds to pay a comparable percentage of full value to all holders of Asbestos

Personal Injury Claims.  *See* Exhibit G to Plan (TDP), Ex. 7 § 5.2.  If the Plan

Trustee later determines that the Payment Percentage should be adjusted upward,

the Plan Trust shall make supplemental payments to claimants who previously

liquidated their claims against the Plan Trust and received payments based on a

lower Payment Percentage.  *See id.*

     The TDP in this case is substantially similar to those that have been

proposed, and approved, in numerous other asbestos bankruptcies in this Circuit

and elsewhere.  *See*, *e.g.*, *In re G-1 Holdings, Inc.*, No. 01-30135 (Bankr. D.N.J.

Oct. 6, 2009) [Dkt. No. 9648], Ex. 73 (the "G-1 TDP"); *In re Owens Corning*, No.

00-03837 (Bankr. D. Del. Sept. 26, 2006) [Dkt. No. 19366], Ex. 81 (the "Owens

---

[9]  The only disease category that will not be subject to the Payment Percentage is
Disease Level I—Cash Discount.  Claimants who satisfy the minimum medical
and exposure criteria of Disease Level I will be paid a one time cash payment of
$250.  This will save the Plan Trust the added time and expense attendant with
ongoing analysis and management of the lowest level of claims.

Corning TDP"); *In re Armstrong World Indus., Inc.*, No. 00-4471 (Bankr. D. Del. Aug. 18, 2006) [Dkt. No. 9116], Ex. 77 (the "Armstrong TDP").

Accordingly, the Plan Trust and the TDP, according to their express terms, shall operate through mechanisms such as the structured, periodic or supplemental payments, pro rata distributions, the periodic review of estimates of the numbers and values of present Asbestos Personal Injury Claims and future Demands, and other comparable mechanisms that are necessary to provide reasonable assurance that the Plan Trust will value, and be in a financial position to pay, Asbestos Personal Injury Claims and Demands in substantially the same manner.  As a result, the Plan and the TDP satisfy the equality of treatment requirements of § 524(g)(2)(B)(ii)(V) of the Bankruptcy Code.

### D.   The Plan's Asbestos Channeling Injunction Complies with the Requirements of § 524(g) of the Bankruptcy Code

Section 524(g) of the Bankruptcy Code sets forth certain requirements for an asbestos channeling injunction.  Specifically, §§ 524(g)(3)(A) and 524(g)(4)(A)(ii) identify requirements for extension of the channeling injunction to third parties and § 524(g)(4)(B)(ii) requires that the channeling injunction be fair and equitable with respect to future asbestos claimants.  The Asbestos Channeling Injunction provided in Section 11.6 of the Plan satisfies all applicable requirements of § 524(g) of the Bankruptcy Code and should be approved.

500522999v5

### 1.    The Court May Extend the Asbestos Channeling Injunction to Third Parties

Sections 524(g)(3)(A) and 524(g)(4)(A)(ii) of the Bankruptcy Code designate certain entities that may be protected by a § 524(g) channeling injunction.  Specifically, § 524(g)(3)(A) provides that:

> (ii) no entity that pursuant to such plan or thereafter becomes a direct or indirect transferee of, or successor to any assets of, a debtor or trust that is the subject of the injunction shall be liable with respect to any claim or demand made against such entity by reason of its becoming such a transferee or successor; and

> (iii) no entity that pursuant to such plan or thereafter makes a loan to such a debtor or trust or to such a successor or transferee shall, by reason of making the loan, be liable with respect to any claim or demand made against such entity, nor shall any pledge of assets made in connection with such a loan be upset or impaired for that reason.

11 U.S.C. § 524(g)(3)(A).

Section 524(g)(4)(A)(ii) also provides that a channeling injunction:

> may bar any action directed against a third party who is identifiable from the terms of such injunction (by name or as part of an identifiable group) and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor to the extent such alleged liability of such third party arises by reason of—

> (I) the third party's ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor;

> (II) the third party's involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party;

> (III) the third party's provision of insurance to the debtor or a related party; or

61

(IV) the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party, including but not limited to—

(aa) involvement in providing financing (debt or equity), or advice to an entity involved in such a transaction; or

(bb) acquiring or selling a financial interest in an entity as part of such a transaction.

Consistent with these provisions, the Plan provides that the Asbestos Channeling Injunction will bar actions against all "Protected Parties."  Plan § 11.6.

The "Protected Parties" include the following:

(a)   the Debtors and Reorganized Congoleum;

(b)   any Entity that, pursuant to the Plan or after the Confirmation Date, becomes a direct or indirect transferee of, or successor to, the Plan Trust or the Debtors;

(c)   the Persons designated on Exhibit "F" (as such Exhibit may be amended on or before the Confirmation Date) as current distributors of the product lines currently manufactured, sold or otherwise produced by Congoleum; or

(d)   each Settling Asbestos Insurance Company, identified on Exhibit H to the Plan.

See Plan § 1.2 (definition of Protected Party).  In addition, § 524(g)(1)(B) provides that the channeling injunction may be used to enjoin entities from taking legal action for the purpose of "directly or indirectly collecting, recovering, or receiving payment or recovery with respect to any claim or demand" that will be addressed by the Plan Trust.  11 U.S.C. § 524(g)(1)(B).  Each Protected Party under the Plan is identifiable from the terms of the Asbestos Channeling Injunction by name or as

62

part of an identifiable group and falls within the groups designated in §§

524(g)(4)(A)(ii) and 524(g)(3)(A) as third parties to whom a channeling injunction

may be extended.  *See* Plan § 1.2 (definition of Protected Party); Exhibit F to Plan

(Schedule of Distributor Protected Parties), Ex. 6; Exhibit H to Plan (Schedule of

Settling Asbestos Insurance Companies), Ex. 8.  Both the definition of Protected

Party in Section 1.2 of the Plan and each of the schedules mentioned above have

been heavily vetted with assistance and input from each of the Plan Proponents and

certain other parties in interest.  Indentifying or describing each Protected Party in

the Asbestos Channeling Injunction is fair and equitable with respect to persons

that might subsequently assert Demands against each such Protected Party, in light

of the benefits provided, or to be provided, to the Plan Trust.  This Court may

extend the Asbestos Channeling Injunction to shield all Protected Parties from

liability for any Asbestos Personal Injury Claims and future asbestos-related

Demands.  *See* Plan §§ 11.6, 1.2.  Accordingly, the Court should authorize and

approve the application of the Asbestos Channeling Injunction to protect all

Protected Parties from liability for any Asbestos Personal Injury Claims, including

any future asbestos-related Demands in accordance with the terms and conditions

of the Plan.

2.    Entry of the Asbestos Channeling Injunction Is Fair and
Equitable with Respect to Future Asbestos Claimants

Section 524(g)(4)(B)(ii) of the Bankruptcy Code requires this Court to find,

as a condition to extending the Asbestos Channeling Injunction to third parties, that

(1) a representative of future demands has been appointed and (2) the contributions

made to the Plan Trust by or on behalf of protected third parties are fair and

equitable to the holders of future demands whose claims will be channeled to the

Plan Trust.  11 U.S.C. § 524(g)(4)(B)(ii).

*First*, on February 18, 2004 [Dkt. No. 355], the Bankruptcy Court appointed

R. Scott Williams as the Futures Representative to act on behalf of all holders of

Demands affected by the Asbestos Channeling Injunction, thus satisfying the first

subsection.  Mr. Williams has vigorously protected the rights of future asbestos

claimants throughout these cases.  The Futures Representative will continue its

work post-confirmation as provided in the Plan Trust Agreement and the TDP.  *See*

Exhibit E to Plan (Plan Trust Agreement), Ex. 5; Exhibit G to Plan (TDP), Ex. 7.

*Second*, Reorganized Congoleum, on behalf of all of the Protected Parties, are

contributing substantial assets to the Plan Trust.  *See* Plan § 5.1(b) (Funding and

Receipt of Plan Trust Assets).  On the Effective Date, Reorganized Congoleum

will irrevocably transfer and assign to the Plan Trust (i) the Plan Trust Common

Stock, representing 50.1% of the Common Stock of Reorganized Congoleum; (ii)

the Asbestos Insurance Rights; (iii) all rights of the Debtors under, and all proceeds

64

of, the Asbestos Insurance Settlement Agreements, which presently total approximately $235 million; (iv) the proceeds of the Asbestos In-Place Insurance Coverage; (v) the proceeds of the Asbestos Insurance Actions; (vi) the proceeds of the Asbestos Insurance Action Recoveries; (vii) the rights granted to the Plan Trust pursuant to the Insurance Assignment Agreement; and (viii) the Asbestos Property Damage Insurance Rights.

Moreover, Congoleum's current distributors have distributed Congoleum products for many years, and have continued to distribute such products during the course of the Reorganization Cases.  Feist Decl. ¶ 86.  The distributors are an integral part to Congoleum's business model, and without them, Congoleum's businesses would grind to a halt.  *Id.*  If the distributors are not protected by the Asbestos Channeling Injunction, such current distributors could be targeted by third parties for having distributed in the past Congoleum products containing asbestos.  *Id.*  Those distributors would, in turn, would be forced to pursue Congoleum for indemnification.  *Id.*  Such suits against Congoleum's current distributors would be an attempt to circumvent the Asbestos Channeling Injunction against the Debtors and Reorganized Congoleum.  Even worse, however, if the distributors were to refuse to carry Congoleum's products, Congoleum's on-going business operations could be damaged.  *Id.*  One of the main goals of § 524(g) is to enjoin parties from collecting, either directly or indirectly, with respect to asbestos

65

claims and demands that are to be addressed by the Plan Trust.  *See* 11 U.S.C. §
524(g)(1)(B).  The Plan Proponents submit that it is fair and equitable to extend the
Asbestos Channeling Injunction to the distributors identified on Exhibit F to the
Plan so that third-parties may not try to circumvent the protections afforded in §
524(g) of the Bankruptcy Code.

Thus, in light of the substantial contributions to be made to the Plan Trust on
behalf of all Protected Parties, entry of the Asbestos Channeling Injunction, and
the naming of the Protected Parties therein, is fair and equitable with respect to
persons that might subsequently assert future asbestos-related Demands.
Accordingly, the Asbestos Channeling Injunction satisfies the requirements of §
524(g)(4)(B)(ii) of the Bankruptcy Code.

### E.    The Plan Trust Has the Elements of a Qualified Settlement Fund (QSF)

In order to approve the Asbestos Channeling Injunction, the Court also must
also find that the Plan Trust satisfies the elements of a "qualified settlement fund"
pursuant to Section 468(B) of the Internal Revenue Code and the regulations
issued pursuant thereto (a "QSF").  If the Plan Trust does not satisfy these
elements, the Debtors and Reorganized Congoleum would be required by
applicable law to defer certain tax deductions to subsequent years.  As set forth in
the following paragraphs, the Plan Trust satisfies the elements of a QSF.

66

*First*, the Plan Trust must be established pursuant to an order of, or approved by, a court of law and be subject to the continuing jurisdiction of that court.  26 C.F.R. § 1.468B-1(c)(1).  This requirement is satisfied because the Plan Trust will be established pursuant to an order confirming the Plan and the Court will have continuing jurisdiction over the Plan Trust.  *See* Plan § 13.2.  *Second*, the Plan Trust must be established to resolve or satisfy one or more contested or uncontested claims that have resulted or may result from an event (or related series of events) that has occurred and that has given rise to at least one claim asserting tort liability.  26 C.F.R. § 1.468B-1(c)(2).  This element is also clearly satisfied. The Plan Trust will be established to resolve or satisfy in excess of 100,000 contested or uncontested asbestos tort claims that have resulted (or may result) from a series of related events that has occurred.  *Third*, the Plan Trust must be a trust under applicable state law, or its assets must be otherwise segregated from other assets of the transferor (and related persons).  26 C.F.R. § 1.468B-1(c)(3). This requirement is satisfied because the Plan Trust will be formed and administered in accordance with Delaware law.  Accordingly, the Plan Trust satisfies the elements of a QSF within the meaning of Section 468(B) of the Internal Revenue Code.

## IV.   THE ANTI-SUIT INJUNCTION SATISFIES THE REQUIREMENTS OF § 105(a) OF THE BANKRUPTCY CODE

During the course of the Reorganization Cases, this Court and the

Bankruptcy Court have approved the Debtors' entry into various Asbestos

Insurance Settlement Agreements.  Certain of these Asbestos Insurance Settlement

Agreements were structured as "sale and buyback" agreements whereby, upon

payment of the respective settlement amounts, the Debtors will sell the relevant

insurance policies back to the insurer free and clear of all claims, liens,

encumbrances or interests of any other person or entity pursuant to §§ 363(b) and

(f) of the Bankruptcy Code, supplemented by a injunction pursuant to § 105 of the

Bankruptcy Code.  The effect of these "policy buybacks" is to fully and finally

extinguish and exhaust all rights, duties, limits and coverage under the relevant

policies as if they were never issued.

In some cases, the policies sold back, or which will be sold back, by the

Debtors pursuant to these sale and buyback agreements included insurance

coverage for both asbestos and non-asbestos claims.  Feist Decl. ¶ 72.  The settling

insurers with policies that covered non-asbestos claims indicated that they would

not buy back their respective policies or pay any settlement amounts unless they

received a full release for their non-asbestos claims, as well as their asbestos

claims.  *Id.*  Accordingly, in connection with the approval of various Asbestos

Insurance Settlement Agreements, the Debtors sought, and this Court and the

Bankruptcy Court issued orders providing for supplemental injunctions pursuant to

§ 105(a) of the Bankruptcy Code that permanently enjoin any cause of action or act

to collect on account of a non-asbestos claim that arises out of, or relates to, the

insurance policies that were the subject of the various settlement agreements (the

"105(a) Injunctions").[10]  *Id.*  The 105(a) Injunctions were fully described in each

motion seeking approval of the respective settlement agreements containing the

injunction, and no party-in-interest objected to their entry.  As a result, both this

Court and the Bankruptcy Court issued various orders creating 105(a) Injunctions

---

[10] For an example, *see* First State/Twin City Settlement and Order, dated February 19, 2010, *In re Congoleum Corp.*, No. 09-04371 (D.N.J.) [Dkt. No. 375] ("Hartford Order") (Ex. 68), which provides the following:  "Pursuant to and to the fullest extent permitted by sections 105(a) and 363 of the Bankruptcy Code and subject to the consummation, as of the Approval Date (but subject to payment of the Settlement Amount under the Agreement), of the sale of the Subject Policies as provided under the Agreement, all Persons that have held or asserted, that hold or assert, or that may in the future hold or assert any Claim or Interest of any kind or nature against or in any of the Debtors' bankruptcy estates, the Congoleum-Related Parties, the Subject Policies, or the Hartford-Related Parties based upon, arising out of, derived from or attributable in any way (a) to the Subject Policies or (b) to any matters or claims that fall within the scope of the releases set forth in Section V of the Agreement (including, but not limited to, any Asbestos-Released Claim, any Extra-Contractual Claim, any Insurance Coverage Claim or any Direct-Action Claim), whenever or wherever arising or asserted (including all thereof in the nature of or sounding in tort, contract, warranty or any other theory of law, equity or admiralty), shall be and hereby are barred, estopped and permanently enjoined from asserting any such Claims or Interests against any of the Hartford-Related Parties or against the Subject Policies and from continuing, commencing, or otherwise proceeding or taking any action against the Hartford-Related Parties to enforce such Interests or Claims or for the purpose of directly or indirectly collecting, recovering or receiving payments from any Hartford-Related Party to recover with respect to any such Claim or Interest."  Hartford Order, Ex. 68 ¶ 7.

to protect Settling Asbestos Insurance Companies from non-asbestos liability that may arise under the insurance policies that were the subject of the sale and buyback settlement agreements.

In addition to the 105(a) Injunctions that were issued pursuant to the respective orders approving the settlement agreements, the terms of such settlements also obligate the Debtors to include a supplemental 105(a) injunction in the Plan itself.  Accordingly, Section 11.11 of the Plan provides for an injunction to protect certain Settling Asbestos Insurance Companies from non-asbestos liability released under any Asbestos Insurance Settlement Agreement (the "Anti-Suit Injunction").  *See* Plan § 11.11.

Section 11.11 provides that, pursuant to § 105(a) of the Bankruptcy Code, the Anti-Suit Injunction:

> shall operate as an injunction permanently and forever prohibiting and enjoining the commencement, conduct or continuation of any action or cause of action, whether known or unknown, the employment of process or any act to collect, recover from or offset any non-asbestos claim, Claim or demand against any Settling Asbestos Insurance Company arising out of, relating to, or in connection with an Asbestos Insurance Policy or any other insurance policy or rights under such other insurance policy issued to or insuring the relationship of the relevant Settling Asbestos Insurance Companies with, the relevant Congoleum entities that are insureds under such policies….

Plan § 11.11.

Section 1123(b)(6) of the Bankruptcy Code authorizes a plan of reorganization to "include any other appropriate provision not inconsistent with the

70

applicable provisions of this title."  11 U.S.C. § 1123(b)(6).  Based on § 1123(b)(6)

and on the Court's expansive equitable authority under § 105(a) of the Bankruptcy

Code, which authorizes a court "to issue any order, process, or judgment that is

necessary or appropriate to carry out the provisions of this title," numerous courts

have held that issuance of a non-debtor channeling injunction is authorized in

appropriate circumstances "where a material benefit results to the Debtors' estates

and advances consummation of a Plan."  *SEC v. Drexel Burnham Lambert Group,

Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 130 B.R. 910, 928 (S.D.N.Y.

1991).  *See In re Owens Corning*, No. 00-3837 (Bankr. D. Del. Sept. 26, 2006)

Order Confirming Plan [Dkt. No. 19366], Ex. 79 at 47-48 (confirming plan of

reorganization providing for § 105(a) injunctions against claims of certain holders

of bank claims and insurance entities).  *See also In re Kaiser Aluminum Corp.*, No.

02-10429 (Bankr. D. Del. Feb. 6, 2006) Order Confirming Plan [Dkt. No. 8225] at

46-49 (confirming plan of reorganization providing for a § 105(a) injunction

against claims or demands against certain insurance entities); *In re American

Family Enters.*, 256 B.R. 377, 405-08 (D.N.J. 2000) (issuing a channeling

injunction pursuant to § 105(a) of the Bankruptcy Code as part of a Chapter 11

plan of reorganization in aid of a settlement, enjoining prosecution of a class action

suit against the debtors and related third parties).

Although the power of the bankruptcy courts to issue injunctive relief is not unlimited, § 105(a) of the Bankruptcy Code permits a court to issue injunctive relief in favor of non-debtor parties in circumstances where "fairness, necessity to the reorganization, and specific factual findings to support these conclusions" were shown. *See In re Continental Airlines*, 203 F.3d 203, 214 (3d Cir. 2000). "Added to these requirements is that the releases 'were given in exchange for fair consideration.'" *United Artists Theatre Co. v. Walton (In re United Artists Theatre Co.)*, 315 F.3d 217, 227 (3d Cir. 2003) (citing *Continental Airlines*, 203 F.3d at 214).

In this case, the Anti-Suit Injunction is fair, is necessary to the reorganization, and has been supported by fair consideration. The Anti-Suit Injunction merely incorporates into the Plan relief that has already been approved pursuant to the various court orders authorizing 105(a) Injunctions. Congoleum provided *extensive* notice of the settlements providing for 105(a) Injunctions. Feist Decl. ¶ 72. Indeed, in connection with numerous settlements, Congoleum or the insurer published notice of such settlements in newspapers with national circulation, and no party objected to sale and buy back of the agreements, nor did any party notify Congoleum or the insurer of potential claims against the policies or proceeds thereof. *Id.*

72

In addition, the Anti-Suit Injunction is necessary to the reorganization.  The Settling Asbestos Insurance Companies indicated that they would not be willing to enter into a settlement agreement absent a supplemental injunction issued pursuant to § 105(a) of the Bankruptcy Code.  *See*, *e.g.*, Hartford Order, Ex. 68 ¶ Q.  The Asbestos Insurance Settlement Agreements have been critical to the success of this reorganization.  Without such settlements, the Debtors would have been faced with a lengthy confirmation process and probable appeals.

Moreover, the Settling Asbestos Insurance Companies have provided critical financial contributions to the Plan Trust.  The Plan Trust is funded almost entirely with the proceeds of the Asbestos Insurance Settlement Agreements (approximately $235 million).  If the Debtors had not been able to secure their various Asbestos Insurance Settlement Agreements, a § 524(g) plan of reorganization would not have been problematic.

The Debtors fully disclosed the terms of the Anti-Suit Injunction in the Plan and Disclosure Statement, and the overwhelming majority of creditors have voted in favor of the Plan.  Accordingly, after weighing and balancing the equities of this specific case and the evidence supporting the Anti-Suit Injunction, it is clear that the issuance of the Anti-Suit Injunction is fair, equitable, and proper under the Bankruptcy Code.

73

## V.   THE ASSUMPTION OR REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES UNDER THE PLAN SHOULD BE APPROVED

The Plan provides that the Debtors will assume the bulk of their executory contracts and unexpired leases.  As of the Effective Date, as set forth in Section 8.1 of the Plan, the Debtors will assume each executory contract and unexpired lease to which it is a party, unless such contract or lease (i) was previously assumed or rejected by the Debtors; (ii) previously expired or terminated pursuant to its own terms; or (iii) is listed on an exhibit to the Plan Supplement as being an executory contract or unexpired lease to be rejected.  In addition, as set forth in Section 8.1(c) of the Plan, and in connection with the Intercompany Settlement in Section 5.17 of the Plan, the Debtors have determined to assume the ABI Canada License Agreement and to reject all Intercompany Agreements.  *See* Plan §§ 8.1(c), 5.17.

Section 1123(b)(2) of the Bankruptcy Code provides that a plan may, "subject to section 365 [of the Bankruptcy Code], provide for the assumption, rejection, or assignment of any executory contract or unexpired lease."  11 U.S.C. § 1123(b)(2).  Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease . . . ."  11 U.S.C. § 365(a).  Courts routinely approve motions to assume, assume and assign, or reject executory contracts or unexpired leases upon a showing that the debtor's decision to take such action will benefit the debtor's

74

estate and is an exercise of sound business judgment. *See*, *e.g.*, *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *Group of Inst'l Investors v. Chicago, Milwaukee, St. Paul, & Pacific R.R. Co.*, 318 U.S. 523, 550 (1943); *In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (the "resolution of th[e] issue of assumption or rejection will be a matter of business judgment by the bankruptcy court . . . .").

The "business judgment" test is not a strict standard; it merely requires a showing that either assumption or rejection of the executory contract or unexpired lease will benefit the debtor's estate. *See*, *e.g.*, *Allied Tech., Inc. v. R.B. Brunemann & Sons, Inc.*, 25 B.R. 484, 495 (Bankr. S.D. Ohio 1982) ("As long as assumption of a lease appears to enhance a debtor's estate, Court approval of a debtor in possession's decision to assume the lease should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code . . . ."); *In re Federal Mogul Global, Inc.*, 293 B.R. 124, 126 (D. Del. 2003).

The Debtors have reviewed their existing executory contracts and unexpired leases and determined, in their business judgment that, with the exception of the rejected Intercompany Agreement set forth in the Plan Supplement, all of the Debtors' existing executory contracts and unexpired leases should be assumed by Reorganized Congoleum. Feist Decl. ¶ 84. The assumption of these executory

75

contracts and unexpired leases is both beneficial and necessary to the Debtors' and Reorganized Congoleum's business operations upon and subsequent to emergence from Chapter 11. *Id.* Accordingly, the assumption and rejection of executory contracts and unexpired leases proposed by the Plan should be approved.

Based upon, among other things, Reorganized Congoleum's anticipated financial wherewithal after the Effective Date, including, without limitation, the operating cash and liquidity available to Reorganized Congoleum under the Exit Facility to fund its post-emergence business operations, Reorganized Congoleum will be fully capable of performing under the terms and conditions of all contracts and/or leases to be assumed. Feist Decl. ¶ 85.

## VI.   THE SETTLEMENTS MADE DURING THE REORGANIZATION ARE FAIR AND REASONABLE AND SATISFY THE REQUIREMENTS OF § 1123(b) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019

Section 1123(b)(3)(A) of the Bankruptcy Code allows a plan to provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3)(A). As part of the Plan, the Plan Proponents have submitted for approval as part of the confirmation process two settlement agreements pursuant to § 1123(b)(3)(A):  (i) the Litigation Settlement Agreement, as amended (*see* Plan § 5.14); and (ii) the Intercompany Settlement Agreement (*see* Plan § 5.17).

As bankruptcy courts have noted, "the standards for approving settlements as part of a plan of reorganization [under § 1123(b)(3)(A)] are the same as the standards for approving settlements under [Bankruptcy Rule] 9019." *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 832 (Bankr. D. Del. 2008) (citing *In re New Century TRS Holdings*, 390 B.R. 140, 167 (Bankr. D. Del. 2008)). *See In re Best Prods. Co.*, 177 B.R. 791, 794 (S.D.N.Y.1995), *aff'd*, 68 F.3d 26 (2d Cir. 1995); *In re Cajun Elec. Power Co-op., Inc.*, 230 B.R. 715, 751 n.101 (Bankr. M.D. La. 1999) ("The standard under 11 U.S.C. § 1123(b)(3) is the same as the standard for approval of settlements under Rule 9019.") (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)). Accordingly, when evaluating the propriety of the First Amendment to the Litigation Settlement Agreement and the Intercompany Settlement Agreement, this Court should analyze the settlements in accordance with Bankruptcy Rule 9019.

The Third Circuit has set forth four criteria that should be considered when evaluating whether a proposed settlement should be approved pursuant to Bankruptcy Rule 9019 as fair and equitable: (i) the probability of success in litigation; (ii) the likely difficulties of collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (iv) the paramount interest of the creditors. *In re Martin*, 91 F.3d 389, 393

77

(3d Cir. 1996); *see also Tindall v. Mavrode (In re Mavrode)*, 205 B.R. 716, 721

(Bankr. D.N.J. 1997) (applying the *Martin* test in determining whether a proposed

settlement was "fair and equitable").  In determining whether to approve a

proposed settlement, a bankruptcy court need not decide the numerous issues of

law and fact raised by the settlement, but should instead "canvass the issues and

see whether the settlement falls below the lowest point in the range of

reasonableness."  *In re Jasmine*, *Ltd.*, 258 B.R. 119, 123 (D.N.J. 2000) (quoting *In*

*re Neshaminy Office Bldg. Assocs.*, 62 B.R. 798, 803 (E.D. Pa.1986)).

It is standard practice in complex Chapter 11 cases for a settlement to

resolve a central dispute and then be incorporated into a plan of reorganization.

*See*, *e.g.*, *G-1 Holdings, Inc.*, 420 B.R. 216, 256-57 (D.N.J. 2009) (approving

global settlement of asbestos personal injury claims, which settlement was "the

product of over eight years of arms-length bargaining" and was "[a]t the heart" of

the debtors' § 524(g) plan of reorganization).  In the present case, the settlements

and compromises reached in the Litigation Settlement Agreement, as amended,

and the Intercompany Settlement are the foundation upon which the current Plan is

built.  As the evidence proffered in connection with the Confirmation Hearing will

demonstrate, the Litigation Settlement Agreement, as amended, and the

Intercompany Settlement should be approved pursuant to § 1123(b)(3) of the

Bankruptcy Code and Bankruptcy Rule 9019.

**A.     The Litigation Settlement Agreement, As Amended, Should be
         Approved**

In August 2008, the Debtors, the Bondholders' Committee, the Futures

Representative, the Asbestos Claimants' Committee, and the Claimants' Counsel

reached a global settlement that resolved certain of the material terms of a plan of

reorganization and a settlement of the Avoidance Actions.  Feist Decl. ¶ 59.  The

terms of the settlement were documented in a global litigation settlement (the

"Original Litigation Settlement Agreement"), which was incorporated into the

Amended Joint Plan, dated November 14, 2008.  *Id.*

The Original Litigation Settlement Agreement represented a comprehensive

settlement and compromise of the fundamental equality of distribution issues.

Feist Decl. ¶ 60.  Counsel representing 87% of asbestos claimants who were parties

to the Pre-Petition Asbestos Agreements executed the Original Litigation

Settlement Agreement; the remainder either did not respond or declined to execute

the agreement on behalf of their clients.  *Id.*  The Original Litigation Settlement

Agreement provides that the parties that executed asbestos personal injury

settlements with Congoleum for future insurance proceeds prior to the Petition

Date (the "Litigation Settlement Claimants") shall waive any and all rights with

respect to their pre-petition settlements, including the liquidated amounts thereof.

*Id.*  Instead, Litigation Settlement Claimants will submit their claims to the Plan

Trust for resolution in accordance with the TDP and will be treated the same as all

79

other present and future asbestos personal injury claimants. *Id.* In exchange, Congoleum was to be released from all of its obligations under the Pre-Petition Settlement Agreements, the Claimant Agreement, the Security Agreement, the Collateral Trust Agreement and any and all other agreements and amendments thereto with respect to the Pre-Packaged Plan. *Id.*

On October 22, 2008, overruling various objections, the Bankruptcy Court issued an opinion pursuant to Bankruptcy Rule 9019 approving the Original Litigation Settlement Agreement, holding that it was "fairly easy to conclude" that the settlement "falls above the lowest point in the range of reasonableness" ("Litigation Settlement Opinion") [Dkt. No. 6941], Ex. 60 at 3. While reserving judgment on whether the Original Litigation Settlement Agreement would satisfy confirmation requirements, the Bankruptcy Court went on to state that the Original Litigation Settlement Agreement "sets the stage for proposing a confirmable plan because it eliminates the disparity of treatment of similarly situated creditors that had been created through the pre-petition settlements and the Claimant Agreement." *See id.* at 3.

As a result of various rulings from the Bankruptcy Court and the District Court, the Plan Proponents made certain modifications to the current Plan that differed from those terms outlined in the Original Litigation Settlement Agreement. Feist Decl. ¶ 66. As a result of these changes and others, the Asbestos

80

Claimants' Committee requested that the parties amend the Original Litigation Settlement Agreement to account for such changes. *Id.* The First Amendment, however, does not alter the material terms of the Original Litigation Settlement Agreement, which are reflected in Section 5.14 of the Plan. *Id.*

The parties circulated a First Amendment to the Original Litigation Settlement Agreement dated October 22, 2009 for approval (the "First Amendment"). Feist Decl. ¶ 67; Ex. 61. The First Amendment was accepted by the Debtors, the Bondholders' Committee, the Futures Representative, the Asbestos Claimants Committee, Claimants' Counsel and the Collateral Trustee, and counsel representing 84% of all parties who entered into Pre-Petition Settlement Agreements with Congoleum. Feist Decl. ¶ 67.

The Plan Proponents continue to believe that the Original Settlement Agreement, as amended by the First Amendment (collectively, the "Litigation Settlement Agreement"), is fair, reasonable, and in the overwhelmingly best interests of these estates. Feist Decl. ¶ 68. Through the negotiation of the Litigation Settlement Agreement, the Debtors and the Bondholders' Committee have evaluated the merits of the Avoidance Actions, the relative costs and benefits associated with the prosecution of such actions, and the potential outcomes from such litigation. *Id.* The Debtors and the Bondholders' Committee have concluded that the benefits of the Litigation Settlement Agreement substantially outweigh the

81

potential costs, risks, distractions and delay in connection with prosecuting the Avoidance Actions. *Id.*

Moreover, as observed by the Bankruptcy Court in its approval of the Original Litigation Settlement Agreement, the Litigation Settlement Agreement eliminates one of the biggest stumbling blocks to confirmation that the Debtors had faced—namely, the disparity of treatment between present and future asbestos claimants, and those claimants who were parties to Pre-Petition Settlement Agreements or the Claimant Agreement. By consensually eliminating the Pre-Petition Settlement Agreements and the Claimant Agreement, the Litigation Settlement Agreement allows for confirmation of the Plan and for the equal treatment of all holders of Asbestos Personal Injury Claims by a Plan Trust funded by approximately $235 million in insurance settlements and 50.1% of the equity of Reorganized Congoleum.

As the evidence proffered in connection with the Confirmation Hearing will demonstrate, the Litigation Settlement Agreement, as amended, is clearly above "the lowest point in the range of reasonableness" and, therefore, Section 5.14 of the Plan should be approved pursuant to § 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019. *See Jasmine*, 258 B.R. at 123; *Martin*, 91 F.3d at 393.

82

**B.     The Intercompany Settlement Should be Approved**

The Intercompany Settlement sets forth the new operational relationship between Reorganized Congoleum and ABI, Congoleum's parent company.  The Intercompany Settlement provides that, on the Effective Date of the Plan, all of ABI's claims against the Debtors, estimated at $1.8 million (*see* Disclosure Statement § 9.1(h)), shall be deemed disallowed, and all Intercompany Agreements between ABI and Congoleum shall be deemed rejected.[11]  The Intercompany Settlement also provides for consensual releases with respect to intercompany causes of action between ABI and Congoleum, but such releases will not affect rights to payment of up to $2 million based on Unpaid Intercompany Amounts arising from ABI and Congoleum's ordinary course of business.  In exchange, the parties shall enter into and effectuate the New ABI Agreement (Exhibit I to the Plan), which shall govern the relationship between ABI and Reorganized Congoleum upon the Effective Date.  Pursuant to the Intercompany Settlement and New ABI Agreement, ABI will provide Reorganized Congoleum with senior management personnel.  The terms of the New ABI Agreement are mutually agreeable to the Debtors, the Bondholders' Committee, the Asbestos Claimants'

---

[11] Notwithstanding the foregoing, the Intercompany Settlement provides that the ABI Parties Canada License Agreement, as amended pursuant to the Intercompany Settlement, shall be deemed to have been assumed by Reorganized Congoleum on the Effective Date.

83

Committee, the Futures Representative and ABI. *See* Plan § 1.2 (definition of New ABI Agreement).

The Debtors submit that the Intercompany Settlement is fair, reasonable, and in the best interests of these estates. Feist Decl. ¶ 87. The Plan Proponents have evaluated the merits of the causes of action between Congoleum and ABI, if any, the relative costs and benefits associated with the prosecution and defense of such actions, and the potential outcomes from such litigation. *Id.* The Plan Proponents have concluded that the benefits of the Intercompany Settlement substantially outweigh the potential costs, risks, distractions and delay in connection with prosecuting these potential causes of action, if any. *Id.* Specifically, the Plan Proponents have concluded that it is much more advantageous to the estates that the Intercompany Settlement be approved and that Reorganized Congoleum continue a beneficial operational relationship with ABI, rather than pursue inchoate causes of action. *Id.*

The Debtors submit that both the Intercompany Settlement and the New ABI Agreement are vital to the future success of Reorganized Congoleum. Feist Decl. ¶ 88. Reorganized Congoleum will benefit from ABI's ongoing contributions of senior management employees in accordance with the Intercompany Settlement and the New ABI Agreement. *Id.* In addition, the Debtors believe that Reorganized Congoleum's continuing commercial relationships with ABI under

84

the New ABI Agreement will be important to Reorganized Congoleum's success, especially given Congoleum's existing customer base and suppliers.  *Id.*

Accordingly, as the evidence proffered in connection with the Confirmation Hearing will demonstrate, the Intercompany Settlement set forth in Section 5.17 of the Plan is above "the lowest point in the range of reasonableness" and should be approved pursuant to § 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019.  *See Jasmine*, 258 B.R. at 123; *Martin*, 91 F.3d at 393.

## VII.  THE PLAN'S RELEASE, EXCULPATION AND RELATED PROVISIONS ARE REASONABLE AND COMPLY WITH APPLICABLE LAW

Article 11 of the Plan provides for certain injunctions, releases, and an exculpation for the Plan Proponents.  *See* Plan §§ 11.1 and 11.4 (providing for the Debtors' fresh-start discharge); § 11.2 (exculpation of Plan Proponents for acts taken in connection with plan formulation); § 11.3 (releases by holders of Plan Trust Asbestos Claims who receive payment from Plan Trust); § 11.6 (Asbestos Channeling Injunction);[12] and § 11.11 (Anti-Suit Injunction).[13]  No party in interest has objected to any of the injunctions, releases and exculpations provided for in the

---

[12] *See supra* at Part III for a discussion of the Asbestos Channeling Injunction.

[13] *See supra* at Part IV for a discussion of the Anti-Suit Injunction.

500522999v5

Plan.[14]  In addition, courts in the Third Circuit have routinely upheld similar

provisions in other asbestos bankruptcies.  *See*, *e.g.*, *G-1 Holdings*, 420 B.R. at

282; *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 170 (D. Del. 2006).  As the

evidence proffered in connection with the Confirmation Hearing will demonstrate,

the injunctions, releases and exculpation provided for in the Plan are fair,

reasonable and proper and should be approved.  *See G-1 Holdings*, 420 B.R. at

282; *Armstrong World Indus.*, 348 B.R. at 170.

## A.    The Plan's Discharge and the Discharge Injunction Should Be Approved

Section 11.1 of the Plan provides that, pursuant to § 1141(d) of the

Bankruptcy Code, the Debtors and Reorganized Congoleum will be discharged

"from any and all Claims of any nature whatsoever and Demands."  In addition,

Section 11.4 of the Plan provides for a discharge injunction "prohibiting and

---

[14] The U.S. Trustee and others objected to the scope of the exculpation and releases
provisions in certain prior plans.  With respect to the Joint Plan in particular, the
Bankruptcy Court determined that the Joint Plan's release of non-debtor third
parties was not consistent with Third Circuit precedent.  *See* Joint Plan Opinion,
Ex. 55 at 10-11.  In addition, the Bankruptcy Court stated that the exculpation
clause provided for in the Joint Plan could be problematic, but determined that
the issue was not appropriate for summary judgment.  *See id.* at 14-15.  In order
to address the Bankruptcy Court's concerns, the Plan Proponents substantially
modified the release and exculpation provisions in the current Plan.  As set forth
in the new Section 11.5, no third party releases are being granted pursuant to the
Plan, other than those specifically permitted under §§ 524(g) and 105(a) of the
Bankruptcy Code.  No party has objected to the revised release and exculpation
provisions in the current Plan.

enjoining" causes of action against the Debtors and Reorganized Congoleum pursuant to §§ 105, 524(g) and 1141 of the Bankruptcy Code.[15]

Sections 11.1 and 11.4 of the Plan are customary provisions that do nothing more than re-state and implement the fresh-start discharge of liability that all Chapter 11 debtors receive upon confirmation of a plan of reorganization. Section 1141(d)(1)(A) of the Bankruptcy Code provides: "[e]xcept as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan discharges the debtor from any debt that arose before the date of such confirmation . . . ." 11 U.S.C. § 1141(d)(1)(A). *See also* 11 U.S.C. §§ 524(a)(2), (3). To the extent that the Plan Proponents otherwise satisfy the requirements for confirmation under §§ 1129 and 524(g) of the Bankruptcy Code, the Plan Proponents submit that the discharge and injunction provided in Sections 11.1 and 11.4 of the Plan are appropriate and should be approved.

### B.   The Plan's Exculpation Provision Should be Approved

Section 11.2 of the Plan (the "Exculpation Provision") is a customary and standard provision in Chapter 11 plans. It limits the liability of certain parties—the Debtors, the official court-appointed committees, and their respective Representatives—for any acts after the Petition Date related to the negotiation of

---

[15] There are certain exceptions from the discharge injunction expressly provided in the Plan, including claims against the Debtors under Environmental Laws. *See* Plan § 11.9.

the Plan or any prior plan, or the pursuit of confirmation of the Plan, or any other prior plan.  *See* Plan § 11.2.  As is customary in substantial commercial Chapter 11 cases of this nature and complexity, the Exculpation Provision relieves the Plan Proponents from exposure to legal liability for their conduct during or in connection with the Debtors' reorganization proceedings, provided, however, that no party is exculpated for gross negligence, fraud or willful misconduct.  In addition, such exculpation only applies to the officers and directors of the Debtors serving on or after the Petition Date."  *See* Plan § 11.2.  Exculpation provisions similar to Section 11.2 of the Plan are regularly approved in this Circuit as fair, reasonable, and equitable.  *See*, *e.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 245-47 (3d Cir. 2000) (*see infra* n.16 for text); *G-1 Holdings*, 420 B.R. at 282 (Ex. 71); *In re Owens Corning*, No. 00-03837 (Bankr. D. Del. Sept. 26, 2006) [Dkt. Nos. 19366], Ex. 79; *In re Armstrong World Indus.*, 348 B.R. at 170 (Ex. 75).

The Exculpation Provision falls squarely within the scope of the exculpation provision that was approved by the Third Circuit in *PWS Holding Corp.*, 228 F.3d at 245-47.  In that case, the Third Circuit approved an exculpation and limitation of liability clause that is almost identical to the Exculpation Provision contained in

88

Section 11.2 of the Plan.[16]  *PWS Holding*, 228 F.3d at 245-47.  In *PWS Holding*,

the Third Circuit approved the exculpation clause at issue, stating that such "a

commonplace provision in Chapter 11 plans, does not affect the liability of these

parties, but rather states the standard of liability under the Code, and thus does not

come within the meaning of § 524(e)."  *Id.* at 245.  The Third Circuit noted that §

1103 of the Bankruptcy Code, which grants to the official committees broad

authority to formulate a plan and perform "such other services as are in the interest

of those represented,"  11 U.S.C. § 1103(c), "has been interpreted to imply both a

fiduciary duty to committee constituents and a limited grant of immunity to

committee members."  *Id.* at 246.  The Court further noted that "committee

members and the debtor are entitled to retain professional services to assist in the

---

[16] Paragraph 58 of PWS Holding's plan of reorganization specifically provided:
      [n]one of the Debtors, the Reorganized Debtors, New Bruno's, the
      Creditor Representative, the Committee or any of their respective
      members, officers, directors, employees, advisors, professionals or agents
      shall have or incur any liability to any holder of a Claim or Equity
      Interest for any act or omission in connection with, related to, or arising
      out of, the Chapter 11 Cases, the pursuit of confirmation of the Plan, the
      consummation of the Plan or the Administration of the Plan or the
      property to be distributed under the Plan, except for willful misconduct or
      gross negligence, and, in all respects, the Debtors, the Reorganized
      Debtors, New Bruno's, the Creditor Representative, the Committee and
      each of their respective members, officers, directors, employees,
      advisors, professionals and agents shall be entitled to rely upon the
      advice of counsel with respect to their duties and responsibilities under
      the plan.

Ex. 83 at 246.

reorganization" and that this immunity covers such parties "for actions within the scope of their duties." *Id.*; *see also United Artists Theatre Co. v. Walton*, 315 F.3d at 231 ("[T]he most that Delaware law requires of directors, though they are fiduciaries, is that they not be grossly negligent."). Thus, the *PWS Holding* court determined that the exculpation clause was appropriate. *PWS Holding*, 228 F.3d at 247.

The Plan Proponents submit that the Exculpation Clause provided in Section 11.2 of the Plan is substantially similar to provisions approved in other cases and complies fully with applicable Third Circuit law. Accordingly, consistent with the Third Circuit's rationale in *PWS Holding*, the Plan's Exculpation Clause should be approved.

### C. The Plan's Release of Holders of Plan Trust Asbestos Claims Should Be Approved

Section 11.3 of the Plan provides that any asbestos claimant that receives a payment from the Plan Trust shall be deemed to have unconditionally released the Plan Trust and each Settling Asbestos Insurance Company from any liability with respect to such party's asbestos claims. Plan § 11.3. Consensual releases of creditors' claims against non-debtor parties under a debtor's plan of reorganization are permissible. *See Continental Airlines*, 203 F.3d at 211; *see also In re Specialty Equip. Cos.*, 3 F.3d 1043, 1047 (7th Cir. 1993) ("[C]ourts have found releases that

90

are consensual and non-coercive to be in accordance with the strictures of the

Bankruptcy Code.").

A release is considered consensual if the releasing party affirmatively

consents to the release, either by settlement or contract, or if the affected creditor

votes in favor of the debtor's plan of reorganization. *See*, *e.g.*, *In re Arrowmill*

*Dev. Corp.*, 211 B.R. 497, 506-07 (Bankr. D.N.J. 1997) ("Where the creditor

consents to the release, and presumably receives consideration in exchange for that

agreement, it has not been forced by virtue of the discharge provisions of the code

. . . . [A]s the settlements arise by agreement and not by operation of law, they do

not run afoul of § 524(e)."); *In re Coram Healthcare Corp.*, 315 B.R. 321, 336

(Bankr. D. Del. 2004) (approving consensual releases provided for in a plan " to

the extent creditors or shareholders voted in favor of [the plan], which provides for

the release of claims"); *Zenith Elecs.*, 241 B.R. at 111-12 (finding that releases do

not run afoul of the Bankruptcy Code where the released parties affirmatively

accept the plan).

In this case, the release in Section 11.3 should be treated as releases

provided in any other settlement or contract.  If an asbestos claimant receives a

payment from the Plan Trust, such claimant will not be permitted to initiate

litigation against the Plan Trust or a Settling Asbestos Insurance Company seeking

a second recovery on that party's claim.  To the extent that an asbestos claimant

does not accept a payment from the Plan Trust, such claimant will retain whatever claim that he or she may have, subject to the Debtors' discharge of liability under §§ 1141 and 524(g) of the Bankruptcy Code.  Thus, the only way in which the release set forth in Section 11.3 will take effect is if an asbestos creditor specifically consents to it.  Accordingly, because the releases contained in Section 11.3 of the Plan are purely consensual, the Plan Proponents submit that Section 11.3 of the Plan is fair, reasonable, and should be approved pursuant to Bankruptcy Code §§ 1123(b)(6) and 105(a).  *See*, *e.g.*, *Arrowmill Dev. Corp.*, 211 B.R. at 506-07.

## VIII.  OBJECTIONS OF CERTAIN CLAIMANTS WHO WERE PARTIES TO EITHER PRE-PETITION SETTLEMENT AGREEMENTS OR THE CLAIMANT AGREEMENT SHOULD BE OVERRULED

The Debtors received a final objection to confirmation of the Plan from David C. Thompson, P.C. ("Thompson").  *See* Thompson Objection, Ex. 23.  The Shein Law Center, Ltd. ( "Shein") filed its Preliminary Objection to confirmation (Ex. 21), but did not file a final objection as required by the Pre-Trial Order (Ex. 29).  As a result, the Plan Proponents request that any objection asserted by Shein be overruled as untimely.  In any event, the Thompson Objection and the Shein Preliminary Objection (collectively, the "Objections") are groundless, devoid of

any legal merit and contrary to the law of these Reorganization Cases.  As a result, the Objections should be overruled.[17]

Thompson and Shein principally object to the Plan's classification of their clients' claims in Class 7 (Asbestos Personal Injury Claims) with other similarly situated asbestos claimants.  Thompson Objection, Ex. 23 at 11-15;[18] Shein Preliminary Objection, Ex. 21 at 2-3.  Pursuant to Section 2.3(g) of the Plan, Class 7 (Asbestos Personal Injury Claims) includes all claims with respect to the 131 claimants that entered into Pre-Petition Settlement Agreements, the approximately 79,000 claimants that participated in the Claimant Agreement, and all other present holders of Asbestos Personal Injury Claims.  *See* Plan § 2.3(g).  Thompson and

---

[17] In addition to the Thompson Objection, Thompson also served the Plan Proponents with a "Pre-Trial Brief" on May 19, 2010 (the "Thompson Brief"). The Thompson Brief echoes several of the arguments set forth in the Thompson Objection and also requests that this Court overrule its January 2010 decision authorizing the Debtors to amend the Avoidance Actions to add the Thompson Claimants as defendants.  *See* Opinion, dated January 21, 2010, *In re Congoleum Corp.*, No. 09-04371 (D.N.J) [Dkt. No. 296] ("Reconsideration Decision"), Ex. 44.  Thompson did not appeal or seek any other relief with respect to the Reconsideration Decision and his request to overturn that decision is not an appropriate objection to Plan confirmation and should not be addressed.  As discussed herein, it is the law of the case that the Thompson Claimants are similarly situated with all other holders of Asbestos Personal Injury Claims, and therefore the classification of the Thompson Claimants in Class 7 (Asbestos Personal Injury Claims) is fair and appropriate.  Whether or not the Thompson Claimants are defendants in the Avoidance Actions, they are holders of Asbestos Personal Injury Claims and properly classified in Class 7 of the Plan. Accordingly, any objections to confirmation of the Plan set forth in the Thompson Brief should be overruled.

[18] The Plan Proponents found the Thompson Objection difficult to comprehend and have tried their best to summarize it.

93

Shein argue that because certain of their clients entered into Pre-Petition Settlement Agreements or participated in the Claimant Agreement, such claimants have contract claims against Congoleum that cannot be classified in Class 7 (Asbestos Personal Injury Claims).  Shein also argues that because certain of his clients received damages verdicts (but not liability verdicts or judgments) with respect to their asbestos claims against Congoleum, such claims are further precluded from classification in Class 7 (Asbestos Personal Injury Claims).

It is the law of the case that the Thompson Claimants, the Shein Claimants and all other holders of Asbestos Personal Injury Claims are "substantially similar" and should be classified in a single class.  *See In re Congoleum Corp.*, No. 03-51524, 2007 WL 2177680, at *2 (Bankr. D.N.J. July 27, 2007), Ex. 51 ("July 2007 Objection Decision") (stating that "the Court regards all pre-judgment asbestos claims as similarly situated").  *See also* Opinion Regarding Joint Plan, dated June 5, 2008, *In re Congoleum Corp.*, No. 03-51524 (Bankr. D.N.J.) [Dkt No. 6575] ("Joint Plan Opinion"), Ex. 55 at 10 ("The [parties that settled pursuant to the Pre-Petition Settlement Agreement and the Claimant Agreement] are not dissimilar from other asbestos claimants simply because their claims were liquidated through inchoate pre-petition settlement agreements.").  Moreover, neither Thompson nor Shein have been able to cite a single case or authority to support their position, nor do they complain that the Bankruptcy Court's prior rulings are incorrect.

94

The Plan has received the overwhelming support of all members of Class 7 (Asbestos Personal Injury Claims), including other similarly classified claimants that either entered into Pre-Petition Settlement Agreements or participated in the Claimant Agreement.  *See* Ballot Certification, Ex. 17 ¶¶ 23 and 24.  Pursuant to the Bankruptcy Code, a class vote binds dissenting members of a class.  *See* 11 U.S.C. § 1126(c) (providing a creditor class accepts a plan if at least two-thirds in amount and more than one-half in number vote in favor of a plan, counting only those creditors that actually vote); 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb) (requiring a super-majority of 75% approval with respect to § 524(g) plans).  Thompson and Shein fail to present any legally supportable argument as to why their clients should not be bound by the overwhelming class vote in support of confirmation of the Plan.  Accordingly, for the reasons set forth herein, the Thompson Objection and Shein Preliminary Objection should be overruled.

## A.    Background of Settlements with the Shein and Thompson Claimants

As discussed in the Feist Declaration, prior to the Petition Date, Congoleum faced a situation where its primary insurers had claimed exhaustion of coverage, its excess insurers refused to provide coverage and were litigating against the company in the Coverage Action, and Congoleum could not afford to pay its asbestos-related costs without prompt reimbursement from its excess insurers. Feist Decl. ¶¶ 16, 21.  As a result, in order to conserve needed cash, Congoleum

95

sought to postpone settlements or, when necessary, to settle pending asbestos cases for non-cash consideration in the form of assignments of future insurance proceeds, whenever possible.  Feist Decl. ¶ 22.  In late 2002 and early 2003, Congoleum settled 131 trial-listed cases in the tort system for cash, promises to pay and/or an assignment of insurance rights (the "Pre-Petition Settlement Agreements").  *Id.*  All claims were settled based on Congoleum's understanding that these cases had upcoming trial dates or, in a few cases, were settled together with other cases that had upcoming trial dates.  *Id.*

Shein asserts its objection on behalf of four clients—Mr. Weinert , Mr. Buckley, Mr. Eck and Mr. Marsilio (collectively, the "Shein Claimants")—that had filed complaints against Congoleum in 2002 and 2003 (the "Shein Complaints").  Feist Decl. ¶ 23; Ex. 36.  In November 2002, two of the Shein Claimants, Mr. Eck and Mr. Marsilio, had obtained damages verdicts in the amount of $3,790,000 and $4,828,000, respectively.  Feist Decl. ¶ 23.  Both of these cases were tried to a jury in a reverse bifurcated fashion, with damages being tried in phase I and with liability determined in phase II.  *Id.*  The Eck case was settled for $275,000 and the Marsilio case was settled for $200,000.  *Id.*  Both settlements were reached after the damages verdicts, but before the liability phase of the trial had commenced.  *Id.*

At the time the Weinert case was set for trial on March 10, 2003, the Eck and Marsilio settlements had not been paid.  Feist Decl. ¶ 24.  Congoleum

96

attempted to negotiate a settlement of the Weinert claim based on an assignment of insurance proceeds and, in connection with these settlement discussions, Shein requested payment of the Eck and Marsilio settlements. *Id.* Shein agreed to settle Weinert based on an assignment of insurance proceeds and agreed to accept an assignment of insurance proceeds on the Eck and Marsilio claims in lieu of the prior agreement for a cash payment. *Id.* Shein also requested that a settlement of the Buckley case, which had a trial date of May 5, 2003, be included with the settlement of the Weinert cases. *Id.* The Buckley case was settled for $125,000 and the Weinert case was settled for $200,000. *Id.* On or about March 11, 2003, Congoleum reached an agreement with the Shein Claimants resolving their asbestos personal injury causes of action for the assignment of future insurance proceeds (the "Shein Settlement"). Feist Decl. ¶ 24; Ex. 37. The Shein Settlement constitutes four of Congoleum's 131 Pre-Petition Settlement Agreements.

At the same time that Congoleum had been discussing the settlements with Shein (on or around March 2003), Congoleum had been negotiating a global claimant settlement with asbestos claimants' counsel, primarily Joe Rice and Perry Weitz. Feist Decl. ¶ 29. On April 10, 2003, one month after the Shein Settlement was executed, the global claimant settlement was memorialized in the Claimant Agreement, the Security Agreement and the Collateral Trust Agreement. *Id.*

Approximately 79,000 asbestos personal injury claims were settled under the terms of the Claimant Agreement.  Feist Decl. ¶ 31.

Fourteen claimants represented by Thompson (the "<u>Thompson Claimants</u>") participated with approximately 79,000 other asbestos claimants in the Claimant Agreement, which, along with the Security Agreement and the Collateral Trust Agreement formed the basis of Congoleum's pre-packaged plan of reorganization (the "<u>Pre-Packaged Plan</u>").  Feist Decl. ¶ 32.  As was customary in asbestos reorganizations at the time, the Pre-Packaged Plan provided different treatment for claimants that settled pursuant to Pre-Petition Settlement Agreements, claimants that settled pursuant to the Claimant Agreement, and all other holders of Asbestos Personal Injury Claims or Demands.  *Id.*  The payment distribution system in the Pre-Packaged Plan was governed by the Collateral Trust Agreement.  *Id.*  The Collateral Trust Agreement provided that those claimants who entered Pre-Petition Settlement Agreement or who participated in the Claimant Agreement would be paid before other present and future asbestos claimants by the Collateral Trustee from insurance process and such claimants would not be governed by the Trust Distribution Procedures (TDP).  *Id.*

While the Debtors were soliciting acceptance of the Fourth Plan, dated as of November 12, 2004, which had modified the payment distribution structure of the Pre-Packaged Plan, the Third Circuit issued its decision in *Combustion*

*Engineering*, 391 F.3d 190 (3d Cir. 2005) (Ex. 45), which addressed, among other things, equality of distribution issues implicated by § 524(g) and the Bankruptcy Code generally.  Feist Decl. ¶ 37.[19]  Thereafter, a new plan was negotiated in an effort to accord the *Combustion Engineering* decision, only for such plan to be withdrawn when certain settled claimants represented by Weitz & Luxenburg withdrew their support.  Feist Decl. ¶ 39.  Extended mediation among the parties commencing in the summer of 2006 resulted in the consensual Tenth Plan, although such plan was held to be unconfirmable as a matter of law by the Bankruptcy Court in February 2007 based, in part, on its interpretation of *Combustion Engineering*.  Feist Decl. ¶¶ 44-46; *see In re Congoleum Corp.*, 362 B.R. at 182, Ex. 48.  Unable to reach a negotiated compromise after additional meditation, litigation was resumed in the Omnibus Avoidance Action by the Debtors to avoid the Pre-Petition Settlement Agreements, Claimant Agreement and related documents, which litigation was ongoing in 2008.  Feist Decl. ¶ 58; *see In*

---

[19] The Bankruptcy Court later described this decision as "shifting the ground" with respect to Congoleum's reorganization efforts.  *In re Congoleum Corp.*, No. 03-51524, 2009 WL 499262, at *7 (Bankr. D.N.J. Feb. 26, 2009), Ex. 62 (Amended Joint Plan Opinion).

500522999v5

*re Congoleum Corp.*, Adv. Pro. No. 05-06245, 2007 WL 4571086 (Bankr. D.N.J.

Dec. 28, 2007), Ex. 52 (Dec. 2007 Avoidance Decision).[20]

Ultimately, in August 2008, a global settlement including the Original

Litigation Settlement Agreement was agreed to among the Debtors, the

Bondholders' Committee, the Futures Representative, the Asbestos Claimants'

Committee, Claimants' Counsel and approximately 87% of the asbestos claimants

who were parties to the Pre-Petition Settlement Agreements.  Feist Decl. ¶ 60; *see*

Litigation Settlement Opinion, Ex. 60.  The Original Litigation Settlement

Agreement was subsequently amended to account for certain developments that

had occurred in the case.  Feist Decl.¶¶ 66-67; *see* Litigation Settlement

Agreement, as amended, Ex. 61.  As discussed more fully *supra* in Part VI,

approximately 84% of all parties to the Pre-Petition Settlement Agreements have

agreed to the Litigation Settlement Agreement, as amended, which has been

incorporated into Section 5.14 of the Plan.  However, both the Thompson

---

[20] The Omnibus Avoidance Action was successful in avoiding the security interests in insurance proceeds that were purportedly granted by the Pre-Petition Settlement Agreements and the Security Agreement.  Feist Decl. ¶ 48; *see* Memorandum Opinion Regarding Security Interests, dated July 9, 2007, *In re Congoleum Corp.*, Adv. Pro. No. 05-06245 (Bankr. D.N.J.) [Dkt. No. 147] Ex. 50 (Security Interest Avoidance Decision).  However, the Debtors' other claims to set aside the Claimant Agreement and other agreements relating to the Pre-Packaged Plan were not successful and became the subject of appeals that have been stayed.

Claimants and the Shein Claimants have not agreed to the settlement.  Feist Decl. ¶ 67.

The Plan specifically provides that *all* holders of Asbestos Personal Injury Claims—regardless of whether such claimants may have had a pre-petition settlement agreement—will be treated the same as required by § 524(g) of the Bankruptcy Code.  *See* Plan § 2.3(g) (providing that "Class 7 consists of all Asbestos Personal Injury Claims, including the unliquidated Asbestos Personal Injury Claims of Pre-Petition Settled Claimants").  Pursuant to the Plan, all parties to the Pre-Petition Settlement Agreements and the Claimant Agreement, in full satisfaction of their Asbestos Personal Injury Claims and any and all rights pursuant to any Pre-Petition Settlement Agreement, Claimant Agreement, Security Agreement, Collateral Trust Agreement, shall be restored to *status quo ante* as such claims existed at the time the Claimant initially submitted its Claim against Congoleum, and such Claim shall be resolved and paid pursuant to the Plan Trust Agreement and the TDP in the same manner as all other Asbestos Personal Injury Claims in Class 7.  *Id.*

## B.    Summary of Objections

Both Thompson and Shein argue that (i) the Pre-Petition Settlement Agreements and the Claimant Agreement are valid contractual agreements that the Plan cannot disturb; and (ii) as a result, the Thompson Claimants and the Shein

101

Claimants are not properly classified in Class 7 (Asbestos Personal Injury Claims) and are deprived of their supposed property rights.  Specifically, the Shein Preliminary Objection provides, in pertinent part, that:

> To the extent the [Plan] classifies the claims of the Shein Law Center Claimants as prepetition tort claims and/or as Asbestos Personal Injury Claims, and not as contract claims, and purports to channel these contract claims to the Asbestos Plan Trust, the Fourth Amended Plan does not properly classify and treat these contract claims and deprives the Shein Law Center Claimants of their contractual property rights without due process.

Shein Preliminary Objection, Ex. 21 at 2.  The Thompson Objection provides that: "The [Thompson Claimants] specifically object to [the Plan] to the extent that it [incorporates] a proposal . . . to invalidate the as-yet non-avoided status of the [Thompson Claimants' contract claims] . . . ."  Thompson Objection, Ex. 23 at 14. As set forth below, both the Thompson Objection and the Shein Preliminary Objection are without merit and should be overruled.  Moreover, because Shein has apparently abandoned its objections to confirmation of the Plan, the Shein Preliminary Objection also should be overruled as procedurally deficient.  *See*, *e.g.*, *American Family Enters.*, 256 B.R. at 429 (overruling various confirmation objections for being untimely, unclear or unintelligible).  However, as a precaution and for the avoidance of any doubt, the Plan Proponents address the Shein Preliminary Objection below.

102

**C.     The Plan Properly Classifies the Claims of the Thompson and Shein Claimants Pursuant to the Law of the Case**

Section 1122(a) of the Bankruptcy Code states that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  11 U.S.C. § 1122(a) (emphasis added).  Classification "is constrained by two straight-forward rules:  Dissimilar claims may not be classified together; similar claims may be classified separately only for a legitimate reason."  *In re Chateaugay Corp.*, 89 F.3d 942, 949 (2d Cir. 1996)).  Plan proponents, however, are permitted "considerable discretion to classify claims and interests according to the facts and circumstances of the case."  *Greate Bay Hotel & Casino*, 251 B.R. at 224 (quoting *Holywell*, 913 F.2d at 880).  Courts in the Third Circuit will uphold a plan's classification of claims and interests so long as there is a "reasonable basis" for the classification and such is "fair and reasonable."  *See*, *e.g.*, *ABB Lummus Global*, 2006 WL 2052409, at *13 (classifying asbestos personal injury claims separately from other general unsecured claims is fair and reasonable).

It is the law of this case that all holders of Asbestos Personal Injury Claims can be placed in a single class and that a § 524(g) plan mandates equal treatment among asbestos claimants whether they hold contract or tort claims.  *See* Joint Plan Opinion, Ex. 55 at 5 ("It is law of the case that all pre-judgment creditors at the same disease level must be treated similarly . . . .").  It is "fair and reasonable" to

103

classify all holders of Asbestos Personal Injury Claims in the same class because, as the Bankruptcy Court made clear, all members of Class 7 (Asbestos Personal Injury Claims) have claims of the same legal character, namely "personal injury claims based on alleged exposure to asbestos contained in Congoleum products." *In re Congoleum Corp.*, 362 B.R. at 188, Ex. 48 (holding that regardless of whether claimants entered into pre-petition settlements with Congoleum, "[t]he legal character of these claims is the same for those cases that were on the eve of trial and those that may arise in the future").  As a result, the Plan's classification of the Thompson and Shein Claimants in Class 7 (Asbestos Personal Injury Claims) is proper notwithstanding the alleged settlement claims possessed by only certain members of the Class.  *See Armstrong World Indus.*, 348 B.R. at 159-60 (District Court's Findings of Fact and Conclusions of Law:  "Because all Asbestos Personal Injury Claims in Class 7 (including Indirect PI Trust Claims) relate, directly or indirectly, to [the debtor's] liability for asbestos-related personal injury and wrongful death claims, *whether arising under tort law* (as is the case with direct Asbestos Personal Injury Claims and may be the case with Indirect PI Trust Claims) *or under contract* (as may be the case with certain direct Asbestos Personal Injury Claims and certain Indirect PI Trust Claims), a reasonable basis exists for the classification of the Asbestos Personal Injury Claims together in a single class.") (emphasis added).  *See also In re Winn-Dixie Stores, Inc.*, 356 B.R.

104

239, 247-51 (Bankr. M.D. Fla. 2006) (approving similar classification and treatment of landlord creditors despite the fact that only certain of such creditors possessed guarantee claims).

Moreover, the Plan's classification is "fair and reasonable" because the Bankruptcy Court has held that the "separate classification [would] render the Plan unconfirmable on its face" and would violate the equality of treatment requirements of § 524(g). *See In re Congoleum Corp.*, 362 B.R. at 182. Section 524(g) requires that an asbestos trust treat "present claims and future demands that involve similar claims in substantially the same manner." 11 U.S.C. § 524(g)(2)(B)(ii)(V). As the Bankruptcy Court has made clear, the fact that certain claimants entered into Pre-Petition Settlement Agreements (as did the Shein Claimants) or entered into the Claimant Agreement (as did the Thompson Claimants), does not entitle such claimants to different treatment under the Bankruptcy Code. *See In re Congoleum Corp.*, 362 B.R. at 182-83.

In a ruling in the Omnibus Avoidance Action, the Bankruptcy Court took another opportunity to reiterate its prior holding regarding the nature of the claims held pursuant to the Pre-Petition Settlement Agreement and the Claimant Agreement. *See* July 2007 Objection Decision, Ex. 51. In the July 2007 Objection Decision, the Bankruptcy Court stated:

> As far as the Court is aware, none of the [claimants with Pre-Petition Settlement Agreements] in this case had obtained a final judgment as

105

to both liability and damages.  Certain objectors emphasize the fact that some claimants had pre-petition damages verdicts in their favor; however, *a damages verdict without a finding of liability is meaningless*. While it may prove a useful tool for the parties in positioning themselves for settlement, it is an inchoate ruling that only gains any legal significance upon a finding of liability.

July 2007 Objection Decision, Ex. 51 at 2.  The Bankruptcy Court also stated that:

"*it should be clear that the Court regards all pre-judgment asbestos claims as similarly situated.  The only proper criterion for differentiating between the pre-judgment claims is their disease level*."  *Id.* (emphasis added).

In yet another ruling, the Bankruptcy Court held that all asbestos personal injury claimants must be classified within a single class and must receive equal treatment, regardless of whether such claimants were parties to Pre-Petition Settlement Agreements.  Joint Plan Opinion, Ex. 55 at 10.  In the Joint Plan, proposed in 2008, the 131 claimants who had executed individual Pre-Petition Settlement Agreements were afforded certain "litigation rights" that were not given to other asbestos claimants.  Feist Decl. ¶ 57.  The Bankruptcy Court ruled that this provision rendered the Joint Plan unconfirmable "because it relies on the pre-petition liquidation of the [claims settled pursuant to the Pre-Petition Settlement Agreements and the Claimant Agreement] as a basis to treat them differently from other asbestos claimants.  Such a distinction is in direct contravention of this Court's prior rulings and the precepts of § 524(g)."  Joint Plan Opinion, Ex. 55 at 4.  The Bankruptcy Court stated further that "[t]he [parties that settled pursuant to

106

the Pre-Petition Settlement Agreement and the Claimant Agreement] are not dissimilar from other asbestos claimants simply because their claims were liquidated through inchoate pre-petition settlement agreements." *Id.* at 10.

The Thompson and Shein Claimants are now attempting to re-litigate that which has already been decided by the Bankruptcy Court on at least three separate occasions. As set forth above, it is unequivocally law of this case that all holders of Asbestos Personal Injury Claims are similarly situated pursuant to § 1122(a) of the Bankruptcy Code and should be classified in a single class. *See* Joint Plan Opinion, Ex. 55 at 5 ("It is law of the case that all pre-judgment creditors at the same disease level must be treated similarly . . . ."). Accordingly, the Objections should be overruled. *See*, *e.g.*, *Arizona v. California*, 460 U.S. 605, 618 (1983) ("The doctrine [of the law of the case] posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."); *Eastern Pilots Merger Comm. v. Continental Airlines, Inc. (In re Continental Airlines, Inc.)*, 279 F.3d 226, 232-33 (3d Cir. 2002) (confirmation order which reduced pilots' seniority rights to money judgment which was discharged in the bankruptcy was law of the case); *AL Tech Specialty Steel Corp. v. Allegheny Int'l Credit Corp.*, 104 F.3d 601, 605-06 (3d Cir. 1997) (holding that it would be inappropriate for the court to reexamine the validity of a claim when earlier decision necessarily decided that claim was valid).

107

### D.   The Thompson Claimants and the Shein Claimants Have Been Bound by Class Vote to the Treatment in the Plan

The Bankruptcy Code provides that a plan of reorganization will bind dissenting members of a class of creditors, so long as such class is comprised of similarly situated claims and the plan is duly confirmed. *See* 7 *Collier* ¶ 1129.02 ("The entire thrust of chapter 11 is that a majority can bind a minority so long as members of the majority *and* minority are similarly situated."). *See also* 11 U.S.C. § 1126(c) (providing a creditor class accepts a plan if at least two-thirds in amount and more than one-half in number vote in favor of a plan, counting only those creditors that actually vote); 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb) (requiring a super-majority of 75% approval with respect to § 524(g) plans); 11 U.S.C. § 1123(a)(4) (a plan "shall provide the same treatment for each claim or interest of a particular class"). Without the ability to bind dissenting members, each member of every class would hold virtual veto power over any plan of reorganization, which would render the Chapter 11 process unworkable. The Bankruptcy Code rejects this approach. Instead, consensual confirmation refers to consent "by class of creditors." 7 *Collier* ¶ 1129.01. In other words, "a plan is said to be confirmed consensually if all classes of creditors vote in favor, even if some classes have dissenting creditors." *Id.*

In the present case, the Litigation Settlement Agreement, the centerpiece of the Plan, was negotiated by the Debtors, the Asbestos Claimants' Committee, the

108

Futures Representative and the Claimants' Counsel.  The Asbestos Claimants'

Committee, in particular, maintains a fiduciary duty to all of the present holders of

Asbestos Personal Injury Claims, including those claimants that entered into Pre-

Petition Settlement Agreements or the Claimant Agreement.  This is how the

Chapter 11 process is designed to work:  representatives of all major constituencies

negotiated openly to agree on framework pursuant to which all estate creditors

would have their claims resolved.  After years of litigation and substantial

negotiation, the Debtors and all of the official committees and representatives

appointed in these Reorganization Cases, along with Claimants' Counsel, agreed

that all holders of Asbestos Personal Injury Claims would be classified in a single

class, receive equal treatment and that no priority or preferential treatment would

be accorded the parties that entered into Pre-Petition Settlement Agreements or

participated in the Claimant Agreement, which agreements were executed in the

year prior to the Petition Date.

     Like all other holders of Asbestos Personal Injury Claims, the Thompson

and Shein Claimants were entitled to vote on the Plan.  They do not, however,

possess the power to veto confirmation; rather, they must abide by the consensus

vote of their Class.  Indeed, as the Bankruptcy Court has noted with respect to

certain contractual arguments asserted by Congoleum's insurers in these cases,

"[w]hile the Bankruptcy Code is not a license to trample on all non-debtors' rights,

109

instances are legion in which 'distinct and valuable' rights of non-debtors are lost or redefined in a bankruptcy case." *In re Congoleum Corp.*, No. 03-51524, 2008 WL 4186899, at \*9 (Bankr. D.N.J. Sept. 2, 2008), Ex. 58 (Supplemental Joint Plan Opinion).

Other bankruptcy courts have expressly rejected similar arguments. For example, in *Winn-Dixie*, the creditors' committee and the debtors agreed to a global settlement that would, among other things, resolve issues pertaining to a class of landlord claims. The settlement agreement was incorporated into the plan pursuant to § 1123(b)(3). *See Winn-Dixie Stores*, 356 B.R. at 245. Approximately 77% of the landlords within the class accepted the plan. *Id.* at 250. Certain dissenting landlords, however, objected to the settlement claiming that the debtors and the committee could not "settle away" their rights. *Id.* at 248. Noting that the settlement was negotiated by the creditors committee who had a fiduciary obligation to all of the unsecured creditors of the estate, the court held that "every affected creditor need not consent to a settlement for it to be binding on all creditors." *Id.* at 249. Because a majority of the landlords voted in favor of the plan, the court determined that the settlement agreement embodied in the class treatment for the landlord creditors was binding on the dissenting creditors. *Id.*

Similarly, in *In re USA Commercial Mortg. Co.*, No. 06-10725, 2007 WL 2571947 (D. Nev. Aug. 29, 2007), the debtor reached a settlement with the

110

majority of its direct lenders, which settlement was negotiated by a committee of direct lenders and included in a plan of reorganization. *Id.* at *2. The class of direct lenders voted in favor of the plan. *Id.* at *11. Dissenting lenders objected to confirmation arguing that their due process rights had been violated because an adversary proceeding against them had not been filed and the settlement agreed to by others could not become binding on them without their consent. *Id.* As an initial matter, the court summarily rejected the due process concerns because all parties received an opportunity to be heard with respect to the confirmation hearing. *Id.* (citing *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 984 (9th Cir. 1998)). The court also rejected the dissenting lenders' attempt to avoid their class's treatment finding that "[i]t is the class vote to accept the plan that binds even non-consenting creditors to claim treatment." *Id.* at *13.

Once a plan under Chapter 11 is confirmed, a creditor can no longer enforce its preconfirmation rights, but is limited to the rights granted in the plan. *See In re Monclava Care Ctr., Inc.*, 254 B.R. 167, 171 (Bankr. N.D. Ohio 2000), *rev'd on other grounds*, 266 B.R. 792 (N.D. Ohio 2001) ("A fundamental principle with regards to a confirmed Chapter 11 Plan, which is really nothing more than a new contract between the parties, is that all the prior obligations and rights of the parties subject to the plan are extinguished and replaced by the terms of the Plan."); 7 *Collier* ¶ 1129.01[1] ("In essence, a valid plan substitutes, in much the same way

111

as a common law novation would, the obligations as stated in the plan for all preconfirmation claims and interests."). *See also* 11 U.S.C. § 1141(d)(A) (confirmation of a plan "discharges the debtor from any debt that arose before the date of such confirmation."); *In re Montgomery Ward Holding Corp.*, 306 B.R. 489, 495 (Bankr. D. Del. 2004) ("The new indebtedness [pursuant to a confirmed plan] is in essence a new and binding contract between the debtor and the creditors."). Accordingly, the Objections regarding the treatment of the Thompson and Shein Claimants under the Plan should be overruled.

## E.   The Due Process Objections Are Without Merit and Should Be Overruled

Both Thompson and Shein have argued that they have been deprived of their contractual property rights without due process of law. *See* Thompson Objection at 12; Shein Preliminary Objection at 2. In general, "notice of the pendency of a hearing to consider confirmation of the plan is sufficient to satisfy due process requirements." *In re Longardner & Assocs., Inc.*, 855 F.2d 455, 465 (7th Cir. 1988). *See Elliot v. Kiesewetter*, 98 F.3d 47, 60 (3d Cir. 1994) (noting due process merely requires notice and an opportunity to be heard). *See also Combustion Eng'g*, 391 F.3d at 245 n.64 ("Minimal due process requirements extend to bankruptcy proceedings."). In the present case, both Shein and Thompson have had ample opportunity to raise objections and to be heard with respect to their objections to confirmation of the Plan and approval of the Litigation Settlement

112

Agreement, as amended.  Thompson has actively participated in these Chapter 11 cases and timely filed objections to the Plan.  Exs. 22, 23.  Shein also raised preliminary objections to the Plan (Ex. 21), although such objections apparently have been abandoned since Shein did not file a final objection as required by this Court's Pre-Trial Order (Ex. 29).  Because both Thompson and Shein have had an opportunity to file objections and be heard with respect to confirmation of the Plan, due process has been satisfied.

For each of the reasons set forth herein, the Plan Proponents respectfully request that this Court overrule the Thompson Objection and the Shein Preliminary Objection in their entirety.

## **CONCLUSION**

WHEREFORE, the Plan Proponents submit that (i) the Plan, as modified, fully satisfies all applicable requirements of the Bankruptcy Code and should be confirmed by the Court, (ii) all pending objections to confirmation should be overruled.  Accordingly, the Plan Proponents respectfully request that the Court enter an order confirming the Plan in substantially the same form as the proposed Confirmation Order and Findings of Fact and Conclusions of Law, and grant the Plan Proponents such other and further relief as this Court may deem just and proper.

500522999v5

Dated:  May 20, 2010        Respectfully submitted,

**OKIN, HOLLANDER & DeLUCA, L.L.P.**
/s/ *Gregory S. Kinoian*
One Parker Plaza
Fort Lee, New Jersey 07024
(201) 947-7500
Paul S. Hollander (PH-2681)
Gregory S. Kinoian (GK-7386)

and

**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1540 Broadway
New York, New York 10036
(212) 858-1000
Richard L. Epling (*pro hac vice* admission)
John F. Pritchard (*pro hac vice* admission)
Kerry A. Brennan (*pro hac vice* admission)
Erica E. Carrig
Brandon R. Johnson
Kent P. Woods

*Attorneys for Congoleum Corporation, et al.,
Debtors and Debtors-in-Possession*


**FORMAN HOLT ELIADES & RAVIN LLC**
/s/ *Stephen B. Ravin*
80 Route 4 East, Suite 290
Paramus, NJ 07652
Telephone: (201) 845-1000
Stephen B. Ravin, Esq. (SBR7074)

and

114

**ORRICK, HERRINGTON & SUTCLIFFE LLP**
Columbia Center
1152 15th Street, N.W.
Washington, DC 20005-1706
Telephone: (202) 339-8400
Jonathan P. Guy, Esq. (admitted *pro hac vice*)
Richard H. Wyron, Esq. (admitted *pro hac vice*)
Roger Frankel, Esq. (admitted *pro hac vice*)

*Counsel to R. Scott Williams,*
*Futures Representative*


**TEICH GROH**
*/s/ Michael A. Zindler*
691 State Highway 33
Trenton, NJ 08619
Michael A. Zindler, Esq. (MZ-0178)

and

**AKIN GUMP STRAUSS HAUER & FELD LLP**
133 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone:  202-887-4000
Facsimile:  202-872-1002
James R. Savin, Esq. (admitted *pro hac vice*)
Michele A. Roberts, Esq. (admitted *pro hac vice*)
David Dunn, Esq. (admitted *pro hac vice*)

One Bryant Park
New York, New York
Telephone:  212-872-1000
Facsimile:  202-872-1002
Michael S. Stamer, Esq. (MS-5900)

*Attorneys for the Official Committee of*
*Bondholders of Congoleum Corporation, et al.*

115

**GREENBAUM, ROWE, SMITH & DAVIS LLP**

*/s/ Nancy Isaacson*

75 Livingston Avenue
Roseland, New Jersey 07068
(973) 535-1600
Nancy Isaacson, Esq. (NI/1325)

**CAPLIN & DRYSDALE, CHTD.**

375 Park Avenue, 35th floor
New York, New York 10152-3500
(212) 319-7125
Elihu Inselbuch, Esq. (EI/2843)
Rita C. Tobin, Esq. (RCT/5413)

and

One Thomas Circle, N.W., Suite 1100
Washington, D.C. 20005
(202) 862-5000
Ronald E. Reinsel., Esq.
Kevin C. Maclay, Esq.

*Attorneys for Unsecured Asbestos Claimants' Committee*

116